Jessica T. Rosenberg
Edward E. Filusch
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Phone: (212) 506-1700
Facsimile: (212) 506-1800
jrosenberg@kasowitz.com
efilusch@kasowitz.com

Ariel D. Zion
Matthew J. Simmons
INSIGHT GLOBAL, LLC
4170 Ashford Dunwoody Road, NE
Suite 250
Atlanta, Georgia 30319
Phone: (404) 257-7900
Facsimile: (404) 257-1070
Ariel.Zion@insightglobal.com
Matt.Simmons@insightglobal.com
*Pro Hac Vice* Application Forthcoming

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INSIGHT GLOBAL, LLC,<br><br>       Plaintiff,<br><br>       -v-<br><br>DANIEL WENZEL, LUKE NORMAN, LAUREN SUTMAR, and BEACON HILL STAFFING GROUP, LLC<br><br>       Defendants. | Civil Action No.: 1:17-cv-8323<br><br>**INSIGHT GLOBAL, LLC'S COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES, AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Insight Global, LLC ("Insight Global" or the "Company"), by its attorneys

Kasowitz Benson Torres LLP, for its Complaint against Defendants Daniel Wenzel, Luke

Norman, Lauren Sutmar and Beacon Hill Staffing Group, LLC ("Beacon Hill"), alleges:

## PRELIMINARY STATEMENT

1.     This action arises out of a coordinated scheme by Defendant Beacon Hill, a national staffing services company, to unlawfully acquire trade secret and confidential information from its direct competitor, Plaintiff Insight Global through the unauthorized poaching of three former Insight Global employees in direct violation of those employees' post-employment restrictive covenants with Insight Global.

2.     In the weeks prior to their separation of employment with Insight Global, employees Daniel Wenzel ("Wenzel"), Luke Norman ("Norman"), and Lauren Sutmar ("Sutmar") (together the "Former Employees"), intentionally accessed and misappropriated numerous confidential documents and electronic files containing Insight Global's trade secrets for the sole purpose of providing those trade secrets to their new employer, Beacon Hill.

3.     While employed with Insight Global, the Company trusted the Former Employees with access to extensive confidential business information and trade secrets regarding Insight Global's business, services, customers and clients, pricing, strategies, and other confidential business, and/or financial information.  Amongst other confidential information in the highly-competitive staffing industry, the Former Employees gained intimate knowledge of the New York City market regarding the needs of Insight Global's clients and the availability of contractors to fill those needs, and the identity of Insight Global's key clients in the New York City area.  Through their employment at Insight Global, the Former Employees were privy to Insight Global's market research, information regarding key contacts at Insight Global's current and prospective clients that influenced the decisionmakers, clients' staffing needs and business preferences, and benefitted from the goodwill generated from Insight Global's relationship and investment in its clients.

4.      Because of the importance and competitiveness of client relationships and other trade secrets and confidential information in the staffing industry, Insight Global takes meaningful steps to protect its valued information, including having employees like the Former Employees, as a condition of employment, execute employment agreements containing several restrictions on their use and/or disclosure of Insight Global's trade secret information, as well as their conduct during and after employment with the Company.

5.      The Former Employees' employment with Insight Global ended on or around the following dates:  (i) Sutmar – March 6, 2017; (ii) Wenzel – July 10, 2017; and (iii) Norman – September 18, 2017.   In each case, almost immediately thereafter, and fully aware of the obligations contained in their respective employment agreements, each Former Employee began employment with Beacon Hill in its New York office in the same or similar position as those that they held at Insight Global.  The Former Employees' activities on behalf of Beacon Hill are in direct violation of multiple provisions of their agreements with Insight Global.

6.      Furthermore, upon information and belief, in the weeks prior to the end of their employment relationships with Insight Global, the Former Employees deliberately and knowingly misappropriated a number of documents and other information containing Insight Global trade secrets and are now using them to compete with the Company.  Such actions were both a breach of their employment agreements and a violation of federal and state trade secret laws.  Upon information and belief, the Former Employees continue to use Insight Global's misappropriated trade secrets to unlawfully compete with the Company on behalf of Beacon Hill, and will continue to do so and cause irreparable harm to Insight Global absent injunctive relief.

7.      Norman and Sutmar also signed separation agreements at the time of their departure from Insight Global.  Pursuant to these separation agreements, Norman and Sutmar reaffirmed their commitment to abide by the binding restrictive covenants in their respective

employment agreements in exchange for a severance payment to which they otherwise would not have been entitled.  However, Norman and Sutmar misappropriated highly confidential and trade secret information and, possibly, already had accepted positions with Beacon Hill at the time they executed the separation agreements.  Thus, Norman and Sutmar never intended to abide by either the restrictive covenants contained in their employment agreements or their reaffirmation of them in the separation agreements.  This constitutes fraudulent inducement of Insight Global, pure and simple.

8.      Beacon Hill, with full knowledge of the fact that the Former Employees were subject to employment agreements (and, likely, separation agreements) with Insight Global that prohibits them from engaging in certain competing activities, hired the Former Employees to engage in those very activities and, upon information and belief, conspired with the Former Employees to hide such facts from Insight Global.  Beacon Hill's tortious activities are in furtherance of an ongoing raid that Beacon Hill has launched against Insight Global to steal Insight Global's employees, clients, and confidential business information, playing out in multiple venues across the United States, which were actively being litigated at the time Beacon Hill hired each of the Former Employees.

**PARTIES**

9.      Plaintiff Insight Global is a limited liability company organized under the laws of the State of Delaware.  Insight Global is a citizen of the states of Delaware and Georgia.  Plaintiff's sole member is IG Staffing Holdings, LLC, whose sole member is IG Investments Holdings, LLC, whose sole member is Igloo Intermediate Holdings, Inc. ("IIH").  IIH is a Delaware corporation with its principal place of business in Atlanta, Georgia.  Insight Global's headquarters and principal place of business are in DeKalb County, Georgia, located at 4170 Ashford Dunwoody Road, Suite 250, Atlanta, Georgia 30319.   Insight Global also

maintains an office in New York City, New York, located at 250 Park Avenue, Suite 1500, New York, NY 10177 (the "New York Office").

10.     Wenzel is a natural person who, upon information and belief, resides and may be served with process at 250 W. 85th Street, Apartment 9H, New York, NY 10024.

11.     Norman is a natural person who, upon information and belief, resides and may be served with process at 205 E. 21st Street, Apartment 3D, New York, NY 10010.

12.     Sutmar is a natural person who, upon information and belief, resides and may be served with process at 100 Jane Street, Apartment 9E, New York, NY 10014.

13.     Beacon Hill is a limited liability company organized under the laws of the State of Massachusetts.  Its headquarters and principal place of business are located at 152 Bowdoin Street, Boston, Massachusetts 02108.  Beacon Hill maintains two offices in New York: 104 W. 40th Street, 8th Floor, New York, NY 10018; and 88 Pine Street, 22nd Floor, New York, NY 10005.  Beacon Hill may be served with process by serving its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207-2543.

## JURISDICTION AND VENUE

14.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Insight Global asserts federal claims under the DTSA.  The Court also has supplemental or pendant jurisdiction over the Company's remaining claims against Defendants, pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal question claims.   In addition, this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over the Former Employees under principles of specific and general jurisdiction, as they are citizens of New York.

16.     This Court has personal jurisdiction over Beacon Hill under principles of specific and general jurisdiction as Beacon Hill conducts significant business in the State of New York, operates two offices in this State – both of which are located in New York City – and has sufficient minimum contacts with the State of New York such that exercise of jurisdiction over Beacon Hill does not offend traditional notions of fair play and substantial justice.

17.     Venue in the Southern District of New York is appropriate under 28 U.S.C. § 1391, as a substantial part of the actions giving rise to the claims herein occurred in this District.

## FACTS GIVING RISE TO THE ACTION

### A.  Insight Global Conducts Business in a Highly-Competitive Industry, Relying On Its Confidential Information and Trade Secrets, Which it Takes Reasonable Steps to Protect

18.     Plaintiff Insight Global is a staffing services company with a focus in the information technology ("IT"), and accounting, finance and engineering ("AF&E") sectors. Insight Global provides its clients with both short- and long-term staffing in a broad range of IT and AF&E positions, and also provides direct placement services for permanent positions. Insight Global regularly provides staffing services to clients throughout the country, including in the New York City metropolitan area.

19.     The staffing industry is highly competitive, with thousands of companies competing for a finite number of clients.  Insight Global competes for both talent and clients with many other companies providing similar services in the marketplace.   Insight Global distinguishes itself through its investment in client relationships and training of its personnel, giving it a competitive advantage over the competition.  Of significance, in such a competitive market, Insight Global distinguishes itself in part through its deep relationships with an understanding of its customers and their needs.  These relationships and knowledge are derived

only after investment of substantial time and monetary resources of hundreds of thousands of dollars.

20.     Insight Global's business model is based upon providing extensive and specialized training and experience for its employees.  The Company typically hires employees with no prior experience in or knowledge of the staffing industry and provides them with a variety of confidential business and financial information to train them effectively to follow Insight Global's successful sales, marketing, and recruiting methods and strategies.  Insight Global devotes substantial amounts of time and expense to recruiting and training its employees to prepare them to advance in the Company and to succeed in building relationships with Insight Global's clients.

21.     Insight Global's New York Office is an open environment, meaning the office's sales manager, account managers, and recruiters work together in a single open room referred to as the sales floor, or the "pit."  To encourage open communication and exchange of information about sales leads, each account manager displays on a white board a list of leading sales prospects and staffing opportunities (referred to as "requisitions").   On any given day, requisitions posted usually include some staffing opportunities that are open to multiple staffing agencies, and some staffing opportunities to be filled exclusively by Insight Global.   The requisitions are then displayed in the pit, and the entire sales team, including the sales manager, account managers, and recruiters, meet regularly to discuss the sales prospects, goals, and strategies of each team member for that day.  These meetings are referred to as Priority Zone, or "P-Zone."  While this information is made available to authorized Insight Global employees, it is treated as highly confidential information and is not made available to persons outside the Company.

22.     Insight Global maintains certain other confidential records and reports regarding its business relationships with customers and vendors, many of which qualify as trade secrets. Insight Global's employees create and update "client sheets" for each customer.  Together, client sheets comprise an account book.  Account books contain confidential information concerning Insight Global's actual and prospective customers, including detailed information regarding the customer's IT systems, short- and long-term staffing needs, staffing preferences, and chain of command for hiring decisions.  The account book also contains contact information for customers' and clients' hiring managers and vendor managers and other personal information relating to such hiring managers.

23.     The information collected is only learned after significant efforts by Insight Global employees to develop relationships with such personnel.  The information contained in the account books is a central part of Insight Global's successful sales strategy to build lasting personal and professional relationships with its customers.  Account books are maintained online through Insight Global's proprietary IT system, with tiered user access to ensure that the information contained in the account books is available only to appropriate personnel – *i.e.*, current employees of Insight Global with a need to access such information.

24.     Insight Global employees maintain and update confidential spreadsheets called "call sheets" daily.  Call sheets contain sales leads and contact information.  Insight Global employees use these call sheets to generate their daily sales calls.  Each workday, call sheets are saved to the Insight Global network, the underlying information provided to their manager, and a paper copy filed in each employee's workspace.  No persons outside the company receive copies.

25.     Additionally, every employee in each office prepares and submits a weekly sales report, which is electronically circulated to employees in that office.  These reports contain

valuable recruiting and sales information, including details of key requisitions, client preferences, out of office client opportunities, and pricing and billing schemes.

26.     Because of Insight Global's collaborative environment, its employees are exposed to, and develop an intimate understanding of, the Company's business.  Employees know Insight Global's key existing customer relationships associated with their office, its sales strategy for developing and maintaining these business relationships, and the identities of the hiring managers and vendor managers who are Insight Global's primary customer contacts in their office.  Sharing this information on a confidential basis among the sales manager, account managers, and recruiters who work together in each office is essential to Insight Global's business model.

27.     Insight Global's success as a business is also substantially based upon its strong customer relationships and goodwill.  These relationships and goodwill have been developed through Insight Global's substantial investment in identifying and cultivating personal relationships with the human resources and management personnel (collectively "hiring managers") of Insight Global's customers, as well as the vendor managers hired by customers to determine which vendors, such as Insight Global, may provide staffing services to the customers. Insight Global's compilations of information about its customer accounts and vendor managers are highly valuable documents that Insight Global intentionally preserves as confidential.

28.     Insight Global must identify prospective customers that have staffing needs. Beyond identifying the company by name, Insight Global must, more importantly, identify the hiring manager(s) who has the authority to make the actual staffing decisions.  This is a challenging process, as companies are organized differently, and the title of an employee does not necessarily identify whether that person has hiring authority.  Insight Global and its competitors cannot merely consult a trade periodical or some other public document or source

for a list of names and contact information for the hiring managers of prospective customers. Instead, Insight Global spends months, if not longer, methodically working through its process to determine who at a prospective customer it should be contacting to sell its staffing services. In this process, Insight Global collects, analyzes, catalogues, and utilizes certain confidential client information to give the Company a competitive advantage in soliciting business from these hiring managers. Because this information is confidential and highly-valued, Insight Global secures this information on its protected network and its access-controlled offices.

29.     Insight Global must cultivate a relationship with the prospective customer hiring manager both to understand the customer's staffing needs and to develop trust. This requires sustained contact with the customer and engagement. Insight Global will spend hundreds of thousands of dollars and hundreds of hours of personnel time developing these relationships and earning customer goodwill.

30.     Insight Global has a legitimate business interest in protecting its (i) trade secrets; (ii) other valuable confidential business and financial information; (iii) relationships with its customers and clients; (iv) goodwill in the IT and AF&E industries at large and in the New York City area in particular; and (v) its investment in the specialized training of its employees.

## B.  The Former Employees' Employment with Insight Global

### a.  Daniel Wenzel

31.     Wenzel began his employment with Insight Global on or about June 17, 2013, and worked for the Company through July 10, 2017. During this time, Wenzel operated out of Insight Global's New York and Philadelphia offices. Prior to his employment with Insight Global, Wenzel had little to no experience in the staffing industry. The Company provided Wenzel with substantial and specialized training regarding its business model and sales and recruiting methods and strategies, as well as access to trade secrets belonging to the Company.

32.     Upon starting to work for Insight Global, Wenzel was employed as a Recruiter in Training.  In that role, Insight Global provided Wenzel with specialized one-on-one and group training to prepare him for a career with the Company with a focus on IT staffing.  During this time, at various formal and informal trainings, Wenzel was exposed to trade secrets regarding the nature and structure of Insight Global's business, its recruiting and placement strategies, and its valuable training methodologies.

33.     On or around August 12, 2013, Wenzel was promoted to the position of Recruiter. As a Recruiter, Wenzel continued to receive specialized training and exposure to Insight Global's trade secrets and other confidential business information, with his primary responsibility being to converse with Account Managers regarding client staffing needs in the IT industry, and ultimately to identify and recommend the best qualified professionals to meet those needs.  Additionally, because most Recruiters are ultimately on the path to sales, Wenzel was encouraged and trained to develop relationships with Insight Global's Account Managers, client hiring and vendor managers, and IT professionals, to develop and perpetuate goodwill on behalf of the Company.  Wenzel regularly accompanied Account Managers on outings to meet with Insight Global's clients.  He also maintained a list of IT professionals ("contractors" or "consultants") that he used to staff client openings, which list is commonly referred to as a "hotbook."

34.     On or around February 4, 2014, Wenzel was promoted to the position of Account Manager.  Account Managers are responsible for creating business partnerships between Insight Global and companies in their given territory.  In his position as Account Manager, and through his relationships with Insight Global's clients, Wenzel was entrusted with significant trade secrets belonging to the Company, including but not limited to actual and potential customer

information and lists, customer preferences, billing rates, pricing practices, and contract expiration dates.

35.     On or around September 28, 2015, Wenzel was promoted to the position of Sales Manager.  On January 4, 2016, Wenzel was transferred to Insight Global's Philadelphia office, where he became the Sales Manager of that office, a leadership position within Insight Global. As a Sales Manager, Wenzel was responsible for overseeing a team of Account Managers and Recruiters, including managing and being directly involved in the service of all existing client accounts and the development of new business.  Wenzel was also granted greater access to Insight Global's highly confidential and trade secret information maintained on Insight Global's computer systems, including access to all account information for the office in which he worked. Wenzel was responsible for meeting with clients and prospective clients; interviewing, hiring and managing new Recruiters and overseeing their development and promotion to Account Manager or Professional Recruiter; overseeing the solicitation of existing clients and prospective clients for new business; and overseeing the staffing of all requisitions received by the office.  In this role, Wenzel acted as the full-time, on-the-ground leader reporting up to a Regional Manager.  He would review reports prepared by each Account Manager to measure their production and sales leads, and participate on weekly leadership calls with other sales managers from his region and Insight Global senior leadership.

36.     On February 17, 2017, Wenzel was demoted to an Account Manager, and on March 27, 2017, transferred back to Insight Global's New York Office as an Account Manager.

37.     During the period Wenzel was employed with Insight Global he traveled to Atlanta, Georgia on multiple occasions to participate in special training at the Insight Global headquarters, including a three-day Recruiter training and a four-day Account Manager training, as well as sales conferences in Atlanta and Orlando.  During these trainings and conferences,

Wenzel was exposed to a substantial number of Insight Global trade secrets regarding its business methods and strategies, sales techniques, and other confidential business and/or financial information.

b. **Luke Norman**

38.    Norman began his employment with Insight Global on or about January 5, 2015, and worked for the Company through September 18, 2017.  During this time, Norman operated out of Insight Global's New York Office, where he reported to Wenzel for a time.  Prior to his employment with Insight Global, Norman had little to no experience in the staffing industry.  The Company provided Norman with substantial and specialized training regarding its business model and sales and recruiting methods and strategies, as well as access to trade secrets belonging to the Company.

39.    Upon starting to work for Insight Global, Norman was employed as a Recruiter in Training.  In that role, Insight Global provided Norman with specialized one-on-one and group training to prepare him for a career with the Company with a focus on IT staffing.  During this time, at various formal and informal trainings, Norman was exposed to trade secrets regarding the nature and structure of Insight Global's business, its recruiting and placement strategies, and its valuable training methodologies.

40.    On or around March 2, 2015, Norman was promoted to the position of Recruiter.  As a Recruiter, Norman continued to receive specialized training and exposure to Insight Global's trade secrets and other confidential business information, with his primary responsibility being to converse with Account Managers regarding client staffing needs in the IT industry, and ultimately to identify and recommend the best qualified professionals to meet those needs.  Additionally, because most Recruiters are ultimately on the path to sales, Norman was encouraged and trained to develop relationships with Insight Global's Account Managers, client

hiring and vendor managers, and IT professionals, to develop and perpetuate goodwill on behalf of the Company.  Norman regularly accompanied Account Managers on outings to meet with Insight Global's clients.  He also maintained a hotbook.

41.     On or around February 8, 2016, Norman was promoted to the position of Professional Recruiter.  As a Professional Recruiter, Norman was in regular communication with Insight Global's customers and clients.  His responsibilities included communicating with client hiring managers and vendor managers about their staffing needs, identifying and recommending the most qualified candidates, accompanying candidates to their interviews with human resources and management personnel at Insight Global's customers' offices, accompanying new placements on the first day of employment in their new positions, and then regularly interfacing between the customer and the consultants to ensure a mutually satisfactory work experience.  He also often accompanied Insight Global's account managers on lunches and other client outings. As a result, Norman developed significant contacts with Insight Global's key clients.

42.     During the period Norman was employed with Insight Global he traveled to Atlanta, Georgia on multiple occasions to participate in special multi-day training sessions at the Insight Global headquarters, as well as sales conferences in Atlanta and Orlando.  During these trainings and conferences, Norman was exposed to a substantial number of Insight Global trade secrets regarding its business methods and strategies, sales techniques, and other confidential business and/or financial information.

### c.  **Lauren Sutmar**

43.     Sutmar began her employment with Insight Global on or about February 3, 2014, and worked for the Company through March 6, 2017.  During this time, Sutmar operated out of Insight Global's Chicago Office and New York Office.  Like Wenzel and Norman, prior to her employment with Insight Global, Sutmar had little to no experience in the staffing industry.  The

Company provided Sutmar with substantial and specialized training regarding its business model and sales and recruiting methods and strategies, as well as access to trade secrets belonging to the Company.

44.     Upon starting to work for Insight Global, Sutmar was employed as a Recruiter in Training.  In that role, Insight Global provided Sutmar with specialized one-on-one and group training to prepare her for a career with the Company with a focus on IT staffing.  During this time, at various formal and informal trainings, Sutmar was exposed to trade secrets regarding the nature and structure of Insight Global's business, its recruiting and placement strategies, and its valuable training methodologies.

45.     On or around March 31, 2014, Sutmar was promoted to the position of Recruiter. As a Recruiter, Sutmar continued to receive specialized training and exposure to Insight Global's trade secrets and other confidential business information, with her primary responsibility being to converse with Account Managers regarding client staffing needs in the IT industry, and ultimately to identify and recommend the best qualified professionals to meet those needs. Additionally, because most Recruiters are ultimately on the path to sales, Sutmar was encouraged and trained to develop relationships with Insight Global's Account Managers, client hiring and vendor managers, and IT professionals, to develop and perpetuate goodwill on behalf of the Company.  Sutmar regularly accompanied Account Managers on outings to meet with Insight Global's clients.  She also maintained a hotbook.

46.     On or around July 1, 2014, Sutmar was promoted to the position of Account Manager.  Account Managers are responsible for creating business partnerships between Insight Global and companies in their given territory.  In his position as Account Manager, and through her relationships with Insight Global's clients, Sutmar was entrusted with significant trade secrets belonging to the Company, including but not limited to actual and potential customer

information and lists, customer preferences, billing rates, pricing practices, and contract expiration dates.  Sutmar transferred to Insight Global's New York Office in August 2016, and remained an Account Manager in that office.

47.     During the period Sutmar was employed with Insight Global she traveled to Atlanta, Georgia on multiple occasions to participate in special training at the Insight Global headquarters, including a three-day Recruiter training and a four-day Account Manager training, as well as sales conferences in Atlanta and Orlando.  During these trainings and conferences, Sutmar was exposed to a substantial number of Insight Global trade secrets regarding its business methods and strategies, sales techniques, and other confidential business and/or financial information.

### d.  The Former Employees Had Access to Confidential and Proprietary Information

48.     As indicated above, while the Former Employees were employed with Insight Global they each had extensive access to valuable trade secrets belonging to the Company and other confidential and proprietary business information about Insight Global's business.  They regularly viewed and discussed requisitions in the P-Zone, accessed client account books, received weekly sales and recruiting reports from employees in the New York Office, and attended meetings and special trainings where Insight Global's confidential and proprietary business information was discussed.  By virtue of being employed and extensively trained in a variety of roles at Insight Global, the Former Employees were given wide-ranging access to Insight Global's trade secrets, including but not limited to:

(a) Information about Insight Global's customer and client relationships including customers' staffing placement history, current and long-term needs and preferences, and pricing;

(b) Identities and personal contact information for hiring managers and vendor managers who are Insight Global's primary customer contacts, and who are difficult to identify from publicly-available information;

(c) Proprietary information relating to pricing for various contractor skill sets, margins, and thresholds for profitability; and

(d) Proprietary bidding procedures, recruiting methods and sales strategies for negotiating and winning business with contractors and clients.

49.      During their employment with Insight Global, the Former Employees had regular access to Insight Global's trade secrets, including proprietary information associated with client relationships developed, maintained, and protected by Insight Global, as well as other confidential and proprietary business information of great competitive value in the IT industry, *e.g.*, the staffing placement history, current needs, preferences, and pricing for Insight Global's customers; the identities and personal contact information for the hiring managers and vendor managers who are Insight Global's primary customer contacts and difficult to identify from publicly-available information; and other information relating to pricing for various contractor skill sets, margins and thresholds for profitability, and negotiation strategies to win and obtain business with contractors and clients.

50.      As a result of Insight Global's investment in training and developing the Former Employees' skill sets, they built important relationships and goodwill with the Company's customers and clients, consultants, and vendors through regular meetings, telephone calls, and other contact.  The Former Employees were also entrusted with extensive customer contact during the placement process for new candidates.

C.  **Insight Global's Legitimate Business Interests**

51.      Insight Global takes reasonable measures to protect its trade secrets and other legitimate business interests.  Insight Global employees are instructed to treat as confidential the training they receive in Insight Global's proprietary sales and marketing methods and strategies, as well as any information shared with them concerning Insight Global's customers. Additionally, Insight Global understands the irreparable injury that could be done by the disclosure of its confidential and proprietary business information and strategies by current and former employees, and seeks to protect its substantial investment in developing strong customer relationships and goodwill.  Accordingly, contractual provisions designed to protect these interests are included in the Company's employment and separation agreements with its employees.  Specifically, employees' agreements contain provisions requiring non-disclosure, non-competition, non-solicitation, and return of Insight Global's property and information at the conclusion of their employment.

52.      Insight Global also maintains access-controlled offices, where visitors are restricted and limited with respect to their ability to view physical documents and electronic information.

53.      Insight Global also stores its data on secure servers with restricted access.  In signing onto the system, Insight Global employees acknowledge that they are only accessing information for legitimate business purposes.  Furthermore, confidential information stored on the system is additionally restricted to the Insight Global personnel who have legitimate needs to access the information.  In other words, even Insight Global employees do not have unfettered access to its confidential information and trade secrets.

54.      Insight Global devotes substantial amounts of time and expense in training its employees, who generally do not have prior staffing experience, to prepare them to advance and

succeed in building relationships with Insight Global's customers and clients. Insight Global employees all over the country are regularly flown to Insight Global's corporate headquarters in Atlanta, Georgia to attend trainings at the company's Professional Development Center (the "PDC"). The Former Employees attended several training sessions at the PDC and received weekly, if not daily, invaluable training by way of formal and informal mentoring during their years of employment with Insight Global.

D. **The Former Employees' Employment Agreements**

55.     Because of the Former Employees' access to Insight Global's trade secrets and confidential information, the Former Employees each entered into multiple At-Will Employment Agreements with Insight Global. Each agreement contained restrictive covenants.

56.     On June 17, 2013, as a condition of his employment with Insight Global, Wenzel and the Company voluntarily entered into an At-Will Employment Agreement. On April 5, 2016, Wenzel and the Company voluntarily entered into another At-Will Employment Agreement. On November 21, 2016, Wenzel and the Company entered into another At-Will Employment Agreement (the June 17, 2013 At-Will Employment Agreement, April 5, 2016 At-Will Employment Agreement, and November 21, 2016 At-Will Employment Agreement shall be collectively referred to herein as the "Wenzel Employment Agreements"). True and correct copies of the Wenzel Employment Agreements are attached hereto as Exhibit A, and are incorporated herein by reference.

57.     On December 21, 2014, as a condition of his employment with Insight Global, Norman and the Company voluntarily entered into an At-Will Employment Agreement. On February 8, 2016, Norman and the Company voluntarily entered into another At-Will Employment Agreement (the December 21, 2014 At-Will Employment Agreement and February 8, 2016 At-Will Employment Agreement shall be collectively referred to herein as the

"Norman Employment Agreements").  True and correct copies of the Norman Employment Agreements are attached hereto as Exhibit B, and are incorporated herein by reference.

58.     On February 3, 2014, as a condition of her employment with Insight Global, Sutmar and the Company voluntarily entered into an At-Will Employment Agreement.  On June 30, 2014, Sutmar and the Company voluntarily entered into another At-Will Employment Agreement.  On April 6, 2016, Sutmar and the Company entered into another At-Will Employment Agreement (the February 3, 2014 At-Will Employment Agreement, June 30, 2014 At-Will Employment Agreement, and April 6, 2016 At-Will Employment Agreement shall be collectively referred to herein as the "Sutmar Employment Agreements").  True and correct copies of the Sutmar Employment Agreements are attached hereto as Exhibit C, and are incorporated herein by reference.

59.     The Wenzel, Norman, and Sutmar Employment Agreements (collectively "the Employment Agreements") contain several restrictions on the Former Employees' conduct during and after their employment with Insight Global.

60.     The Employment Agreements contain an express provision for the protection of Insight Global's trade secrets, in which the Company agreed to provide the employee with Trade Secrets, as defined in the agreements, and the employee agreed not to use or disclose any trade secret at any time during or after employment without the Company's prior written consent (the "Trade Secret Provision").

61.     Insight Global's customer information, including but not limited to information contained in client account books, weekly sales and recruiter reports, daily requisition postings and training materials, constitutes protected Trade Secrets as defined in the Employment Agreements.  Such information has been compiled and created over many years at substantial effort and expense and is not publicly available, and Insight Global takes reasonable steps to

protect its secrecy as described herein. The IT industry in which Insight Global operates is highly competitive.

62.     Under the Employment Agreements, the Former Employees also agreed to protect Insight Global's confidential business information and not disclose the Confidential Information, as defined in the Employment Agreements (the "Non-Disclosure Provision").

63.     Under the Employment Agreements, the Former Employees further agreed not to perform similar staffing services in competition with Insight Global within a pre-determined radius of the Insight Global office in which he or she worked for a period of one year following the termination of employment (the "Non-Competition Provision").

64.     The Former Employees also agreed that they would not solicit actual or prospective Insight Global clients, with whom they had material contact during the last two years of employment, for a period of one year following the termination of employment (the "Non-Solicitation Provision").

65.     The Former Employees further agreed to return all of Insight Global's property, information and other materials upon termination of their respective employment (the "Return of Materials Provision").

66.     The Former Employees also agreed to provide any future employer with a copy of the Employment Agreement and notify Insight Global of such employment during the Restricted Period, as defined in the Employment Agreements (the "Notification Provision").

67.     In addition to the promises above, the Former Employees stipulated and agreed in the Employment Agreements that any breach of the restrictive covenants above would cause Insight Global irreparable injury and that the restrictions contained therein were reasonable.

68.     Moreover, if any of the Former Employees breached the Non-Competition or Non-Solicitation Provision, the Former Employees each agreed that the duration of the

restrictions contained in those Provisions would be tolled during that period of breach (the "Tolling Provisions").

69.     Additionally, in the Employment Agreements, Insight Global and the Former Employees agreed that the Company would be entitled to attorneys' fees and costs if it prevailed in litigation seeking to enforce the provisions contained in the Employment Agreement (the "Attorneys' Fees Provision").

70.     Lastly, each of the Employment Agreements contains a choice of law provision, to which each of the Former Employees agreed would apply to their respective agreements without regard to conflicts of laws provisions.

### E.  Norman and Sutmar's Separation Agreements

71.     On March 6, 2017, Sutmar entered into a Separation Agreement with Insight Global (the "Sutmar Separation Agreement").  As consideration for entering into the Sutmar Separation Agreement, Sutmar received a severance payment equal to two weeks of wages to which she would not have otherwise been entitled to collect.  A true and correct copy of the Sutmar Separation Agreement is attached hereto as Exhibit D, and is incorporated herein by reference.

72.     On September 18, 2017, Norman entered into a Separation Agreement with Insight Global (the "Norman Separation Agreement," and collectively with the Sutmar Separation Agreement, the "Separation Agreements").  As consideration for entering into the Norman Separation Agreement, Norman received a severance payment equal to two weeks of wages to which he would not have otherwise been entitled to collect.  A true and correct copy of the Norman Separation Agreement is attached hereto as Exhibit E, and is incorporated herein by reference.

73.    In the Separation Agreements, Norman and Sutmar agreed that the restrictive covenants contained in their Employment Agreements were enforceable and reaffirmed their commitment to abide by and not violate any of these restrictive covenants.  Specifically, Section 5 of the Separation Agreements (the "Reaffirmation Provision") provides:

**AFFIRMATION OF RESTRICTIVE COVENANTS.**

(a)    As a condition of Employee's employment with the Employer, Employee entered into an At-Will Employment Agreement containing certain restrictive covenants intended to protect the Employer's confidential business information and trade secrets, investment in recruitment and specialized training for Employer's employees, substantial relationships with actual and prospective customers and clients and their personnel whom Employee met through work for the Employer, the Employer's customer goodwill, and its goodwill and beneficial relationships with other employees.  Employee acknowledges that the Employer would not have been willing to employ Employee, or provide Employee the specialized training, confidential business information, trade secrets, and customer relationships Employee received during employment with the Employer, absent Employee's agreement to such covenants.  Employee further acknowledges that the covenants were and are reasonable and necessary to protect the Employer's legitimate business interest in protecting itself from unfair competition.

(b)    Accordingly, and in exchange for the Severance Payment and other good and valuable consideration under this Agreement, Employee affirms, acknowledges and agrees that the restrictive covenants in the At-Will Employment Agreement are valid and binding on Employee and that Employee intends to comply fully with the entire requirements of these covenants, including if applicable, "Confidential Business Information," "Trade Secrets," "Agreement Not to Compete," "Agreement Not to Solicit Employees," and "Agreement Not to Solicit Customers and Clients."  Employee represents and warrants that Employee has not breached and has no intent to breach any of these covenants and has neither accepted nor intends to accept any offer of employment prohibited by any of these covenants.

(c)    For the avoidance of doubt, Employee and the Employer agree that the term "Business Location" as used in the Agreement Not to Compete shall refer to the office address or addresses indicated on the first page of this Agreement.  Nothing in this Agreement is intended to modify or amend any other provision of the At-Will Employment Agreement or otherwise to relieve Employee of any of the obligations under the At-Will Employment Agreement that survive termination of employment.

74.     Additionally, Norman and Sutmar certified in the Separation Agreements that each had returned all of Insight Global's property, regardless of whether it is tangible or intangible in form, to Insight Global.

**F. The Former Employees Each Breached the Employment Agreements and Separation Agreements (as applicable) Multiple Times During and After Their Employment with Insight Global**

      **a.  Misappropriation of Insight Global's Trade Secrets**

          **i.  Daniel Wenzel**

75.     Wenzel started in Insight Global's New York Office, where he was ultimately promoted to Sales Manager.  He was then transferred to Insight Global's Philadelphia Office as a Sales Manager.  Wenzel was, however, less successful in his new role, and Insight Global demoted him back to Account Manager.  Wenzel transferred back to Insight Global's New York Office, where he ended his employment.

76.     After Wenzel's termination, Insight Global began to hear in the market that Wenzel had, in fact, accepted employment with Beacon Hill in a similar capacity and within the same region where he worked for the Company.  As a result of this information, Insight Global investigated Wenzel's conduct and activity in the lead-up to his resignation to understand the scope of his unlawful actions and the extent to which these actions damaged the Company and could continue to do so.

77.     Upon realizing his employment with Insight Global was drawing to a close, upon information and belief, Wenzel began to collect and misappropriate Insight Global's trade secrets and confidential information.

78.     The information misappropriated by Wenzel included, but were not limited to: (i) details regarding Insight Global clients, including contact details for hiring managers with these clients; (ii) information regarding active and former contractors which Insight Global had placed

with its clients, including all relevant contact information for these contractors and their respective rates; and (iii) leads for prospective contractors and customers with whom Insight Global intended to conduct business.  These documents and other information misappropriated by Wenzel contained confidential business and/or financial information, listing of customer names, addresses, and telephone numbers, and/or other information relating to Insight Global's business that is secret and of value.

### ii.  Luke Norman

79.     After Norman's promotion to Professional Recruiter, his performance began to decline.  After several conversations between Norman and his supervisors about the need to improve his performance and attitude, Norman turned in his resignation and signed the Norman Separation Agreement.

80.     After Norman resigned and signed the Norman Separation Agreement reaffirming his post-employment restrictions from the Norman Employment Agreements, Insight Global began to hear in the market that Norman had, in fact, accepted employment with Beacon Hill in a similar capacity and within the same region where he worked for the Company.  As a result of this information, Insight Global investigated Norman's conduct and activity in the lead-up to his resignation to understand the scope of his unlawful actions and the extent to which these actions damaged the Company and could continue to do so.

81.     Upon realizing his employment with Insight Global was drawing to a close, upon information and belief, Norman began to collect and misappropriate Insight Global's trade secrets and confidential information.

82.     The information misappropriated by Norman included, but were not limited to: (i) details regarding Insight Global clients, including contact details for hiring managers with these clients; (ii) information regarding active and former contractors which Insight Global had placed

with its clients, including all relevant contact information for these contractors and their respective rates; and (iii) leads for prospective contractors and customers with whom Insight Global intended to conduct business. These documents and other information misappropriated by Norman contained confidential business and/or financial information, listing of customer names, addresses, and telephone numbers, and/or other information relating to Insight Global's business that is secret and of value.

### iii.  **Lauren Sutmar**

83.     Sutmar began in Insight Global's Chicago Office, and moved to New York City on her own accord in August 2016. At that time, Sutmar was an Account Manager. Insight Global permitted Sutmar to transfer to its New York Office and retain her position as an Account Manager. Sutmar resigned in March 2017.

84.     After Sutmar resigned and signed the Sutmar Separation Agreement reaffirming her post-employment restrictions from the Sutmar Employment Agreements, Insight Global began to hear in the market that Sutmar had, in fact, accepted employment with Beacon Hill in a similar capacity and within the same region where she worked for the Company. As a result of this information, Insight Global investigated Sutmar's conduct and activity in the lead-up to her resignation to understand the scope of her unlawful actions and the extent to which these actions damaged the Company and could continue to do so.

85.     Upon realizing her employment with Insight Global was drawing to a close, upon information and belief, Sutmar began to collect and misappropriate Insight Global's trade secrets and confidential information.

86.     The information misappropriated by Sutmar included, but were not limited to: (i) details regarding Insight Global clients, including contact details for hiring managers with these clients; (ii) information regarding active and former contractors which Insight Global had placed

with its clients, including all relevant contact information for these contractors and their respective rates; and (iii) leads for prospective contractors and customers with whom Insight Global intended to conduct business.  These documents and other information misappropriated by Sutmar contained confidential business and/or financial information, listing of customer names, addresses, and telephone numbers, and/or other information relating to Insight Global's business that is secret and of value.

### b.  Solicitation of Insight Global's Clients

87.    Upon information and belief, Wenzel and Sutmar have and are currently unlawfully soliciting business from Insight Global's clients on behalf of Beacon Hill using information and tactics that they obtained through the misappropriation of Insight Global's trade secret and confidential information.

### c.  Solicitation of Insight Global's Employees

88.    While Norman and Wenzel were both employed at Insight Global, Norman worked for and directly reported to Wenzel, and interacted with him on a frequent basis.

89.    Upon information and belief, Wenzel – misusing Insight Global's confidential information concerning employee salaries – solicited, encouraged, and caused Norman to resign from Insight Global and join Wenzel in working for Beacon Hill.

### d.  Competing with Insight Global

90.    Upon information and belief, the Former Employees are all currently employed by Beacon Hill in New York City.  In their capacity as Beacon Hill employees, the Former Employees are, among other things, recruiting for various positions, including communicating and regularly interfacing with hiring and vendor managers at companies in and around the New York City area about their staffing needs, identifying and recommending qualified candidates, and placing and communicating with contractors.  Upon information and belief, in furtherance of

these objectives, the Former Employees have utilized the trade secret information they misappropriated from Insight Global to more effectively, and unlawfully, target Insight Global customers on behalf of Beacon Hill.

91.     The Former Employees also did not notify Insight Global of their employment with Beacon Hill at least fourteen (14) days prior to the commencement of their employment with Beacon Hill, and at no time have the Former Employees provided Insight Global with a sworn affidavit stating that their employment with Beacon Hill shall not violate the terms of the Employment Agreements with Insight Global, and that they have provided a copy of their respective Employment Agreements with Insight Global to Beacon Hill.   In fact, the Former Employees hid their current employment with Beacon Hill by, among other things, not updating their LinkedIn profiles to reflect their current place of employment.

92.     Further, the Former Employees' unlawful competition through the actual and threatened use of Insight Global's trade secrets, in breach of their Employment Agreements and Separation Agreements, stands to cause significant harm to the Company due to the Former Employees' substantial knowledge of the Company's customers and clients, including several key accounts, and their training in the Company's trade secret sales methods and strategies.

93.     Additionally, it is impossible for the Former Employees to perform their job duties for Beacon Hill without using or disclosing Insight Global's trade secrets in violation of the Non-Disclosure Provision and New York law.   Even if Beacon Hill were to instruct the Former Employees not to use or disclose such trade secret and confidential information, it is impossible for the Former Employees to perform their job functions without relying on their knowledge of Insight Global's trade secrets, including information regarding current and prospective clients, including identity, contact information, and preferences of hiring and vendor managers, and sales, marketing, and recruiting strategies and techniques.

94.     As a result of the Former Employees' misappropriation of Insight Global's trade secrets, the Company has and will continue to suffer irreparable harm in the form of loss of goodwill, actual loss of customers, exposure of its trade secrets and resulting loss of competitive advantage, among other things.

95.     As a direct consequence of the Former Employees' wrongful conduct, Insight Global has incurred substantial expense to enforce the Employment Agreements and the Separation Agreements.

### G.  Beacon Hill's Knowledge of the Employment Agreements, Improper Poaching, and other Wrongful and Tortious Actions

96.     Competing unfairly for employees – including by inducing employees to breach their contracts with competitors – is Beacon Hill's business model.  This is illustrated by the fact that Beacon Hill has been sued almost thirty times over the last eleven years in similar cases by many competitors in the staffing industry.  Beacon Hill's long history of engaging in improperly poaching employees has also led to multiple prior lawsuits with Insight Global.[1]

97.     As a result of their litigation track record, and the discovery exchanged in those cases, Beacon Hill is well aware that Insight Global enters into At-Will Employment Agreements with all of its employees that contain certain restrictive covenants.  Specifically, and prior to their employment of the Former Employees, Beacon Hill had active knowledge that these agreements include, among other things, the Non-Competition clause, the Non-Solicitation covenant, and the Non-Disclosure and Trade Secret Provisions.

---

[1] Moreover, Insight Global and Beacon Hill are currently litigating two cases – other than the one at bar – tied to Beacon Hill's unfair competition and tortious interference with Insight Global's contractual relations with its then-current and former employees.  *See Insight Global, LLC v. Beacon Hill Staffing Group LLC*, N.D. Cal., 3:17-cv-00309-BLF (HRL) (the "California Action"); *Insight Global, LLC v. Mary McDonald and Beacon Hill Staffing Group, LLC*, D. Colo., 1:17-cv-01915-MSK-MJW (the "Colorado Action").

98.     Additionally, Beacon Hill has conducted and continues to conduct an unlawful employee-raiding campaign of Insight Global's then-current and former employees.   The California Action and the Colorado Action are not the only examples of Beacon Hill's illegal and unfair competitive strategy.   For example, Beacon Hill has hired approximately ten Insight Global employees in 2017 – and that number only includes the individuals that Insight Global knows about.  As it is Beacon Hill's *modus operandi* to conceal its hires of former Insight Global employees from Insight Global (by, for example, instructing the employees not to update their LinkedIn profiles to disclose their employment with Beacon Hill), the actual number is likely higher – possibly by a significant margin.

99.     Pursuant to the Employment Agreements and the Separation Agreements, the Former Employees are bound by valid and enforceable agreements that, among other things: (i) bar the Former Employees from soliciting customers or clients of Insight Global about whom they obtained confidential business information or trade secrets during the last twenty-four months of their employment with Insight Global; (ii) prevent the Former Employees from soliciting other employees of Insight Global to terminate their employment with Insight Global; (iii) prohibit the Former Employees from using, disclosing, or exploiting Insight Global's confidential business information; and (iv) require the Former Employees to return all information and materials to Insight Global immediately upon the termination of their employment.  Beacon Hill is aware that the Former Employees are bound by these contractual obligations.

100.    Upon information and belief, Beacon Hill has instructed the Former Employees that they do not need to comply with their contractual obligations to Insight Global, and has promised to provide the Former Employees with a legal defense and indemnify the Former Employees for any adverse judgment they may incur as a result of litigation with Insight Global.

101.    Insight Global has not authorized any of the Former Employees to possess, use, disclose, or exploit its confidential business information during their Beacon Hill employment or at any other time.

102.    Upon information and belief, the Former Employees have used and are using Insight Global's confidential business information to conduct business for Beacon Hill and to solicit Insight Global's current and prospective clients, to do business with Beacon Hill in violation of the Employment Agreements and the Separation Agreements.  Insight Global is informed and believes and thereon alleges that Beacon Hill has and had knowledge of, and approved, these unlawful actions.

103.    Furthermore, the Former Employees have taken steps to keep their illegal activities hidden from disclosure.  Insight Global is informed and believes and thereon alleges that the Former Employees have done these things in concert with Beacon Hill to cover up the illegal nature of their and Beacon Hill's activities.

104.    In knowing of the restrictive covenants in the Former Employees' Employment Agreements, hiring the Former Employees, encouraging the Former Employees to solicit Insight Global's current and prospective clients using Insight Global's confidential and trade secret information, and assisting the Former Employees in covering up their illegal actions, Beacon Hill has engaged and is engaging in unfair competition that is contrary to honest business practices.

## COUNT I
## Misappropriation of Trade Secrets Under the DTSA – 18 U.S.C. § 1832
## (Against the Former Employees)

105.    Insight Global adopts and realleges the allegations contained in paragraphs 1-104 above as if fully set forth herein.

106.    Insight Global operates its business in interstate commerce across the United States.

107.    As set forth above and upon information and belief, the Former Employees improperly retained Insight Global's trade secret and confidential information after their employment relationships with Insight Global ended.  The trade secrets misappropriated by the Former Employees included information concerning Insight Global's methodologies and market research, information regarding Insight Global's contractors, as well as client-related information, in violation of the Employment Agreements.  This and other information Insight Global believes the Former Employees misappropriated contained confidential business and/or financial information, listing of customer names, addresses, and telephone numbers, and/or other information relating to Insight Global's business that is secret and of value.

108.    The above-documents qualify as "trade secrets" under the DTSA, as defined under 18 U.S.C. § 1839(3).  Insight Global has its employees sign an agreement prohibiting use and disclosure of such trade secrets outside of the Company and demanding their return upon termination of employment.   Such information required substantial resources, time and investment by Insight Global to create, collect and/or develop, and it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means.  The Former Employees have used, are using, and inevitably will continue to use Insight Global's trade secrets on behalf of Beacon Hill unless enjoined.

109.    The Former Employees' actions described herein constitute a willful and malicious misappropriation of Insight Global's trade secrets under 18 U.S.C. § 1836(b)(2).

110.    The Former Employees' misappropriation of Insight Global's trade secrets is causing, and threatens to continue causing, Insight Global to suffer irreparable harm, including but not limited to loss of clients, loss of reputation and customer goodwill, and loss of its

investment in its trade secrets.  This harm cannot be adequately remedied at law and requires permanent injunctive relief.

111.    Upon information and belief, the Former Employees have used Insight Global's trade secrets and confidential information to compete with Insight Global and are continuing to do so.

112.    Insight Global is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs, and expenses.

113.    Because the Former Employees' DTSA violations have been willful and malicious, Insight Global is entitled to exemplary damages of no more than twice the amount of damages for any actual loss and any unjust enrichment.

114.    As such, Insight Global demands judgment against the Former Employees for their violations of the DTSA in the form of compensatory and exemplary damages, permanent injunctive relief, prejudgment interest, an award of Insight Global's reasonable attorneys' fees, and costs pursuant to both the Employment Agreements and 18 U.S.C. § 1836(b)(3)(D), and such other relief as the Court deems just and proper.

## COUNT II
### Misappropriation of Trade Secrets under New York State Common Law
### (Against the Former Employees)

115.    Insight Global adopts and alleges the allegations contained in paragraphs 1-114 above as if fully set forth herein.

116.    The documents and information described herein that were misappropriated by the Former Employees qualify as "trade secrets" under New York law.

117.    As expressly acknowledged in the Employment Agreements, Insight Global considers these items to be confidential and proprietary trade secrets, and it has taken reasonable

steps as part of its ongoing standard operating procedures to maintain the confidential nature of this information.

118.    Upon information and belief, the Former Employees improperly retained documents and information containing Insight Global's trade secrets in violation of the Employment Agreements.

119.    Upon information and belief, the Former Employees used, are using, and inevitably will continue to use Insight Global's trade secrets in violation of the Employment Agreements unless enjoined.

120.    The Former Employees' actions described herein constitute the willful misappropriation of Insight Global's trade secrets under New York law.

121.    The Former Employees' misappropriation of Insight Global's trade secrets is causing, and threatens to continue causing, Insight Global to suffer irreparable harm, including but not limited to loss of clients, loss of reputation and customer goodwill, and loss of its investment in its trade secrets.  This harm cannot be adequately remedied at law and requires permanent injunctive relief.

122.    Insight Global is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs, and expenses.

123.    Accordingly, Insight Global demands judgment against the Former Employees for compensatory damages, permanent injunctive relief, prejudgment interest, an award of Insight Global's reasonable attorneys' fees, and costs pursuant to the Employment Agreements as well as New York law, and such other relief as the Court deems just and proper.

## COUNT III
## Breach of Contract
## (Against the Former Employees)

124.     Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 123 above as if fully set forth herein.

125.     As a condition of their employment with Insight Global, and for valuable consideration, the Former Employees entered into the Employment Agreements, which contain several restrictive covenants, including the Non-Competition, Non-Solicitation, Non-Disclosure and Trade Secret Provisions, as well as a Return of Materials Provision.  The specific terms of these covenants are set forth in Exhibits A through C.

126.     Insight Global performed its obligations under the Employment Agreements.

127.     The Former Employees have breached the Non-Disclosure, Trade Secret, Return of Materials, Notification Provisions, and, as to Wenzel and Sutmar, upon information and belief, the Non-Solicitation Provision by, among other things, (i) working for Beacon Hill in the New York City area in the same or similar capacity in which he worked for Insight Global, (ii) upon information and belief, soliciting employees and clients or customers of Insight Global on behalf of Beacon Hill and (iii) using, disclosing, or retaining Insight Global's confidential business information, and by not notifying Insight Global of their acceptance of employment with Beacon Hill.

128.     As a result of the Former Employees actions in violation of the Employment Agreements, Insight Global has suffered, and continues to suffer, substantial and irreparable injury.

129.     The Former Employees' continuing actions in violation of the Employment Agreements expose Insight Global to a pending and ongoing threat of immediate and irreparable harm.

130.    The Former Employees agreed, in writing, that Insight Global would suffer irreparable harm as a result of any actions taken by them in violation of the Employment Agreements, and that remedies at law would be inadequate.  The Former Employees further acknowledged and agreed that Insight Global would be entitled to immediate injunctive relief and other equitable remedies in the event of their breach of the Employment Agreements, and that the Restricted Period would be tolled for as long as they are and remain in breach of their obligations under the Employment Agreements.

131.    Because of the Former Employees' multiple, willful, and malicious breaches of the Employment Agreements, Insight Global demands judgment against them for compensatory damages, injunctive relief, prejudgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

<u>**COUNT IV**</u>
<u>**Breach of Contract -Separation Agreements**</u>
<u>**(Against Norman and Sutmar)**</u>

132.    Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 131 above as if fully set forth herein.

133.    For valuable consideration, Norman and Sutmar entered into Separation Agreements with Insight Global, which contain several restrictive covenants, including the Reaffirmation Provision, the Return of Property Affirmation, and the General Release Provision. The specific terms of these covenants are set forth in Exhibits D and E.

134.    Insight Global performed its obligations under the Separation Agreements.

135.    Norman and Sutmar have breached the Reaffirmation Provision and the Return of Property Affirmation by, among other things, (i) retaining the Insight Global trade secret and confidential information and documentation after both his employment with Insight Global ended and he entered into the Separation Agreement; and (ii) by using, disclosing, or retaining

Insight Global's trade secret and confidential business information in competition with Insight Global on behalf of Beacon Hill.

136.    As a result of Norman and Sutmar's actions in violation of the Separation Agreements, Insight Global has suffered, and continues to suffer, substantial and irreparable injury.

137.    Norman and Sutmar's continuing actions in violation of the Separation Agreements expose Insight Global to a pending and ongoing threat of immediate and irreparable harm.

138.    Because of Norman and Sutmar's multiple, willful, and malicious breaches of the Separation Agreements, Insight Global demands judgment against them for compensatory damages, injunctive relief, prejudgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

<u>**COUNT V**</u>
<u>**Fraudulent Inducement**</u>
<u>**(Against Norman and Sutmar)**</u>

139.    Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 138 above as if fully set forth herein.

140.    Norman and Sutmar made misrepresentations and omissions of material facts to Insight Global in entering into the Separation Agreements with Insight Global, as they knew at that time that they: (i) intended to compete with Insight Global; and, upon information and belief, (ii) had already accepted or would shortly thereafter accept Beacon Hill's offers of employment.  These representations were material and induced Insight Global to pay Norman and Sutmar the severance payments to which they were not otherwise entitled.  Had Insight

Global known the true facts, it would have immediately put a stop to Norman and Sutmar's unlawful actions and would not have issued the severance payments to them.

141.    Norman and Sutmar's representations to Insight Global as to their compliance with the Return of Property Affirmation and their agreement to the Reaffirmation Provision were false and intended to induce Insight Global to issue the severance payments to Norman and Sutmar.  Norman and Sutmar knew that their representations were false when they were made. Norman and Sutmar intended that Insight Global rely on their misrepresentations.  The conduct of Norman and Sutmar was such as to rise to the level of fraud.

142.    At the time the Separation Agreements were executed and the severance payments specified therein was issued to Norman and Sutmar, Insight Global had no knowledge of the falsity of Norman and Sutmar's representations and omissions of material facts.  Insight Global reasonably and justifiably relied upon Norman and Sutmar's representations or omissions in deciding to pay the severance payments.

143.    Insight Global has been injured as a direct and proximate result of the foregoing fraud in in an amount to be proven at trial.  Additionally, Norman and Sutmar committed these acts willfully and wantonly, and, accordingly, Insight Global is entitled to recover punitive damages in an amount to be determined by a trier of fact.

## COUNT VI
### Conversion
### (Against The Former Employees)

144.    Insight Global adopts and realleges the allegations contained in paragraphs 1 – 143 above as if fully set forth herein.

145.    The Former Employees are in wrongful possession of Insight Global's proprietary trade secret and confidential information.

146.    The Former Employees have wrongfully asserted dominion or control over Insight Global's proprietary trade secret and confidential information.

147.    As a direct and proximate result of the Former Employees' conversion of Insight Global's proprietary trade secret and confidential information, Insight Global has sustained substantial damages in an amount to be determined at trial.

148.    The value of Insight Global's proprietary trade secret and confidential information is in its exclusive use by Insight Global and its employees.  By wrongfully asserting dominion or control over this information and, upon information and belief, sharing it with his new employer, the Former Employees have greatly diminished the monetary value of the information that Insight Global has sought to protect.

149.    As such, Insight Global demands judgment against the Former Employees for their conversion of Insight Global's proprietary trade secret and confidential information in the form of compensatory damages, injunctive relief, prejudgment interest, and such other relief as the Court deems just and proper.

## COUNT VII
### Breach of the Duty of Loyalty
### (Against the Former Employees)

150.    Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 149 above as if fully set forth herein.

151.    The Former Employees breached their respective duties of loyalty to Insight Global by, among other things, misappropriating Insight Global's confidential, proprietary and/or trade secret information while they were still employed by Insight Global for the purpose of using the information to compete with Insight Global in their new roles at Beacon Hill.

152.    As a result of the Former Employees' breach, Insight Global has suffered and will continue to suffer damages, including irreparable damages.

153.    Insight Global has been injured as a direct and proximate result of the Former Employees' breach of their duty of loyalty to Insight Global and, thus, seeks monetary damages in an amount to be proven at trial, as well as injunctive relief against the Former Employees to prevent further harm.

## COUNT IIX
## Tortious Interference with Contract
## (Against Beacon Hill)

154.    Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 153 above as if fully set forth herein.

155.    As described above, Insight Global entered into binding Employment Agreements with the Former Employees which contained certain restrictive covenants, including the Non-Competition clause, the Non-Solicitation covenant, and the Non-Disclosure and Trade Secret Provisions.

156.    Beacon Hill knew that Insight Global and the Former Employees had a contractual relationship via the Employment Agreements, as well as the terms of the restrictive covenants contained therein.

157.    Despite having this knowledge, Beacon Hill knowingly, intentionally, and maliciously decided, endeavored, and sought to engage in acts which intended and did induce each of the Former Employees to breach, among other things, the Non-Disclosure, Non-Competition and Trade Secret Provisions as well as, upon information and belief, the Non-Solicitation Provision of the Employment Agreements.

158.    The improper conduct of Beacon Hill was committed with actual malice and ill will toward Insight Global, and with the intentional and improper purpose of causing irreparable damage.

159.    Accordingly, Insight Global demands judgment against Beacon Hill for it tortious interference with the Former Employees' Employment Agreements in the form of compensatory and punitive damages, prejudgment interest, Insight Global's reasonable attorneys' fees and costs, and such other relief as the Court deems just and proper.

**COUNT IX**
**Tortious Interference with Norman's**
**Employment Agreements (Against Wenzel)**

160.    Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 159 above as if fully set forth herein.

161.    As described above, Insight Global entered into the Norman Employment Agreements with Norman which contained certain restrictive covenants, including the Non-Competition clause, the Non-Solicitation covenant, and the Non-Disclosure and Trade Secret Provisions.

162.    Wenzel knew that Insight Global and Norman had a contractual relationship via the Norman Employment Agreements, as well as the terms of the restrictive covenants contained therein.

163.    Despite having this knowledge, Wenzel knowingly, intentionally, and maliciously decided, endeavored, and sought to engage in acts which intended and did induce Norman to breach, among other things, the Non-Disclosure, Non-Competition and Trade Secret Provisions of the Norman Employment Agreements.

164.    The improper conduct of Wenzel was committed with actual malice and ill will toward Insight Global, and with the intentional and improper purpose of causing irreparable damage.

165.    Accordingly, Insight Global demands judgment against Wenzel for his tortious interference with Norman's Employment Agreements in the form of compensatory and punitive damages, prejudgment interest, Insight Global's reasonable attorneys' fees and costs, and such other relief as the Court deems just and proper.

**COUNT X**
**Tortious Interference with Insight Global's**
**Existing and Prospective Business Relationships (Against Wenzel)**

166.    Insight Global adopts and realleges the allegations contained in paragraphs 1 – 165 above as if fully set forth herein.

167.    As described above, Insight Global had business relationships with its clients and customers.

168.    Wenzel knew that: (i) Insight Global had business relationships with two particular customers in the New York City area (the "Customers-A"); (ii) Customers-A had entered into multiple agreements for Insight Global's provision of staffing services to Customers-A; and that (iii) Insight Global intended to continue to seek the business of and enter into additional agreements with Customers-A.

169.    Despite having this knowledge, Wenzel knowingly, intentionally, and maliciously decided, endeavored, and sought to engage in acts which would cause irreparable damage to the agreements between Customers-A and Insight Global and Insight Global's advantageous business relationship with Customers-A.

170.    Wenzel intentionally, knowingly, maliciously, and without justification interfered with the business relationship between Insight Global and Customers-A.

171.    As a direct result of the willful and improper conduct of Wenzel, the business relationship between Insight Global and Customers-A suffered substantial harm.

172.    The conduct of Wenzel in interfering with Insight Global's economic relationship was intentional, willful, and calculated to cause damage to this business relationship.

173.    The improper conduct of Wenzel was committed with actual malice and ill will toward Insight Global, and with the intentional and improper purpose of causing irreparable damage.

174.    Accordingly, Insight Global demands judgment against Wenzel for his tortious interference with Insight Global's advantageous business relationship with Customers-A in the form of compensatory and punitive damages, prejudgment interest, Insight Global's reasonable attorneys' fees and costs, and such other relief as the Court deems just and proper.

## COUNT XI
### Tortious Interference with Insight Global's
### Existing and Prospective Business Relationships (Against Sutmar)

175.    Insight Global adopts and realleges the allegations contained in paragraphs 1 – 174 above as if fully set forth herein.

176.    As described above, Insight Global had business relationships with its clients and customers.

177.    Sutmar knew that: (i) Insight Global had business relationships with a particular customer in the New York City area (the "Customer-B"); (ii) Customer-B had entered into multiple agreements for Insight Global's provision of staffing services to Customer-B and that

(iii) Insight Global intended to continue to seek the business of and enter into additional agreements with Customer-B.

178.    Despite having this knowledge, Sutmar knowingly, intentionally, and maliciously decided, endeavored, and sought to engage in acts which would cause irreparable damage to the agreements between Customer-B and Insight Global and Insight Global's advantageous business relationship with Customer-B.

179.    Sutmar intentionally, knowingly, maliciously, and without justification interfered with the business relationship between Insight Global and Customer-B.

180.    As a direct result of the willful and improper conduct of Sutmar, the business relationship between Insight Global and Customer-B suffered substantial harm.

181.    The conduct of Sutmar in interfering with Insight Global's economic relationship was intentional, willful, and calculated to cause damage to this business relationship.

182.    The improper conduct of Sutmar was committed with actual malice and ill will toward Insight Global, and with the intentional and improper purpose of causing irreparable damage.

183.    Accordingly, Insight Global demands judgment against Sutmar for her tortious interference with Insight Global's advantageous business relationship with Customer-B in the form of compensatory and punitive damages, prejudgment interest, Insight Global's reasonable attorneys' fees and costs, and such other relief as the Court deems just and proper.

<u>**COUNT XII**</u>
<u>**Tortious Interference with Insight Global's**</u>
<u>**Existing and Prospective Business Relationships**</u>
<u>**(Against Beacon Hill)**</u>

184.    Insight Global adopts and realleges the allegations contained in paragraphs 1 – 183 above as if fully set forth herein.

185.    As described above, Insight Global had business relationships with its clients and customers.

186.    Beacon Hill, through its employees Wenzel and Sutmar, knew that: (i) Insight Global had business relationships with Customers-A and Customer-B in the New York City area (the "Customers"); (ii) Customers had entered into multiple agreements for Insight Global's provision of staffing services to Customers and that (iii) Insight Global intended to continue to seek the business of and enter into additional agreements with Customers.

187.    Despite having this knowledge, Beacon Hill knowingly, intentionally, and maliciously decided, endeavored, and sought to engage in acts which would cause irreparable damage to the agreements between Customers and Insight Global and Insight Global's advantageous business relationship with Customers.

188.    Beacon Hill intentionally, knowingly, maliciously, and without justification interfered with the business relationship between Insight Global and Customers.

189.    As a direct result of the willful and improper conduct of Beacon Hill, the business relationship between Insight Global and Customers suffered substantial harm.

190.    Beacon Hill's conduct in interfering with Insight Global's economic relationship was intentional, willful, and calculated to cause damage to this business relationship.

191.    Beacon Hill's improper conduct was committed with actual malice and ill will toward Insight Global, and with the intentional and improper purpose of causing irreparable damage.

192.    Accordingly, Insight Global demands judgment against Beacon Hill for its tortious interference with Insight Global's advantageous business relationship with Customers in the form of compensatory and punitive damages, prejudgment interest, Insight Global's reasonable attorneys' fees and costs, and such other relief as the Court deems just and proper.

## COUNT XIII
## Attorneys' Fees and Expenses (Against the Former Employees)

193.     Insight Global adopts and realleges the allegations contained in paragraphs 1 – 192 above as if fully set forth herein.

194.     The Former Employees breached numerous provisions of the Employment Agreements and Separation Agreements (as applicable), entitling Insight Global to recover its attorneys' fees and all costs and expenses of litigation and appeal under the Attorney Fees Provision of the Employment Agreements and New York law.

## PRAYER FOR RELIEF

WHEREFORE, Insight Global respectfully demands that judgment be made and entered in its favor and against the Former Employees and Beacon Hill as follows:

(a)     Enter an Injunction enjoining the Former Employees from further violating the Trade Secret, Non-Competition, and Non-Solicitation Provisions of the Employment Agreements, as well as the other restrictive covenants in the Employment Agreements designed to protect Insight Global's trade secrets, and require the Former Employees to return any Insight Global trade secrets in their possession pursuant to the Return of Materials Provision;

(b)     Award Insight Global damages in an amount to be determined at trial for the Former Employees breaches of the Employment Agreements;

(c)     Enter an Injunction enjoining Norman and Sutmar from further violating the Separation Agreements and require Norman and Sutmar to return any Insight Global trade secrets in their possession pursuant to the Return of Property Affirmation;

(d)     Award Insight Global damages in an amount to be determined at trial for Norman and Sutmar's breaches of the Separation Agreements;

(e)     Award Insight Global actual, liquidated, and/or compensatory damages as well as punitive damages in an amount to be determined at trial against Norman and Sutmar for their fraudulent actions;

(f)     Require the Former Employees to account to Insight Global for all revenues and profits derived from their misappropriation of Insight Global's trade secrets;

(g)     Award Insight Global actual, liquidated, and/or compensatory damages in an amount to be determined at trial against the Former Employees for their misappropriation of Insight Global's trade secrets;

(h)     Award Insight Global exemplary damages pursuant to (i) the DTSA and (ii) the New York state law due to the Former Employees' willful and malicious misappropriation of Insight Global's trade secrets;

(i)     Award Insight Global actual, liquidated, and/or compensatory damages as well as punitive damages in an amount to be determined at trial against the Former Employees for their conversion of Insight Global's property;

(j)     Enter an Injunction enjoining the Former Employees from further breaching the duty of loyalty they owe to Insight Global;

(k)     Award Insight Global actual, liquidated, and/or compensatory damages for the Former Employees' breaches of the duty of loyalty;

(l)     Award Insight Global actual, liquidated, and/or compensatory damages as well as punitive damages in an amount to be determined at trial against Beacon Hill for its tortious interference with the Former Employees' Employment Agreements;

(m)     Award Insight Global actual, liquidated, and/or compensatory damages as well as punitive damages in an amount to be determined at trial against Wenzel for his tortious interference with the Norman Employment Agreements;

(n)     Award Insight Global actual, liquidated, and/or compensatory damages as well as punitive damages in an amount to be determined at trial against Beacon Hill, Wenzel, and Sutmar for their tortious interference with Insight Global's existing and prospective business relationships;

(o)     Award Insight Global prejudgment interest against the Former Employees and Beacon Hill for the claims asserted against them herein;

(p)     Award Insight Global all costs and attorneys' fees it incurs in the prosecution of this lawsuit pursuant to both the Attorney Fees Provision of the Employment Agreement and relevant New York law; and

(q)     Award Insight Global such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Insight Global hereby demands a trial by jury.

Dated: New York New York
October 27, 2017

KASOWITZ BENSON TORRES LLP

By: _____

Jessica T. Rosenberg (jrosenberg@kasowitz.com)
Edward E. Filusch (efilusch@kasowitz.com)
1633 Broadway
New York, New York 10019
Phone: (212) 506-1700
Facsimile: (212) 506 - 1800

INSIGHT GLOBAL, LLC
Ariel D. Zion (Ariel.Zion@insightglobal.com)
Georgia Bar No. 230543
Matthew J. Simmons
(Matt.Simmons@insightglobal.com)
Georgia Bar No. 561107
4170 Ashford Dunwoody Road, NE
Suite 250
Atlanta, Georgia 30319
Phone: (404) 257-7900
Facsimile: (404) 257-1070
*Pro Hac Vice* Application Forthcoming

*Attorneys for Plaintiff Insight Global, LLC*