UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED: _8/27/18_ | |

INSIGHT GLOBAL, LLC,

                   Plaintiff,

     - v -

DANIEL WENZEL, LUKE NORMAN,
LAUREN SUTMAR, and BEACON HILL
STAFFING GROUP, LLC,

                   Defendants.

**ORDER**

17 Civ. 8323 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       Plaintiff Insight Global, LLC – a staffing services company – brings this action against its competitor, Beacon Hill Staffing Group, LLC, and Daniel Wenzel, Luke Norman, and Lauren Sutmar – three of Plaintiff's former employees who now work for Beacon Hill. (Am. Cmplt. (Dkt. No. 27) ¶¶ 1-2, 18)  The Amended Complaint alleges that Defendants engaged in a "coordinated scheme" to "unlawfully acquire" Plaintiff's trade secrets and confidential information, and asserts causes of action for misappropriation of trade secrets in violation of federal and New York state law; breach of contract; fraudulent inducement; breach of the duty of loyalty; tortious interference with contract; and tortious interference with existing and prospective business relations.  (Id. ¶¶ 1-3, 18-19, 106-87)

       Defendants have moved to dismiss Counts Nine, Ten, and Eleven, which allege tortious interference with existing and prospective business relations.  (Mot. (Dkt. No. 39) at 1-2)[1]  For the reasons stated below, Defendants' motion to dismiss will be granted.

---

[1]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

## BACKGROUND[2]

### I.   FACTS

Insight Global provides staffing services throughout the country – including in the New York metropolitan area – with a focus on the information technology, accounting, finance, and engineering sectors.  (Am. Cmplt. (Dkt. No. 27) ¶ 18)  Beacon Hill is also a national staffing services company, and competes directly with Insight Global.  (Id. ¶ 1)  Daniel Wenzel, Luke Norman, and Lauren Sutmar are all former employees of Insight Global who now work for Beacon Hill.  (Id. ¶¶ 1-8)

#### A.   Wenzel and Sutmar's Former Employment at Insight Global

Until 2017, Wenzel and Sutmar worked as account managers for Insight Global. (Id. ¶¶ 31-37, 43-47)  Account managers are responsible for creating business partnerships between Insight Global and potential customers in a given territory.  (Id. ¶¶ 34, 46)  As account managers, Wenzel and Sutmar were entrusted with Insight Global's trade secrets, including "actual and potential customer information and lists, customer preferences, billing rates, pricing practices, and contract expiration dates."  (Id. ¶¶ 34, 46, 48-50)  Wenzel and Sutmar also attended training sessions and conferences at Insight Global headquarters, where they were exposed to the Company's trade secrets regarding business methods and strategies.  (Id. ¶¶ 37, 47)

---

[2] Unless otherwise noted, the following facts are drawn from the Amended Complaint and are presumed true for purposes of resolving Defendants' motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  Wenzel and Sutmar's Employment Agreements are also properly considered in resolving Defendants' motion to dismiss, because they are attached as exhibits to the Amended Complaint.  See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

As a condition of their employment, Wenzel and Sutmar entered into at-will employment agreements with Insight Global, which contained various restrictive covenants. (Id. ¶¶ 55-57)  For example, the employment agreements obligate Wenzel and Sutmar not to use or disclose any of Insight Global's trade secrets or confidential business information during or after their employment, without the Company's written consent. (Id. ¶¶ 60-62; Am. Cmplt., Ex. A (Wenzel Employment Agmt.) (Dkt. No. 27-1) at 3-4 ¶¶ 2-3; Am. Cmplt., Ex. C (Sutmar Employment Agmt.) (Dkt. No. 27-3) at 3-4 ¶¶ 2-3)  The employment agreements also contain a non-compete clause providing that Wenzel and Sutmar will not perform similar staffing services in competition with Insight Global "within a pre-determined radius of the Insight Global office in which he or she worked for a period of one year following the termination of employment." (Am. Cmplt. (Dkt. No. 27) ¶ 63; Am. Cmplt., Ex. A (Wenzel Employment Agmt.) (Dkt. No. 27-1) at 4-5 ¶ 4; Am. Cmplt., Ex. C (Sutmar Employment Agmt.) (Dkt. No. 27-3) at 4-5 ¶ 4)  There is also a non-solicitation provision, which bars Wenzel and Sutmar from "soliciting actual or prospective Insight Global clients, with whom they had material contact during the last two years of employment, for a period of one year following the termination of employment." (Am. Cmplt. (Dkt. No. 27) ¶ 64; Am. Cmplt., Ex. A (Wenzel Employment Agmt.) (Dkt. No. 27-1) at 5 ¶ 6; Am. Cmplt., Ex. C (Sutmar Employment Agmt.) (Dkt. No. 27-3) at 5 ¶ 6)

### B.   Beacon Hill's Practice of "Poaching" Insight Global Employees

The Amended Complaint alleges that Beacon Hill has a "long history" of "[c]ompeting unfairly for . . . [and] improperly poaching employees." (Am. Cmplt. (Dkt. No. 27) ¶¶ 97-99)  For example, in 2017 Beacon Hill hired approximately ten Insight Global employees. (Id. ¶ 99)  Moreover, because Beacon Hill conceals its hiring of former Insight Global employees – "by, for example, instructing the employees not to update their LinkedIn

3

profiles to disclose their employment with Beacon Hill" – the number of former Insight Global employees now working at Beacon Hill is likely higher than the ten hired in 2017.  (Id.)

Beacon Hill's hiring practices have generated "multiple prior lawsuits with Insight Global."  (Id. ¶ 97)  As a result of this litigation, Beacon Hill is "well aware that Insight Global enters into [a]t-[w]ill [e]mployment [a]greements with all of its employees that contain certain restrictive covenants," and Beacon Hill has "active knowledge" of the trade secrets, non-disclosure, non-compete, and non-solicitation provisions contained therein.  (Id. ¶¶ 98, 100) Beacon Hill instructs Insight Global's former employees that they need not comply with their contractual obligations to Insight Global, however.  (Id. ¶ 101)  Moreover, Beacon Hill promises to provide Insight Global's former employees with a legal defense and to indemnify them for any adverse judgment they incur as a result of litigation with Insight Global.  (Id.)

### C.  Wenzel and Sutmar's Employment at Beacon Hill

Wenzel and Sutmar resigned from Insight Global in 2017.  (See id. ¶¶ 36-37, 75, 82-82)  Prior to leaving Insight Global, Wenzel and Sutmar began to collect and misappropriate Insight Global's trade secrets and confidential business information, including details regarding, and contact information for, Insight Global clients, information regarding active and former contractors whom Insight Global worked with to place at its clients, and leads for prospective contractors and customers with whom Insight Global intended to do business.  (Id. ¶¶ 76-77, 84-85)  Soon after Wenzel and Sutmar resigned, Insight Global learned that they had both accepted employment at Beacon Hill "in a similar capacity and within the same region where [they] worked for [Insight Global.]"  (Id. ¶¶ 75, 83)

According to the Amended Complaint, Wenzel and Sutmar used Insight Global's trade secrets to "recruit[] for various positions," communicate and "interface[e] with hiring and

vendor managers at companies in and around the New York City area about their staffing needs," and "communicat[e] with contractors." (Id. ¶ 91)

Wenzel and Sutmar have also solicited business from Insight Global customers on behalf of Beacon Hill, using the trade secret and confidential information that they misappropriated from Insight Global. (Id. ¶¶ 86, 91)  For example, Wenzel "intentionally interfered [with], and continues to intentionally interfere" with, Insight Global customers NBC Universal Media and Sony Media Entertainment. (Id. ¶ 87)  Sutmar has likewise "intentionally interfered [with], and continues to intentionally interfere" with, the Museum of Modern Art – another Insight Global customer. (Id. ¶ 88)  Wenzel and Sutmar engaged in this conduct despite knowing that these customers had entered into multiple agreements with Insight Global for staffing services, and that Insight Global intended to enter into additional agreements with these customers. (Id. ¶¶ 163, 172)  As a result of Wenzel and Sutmar's misconduct, Insight Global's relationship with these customers "suffered substantial harm." (Id. ¶¶ 166, 175)

The Amended Complaint further alleges that Beacon Hill "has and had knowledge of, and approved, these unlawful actions," and that Wenzel and Sutmar have acted "in concert with Beacon Hill to cover up the illegal nature of their and Beacon Hill's activities." (Id. ¶¶ 103-04, 181-82)

*        *        *        *

The Amended Complaint was filed on January 11, 2018, and asserts claims for misappropriation of trade secrets in violation of federal and New York state law; breach of contract; fraudulent inducement; breach of the duty of loyalty; tortious interference with contract; and tortious interference with existing and prospective business relations. (Id. ¶¶ 106-87)  Defendants have moved to dismiss Counts Nine, Ten and Eleven, which assert claims for

tortious interference with existing and prospective business relations against Wenzel, Sutmar, and Beacon Hill.  (Id. ¶¶ 161-87)

## DISCUSSION

I.    **RULE 12(b)(6) STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Allegations that "are no more than conclusions[] are not entitled to the assumption of truth," however.  Iqbal, 556 U.S. at 679.  A pleading is conclusory "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" id. at 678, offers "'a formulaic recitation of the elements of a cause of action,'" id., and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007).  While legal conclusions "can provide the complaint's framework, they must be supported by factual allegations." Iqbal, 556 U.S. at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner,

Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). Additionally, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

## II.   TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

To state a claim for tortious interference with business relations under New York law, a plaintiff must demonstrate that: "'(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'" 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 261 (2d Cir. 2015) (quoting Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008)). A plaintiff cannot prevail "unless [it] 'demonstrate[s] both wrongful means and that the wrongful acts were the proximate cause of the rejection of the plaintiff's proposed contractual relations.'" State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 171-72 (2d Cir. 2004) (quoting Pacheco v. United Medical Assoc., P.C., 305 A.D.2d 711, 712 (3d Dep't 2003)). Moreover, a plaintiff must allege conduct directed at its customers or other business. See Plasticware, LLC v. Flint Hills Res., LP, 852 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (citing Carvel Corp. v. Noonan, 3 N.Y.3d 182, 192 (2004) ("[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.")).

In moving to dismiss Counts Nine, Ten, and Eleven, Defendants contend that the Amended Complaint does not allege sufficient facts to establish the third and fourth elements of

a claim for tortious interference with business relations.  (Def. Br. (Dkt. No. 40) at 4-12)

A.    **Wrongful Means**

1.    **Applicable Law**

"[T]he third element – which requires that a defendant act with a wrongful purpose or utilize wrongful means – distinguishes tortious interference with business relations from tortious interference with contract." Glob. Packaging Servs., LLC v. Glob. Printing & Packaging, 248 F. Supp. 3d 487, 494 (S.D.N.Y. 2017).  "'[G]reater protection is accorded an interest in an existing contract (as to which respect for individual contract rights outweighs the public benefit to be derived from unfettered competition) than to the less substantive, more speculative interest in a prospective relationship (as to which liability will be imposed only on proof of more culpable conduct on the part of the interferer).'" NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc., 87 N.Y.2d 614, 622 (1996) (alterations in original) (quoting Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191 (1980)).  Accordingly, the wrongful means requirement "sets a high bar," 16 Casa Duse, LLC, 791 F.3d at 262, and "makes alleging and proving a tortious interference claim with business relations 'more demanding' . . . because a plaintiff's mere interest or expectation in establishing a contractual relationship must be balanced against the 'competing interest of the interferer,' as well as the broader policy of fostering healthy competition." Catskill Dev., L.L.C., 547 F.3d at 132 (quoting Guard-Life Corp., 50 N.Y. 2d at 191).

As a general rule, in order to satisfy the third element of a tortious interference with business relations claim, the "defendant's conduct must amount to a crime or an independent tort." Carvel Corp., 3 N.Y.3d at 190.  "Conduct that is not criminal or tortious will generally be lawful, and thus insufficiently 'culpable' to create liability." Id.

There is an exception to this general rule, however.  Where no crime or independent tort is alleged, a defendant may nevertheless be held liable if he engages in conduct "'for the sole purpose of inflicting intentional harm on plaintiff[],'" or has employed "wrongful means," such as "'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and extreme and unfair economic pressure.'" Id. at 190-91 (citations omitted); see also Sidney Frank Importing Co. v. Beam Inc., 998 F. Supp. 2d 193, 212 (S.D.N.Y. 2014) ("In Carvel Corp., the New York Court of Appeals recognized one exception to the general rule 'where a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs.'" . . . The court then identified other 'more culpable' conduct discussed in earlier cases, explaining that an interferer would not be held liable 'so long as 'the means employed are not wrongful.'" (citations omitted)).   "[P]ersuasion alone although it is knowingly directed at interference with the contract[]" does not constitute wrongful means.  Carvel Corp., 3 N.Y.3d at 191 (internal quotation marks and citations omitted).  Moreover, this exception is narrow, and does not apply where a defendant's "motive in interfering with the [plaintiff's] relationships with their customers was normal economic self-interest." Id. at 190; 16 Casa Duse, LLC, 791 F.3d at 262 ("[T]his exception is narrow:  When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate.'" (citations omitted)).

## 2.   Analysis

Here, Plaintiff alleges that – prior to resigning from Insight Global – Wenzel and Sutmar began collecting and misappropriating Insight Global's trade secrets and confidential information, including details regarding and contact information for Insight Global's clients, information regarding active and former contractors whom Insight Global worked with to place

at its clients, and leads for prospective contractors and customers with whom Insight Global intended to do business. (Am. Cmplt. (Dkt. No. 27) ¶¶ 76-77, 84-85)  Plaintiff further alleges that – soon after leaving Insight Global – Wenzel and Sutmar began working for Beacon Hill (id. ¶¶ 75, 83), where they have been using Insight Global's confidential business information and trade secrets – with Beacon Hill's knowledge and approval – to solicit Insight Global's clients on behalf of Beacon Hill.  (Id. ¶¶ 86, 103)  Indeed, using "information and tactics that they obtained through the misappropriation of Insight Global's trade secret and confidential information," Wenzel and Sutmar allegedly "intentionally interfered [with], and continue[] to interfere" with, Insight Global's business relations with several of its existing customers, including NBC Universal Media, Sony Media Entertainment, and the Museum of Modern Art.  (Id. ¶¶ 86-88, 163-168, 172-77)  Moreover, Beacon Hill allegedly "has and had knowledge of, and approved, these unlawful actions" (id. ¶¶ 103, 181-83), "encourage[s] [Wenzel and Sutmar] to solicit Insight Global's current and prospective clients using Insight Global's confidential and trade secret information, and assist[s] [them] in covering up their illegal actions," thereby "engaging in unfair competition."  (Id. ¶ 105)

Numerous courts have recognized that allegations of independently tortious conduct – such as misappropriation of trade secrets and unfair competition – suffice to establish the "wrongful means" element at the pleadings stage.  See, e.g., Advance Watch Co. v. Pennington, No. 13 Civ. 8169 (JMF), 2014 WL 5364107, at *6 (S.D.N.Y. Oct. 22, 2014) ("Among other things, Plaintiffs allege that Defendants engaged in unfair competition and misappropriated trade secrets from Geneva, and then used the misappropriated trade secrets to induce the MLB and NFL to refuse to renew their exclusive licensing agreements with Geneva.  In light of those allegations, 'the 'wrongful means' element is clearly present here,

given that the alleged interference occurred by means of separate torts, here trade

secret misappropriation and unfair competition.'" (citations omitted)); Faiveley Transp. USA,

Inc. v. Wabtec Corp., 758 F. Supp. 2d 211, 222 (S.D.N.Y. 2010) ("Under New York law, the

complaint's assertion that the alleged interference occurred by means of separate torts, here trade

secret misappropriation and unfair competition, is sufficient to satisfy the 'improper means'

element of a tortious interference claim."); All R's Consulting, Inc. v. Pilgrims Pride Corp., No.

06 Civ. 3601 (DAB), 2008 WL 852013, at *16 (S.D.N.Y. Mar. 28, 2008) (plaintiffs' allegations

that defendants engaged in conduct amounting to tort of unfair competition were sufficient to

establish "wrongful means"); Cardiocall, Inc. v. Serling, 492 F. Supp. 2d 139, 153 (E.D.N.Y.

2007) ("[T]he knowing use of trade secret or other confidential information has been held to be

the sort of tortious conduct necessary to state a claim" for tortious interference with prospective

business relations.); Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 483-84

(S.D.N.Y. 1997) (evidence that defendant obtained plaintiff's customer lists under false

pretenses in order to induce plaintiff's customers to return to defendant was sufficient to

establish wrongful means).

       Accordingly, the Amended Complaint's factual allegations are sufficient to make

out the "wrongful means" element of a claim for tortious interference with business relations.

### B.    <u>Injury to Business Relations</u>

       "Under New York law, to prevail on a claim of tortious interference with

prospective business relations, a plaintiff must demonstrate that the defendant interfered with

business relations existing between a plaintiff and a third party. . . . Although there is some case

law suggesting that the plaintiff must identify a particular contract or contractual negotiations

that are the basis of the action, more accurately, the tort usually involves interference with a

business relationship not amounting to a contract." Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55, 74 (2d Cir. 1988) (citations omitted); see also Scutti Enterprises, LLC. v. Park Place Entm't Corp., 322 F.3d 211, 215 (2d Cir. 2003) ("The lack of a valid contract . . . is not a barrier to a claim for tortious interference with business relations.  Indeed, [plaintiff] 'can recover if [it] can prove that the defendant tortiously interfered with 'a continuing business or other customary relationship not amounting to a formal contract.''" (citations omitted)). "Where 'the underlying business relations remained undisturbed,' [however,] a claim for tortious interference is 'fatally defective.'" RFP LLC v. SCVNGR, Inc., 788 F. Supp. 2d 191, 198 (S.D.N.Y. 2011) (quoting PPX Enterprises, Inc. v. Audiofidelity Enters., 818 F.2d 266, 269 (2d Cir. 1987), abrogated on other grounds by Hannex Corp. v. GMI, Inc., 140 F.3d 194, 206 (2d Cir. 1998)).

Here, Plaintiff has not alleged sufficient facts to demonstrate injury to its business relations with NBC Universal Media, Sony Media Entertainment, and the Museum of Modern Art.  (See Am. Cmplt. (Dkt. No. 27) ¶¶ 87-88, 163-86)  While Plaintiff alleges in a conclusory fashion that Wenzel, Sutmar, and Beacon Hill used Insight Global's trade secrets to "intentionally, knowingly, maliciously, and without justification interfere[] with the business relationship between Insight Global and [these c]ustomers," causing Insight Global's business relationship with them to "suffer[] substantial harm," the Amended Complaint does not set forth any facts to support these allegations.  (See id. ¶¶ 86-88, 165-66, 174-75, 183-84)  For example, the Amended Complaint does not explain how Sutmar, Wenzel, and Beacon Hill "interfered" with Plaintiff's business relations with NBC Universal Media, Sony Media Entertainment, and the Museum of Modern Art.  (See id.)  Nor does the Amended Complaint assert that any of these customers (1) terminated, altered, or modified their existing agreement or relationship with

12

Plaintiff, or (2) failed to enter into a prospective agreement or relationship with Plaintiff. (See id. ¶¶ 86-88, 165-66, 174-75, 183-84)  In short, Plaintiff has not pled facts demonstrating that it lost business from any customer as a result of Defendants' alleged "interference."

    Plaintiff's bare and conclusory allegation that "as a direct result of the willful and improper conduct of [Wenzel, Sutmar, and Beacon Hill], the business relationships between Insight Global and [these customers suffered substantial harm]" is not sufficient to demonstrate that Defendants caused injury to Plaintiff's business relations with these customers. See Ritani, LLC v. Aghjayan, 880 F. Supp. 2d 425, 452 (S.D.N.Y. 2012) (dismissing tortious interference with business relations claim where "[plaintiff] has not alleged that, as a result of [defendant's] actions, . . . any of these customers did not buy from [plaintiff], or that any order was canceled or that it had an actual, legitimate expectation as to their further patronage"); RFP LLC, 788 F. Supp. 2d at 198-99 ("Although SCVNGR does make the bare allegation that it 'suffered injury to its business relationship with Bremer,' it has not alleged that Bremer stopped working with it or pulled out of the Bloomington Event. . . . Rather than causing a breakdown in the business relationship between Bremer and SCVNGR, the Counter-Defendants' interference left the underlying relationship undisturbed. . . . The allegations are therefore insufficient to support the injury element of the tortious interference claim."); cf. Sidney Frank Importing Co., 998 F. Supp. 2d at 213-14 (holding that the injury element was met where plaintiff alleged in detail that "it had cultivated ongoing long-term relationships with distributors, that the distributors enthusiastically promoted and distributed the Michael Collins brand nationally, and that Beam's alleged misrepresentations caused the distributors (one of which distributed more than half of [p]laintiff's brand in the U.S.) to lose confidence in the Michael Collins brand and to

'withhold their support' which they had previously given, resulting in economic loss").[3]

## III.   LEAVE TO AMEND

In its opposition brief, Plaintiff requests leave to amend in the event that

Defendants' motion to dismiss is granted.  (See Pltf. Br. (Dkt. No. 41) at 17 n. 8)

District courts "ha[ve] broad discretion in determining whether to grant leave to

amend," Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000), and leave to amend should

generally be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).  A court may

properly deny leave to amend, however, in cases of "'undue delay, bad faith or dilatory motive

on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment,

futility of amendment, etc.'" Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008)

(quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see also Murdaugh v. City of New York,

No. 10 Civ. 7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under

Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely

given,' leave to amend need not be granted where the proposed amendment is futile.").  "An

amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss

pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002)

(citation omitted).

---

[3] A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC, 241 F. Supp. 3d 461, 486-87 (S.D.N.Y. 2017) – cited by Plaintiff (see Pltf. Br. (Dkt. No. 41) at 14) – is distinguishable.  In A.V.E.L.A., the court found the allegations "thin, but just substantial enough to state a claim for tortious interference with prospective economic advantage." Id. at 486.  In that case, however, there were factual allegations regarding the nature of the alleged interference, and the injury suffered as a result of the alleged interference.  See id. at 486-87 (noting allegations that Estate had "interfered with a prospective licensing agreement into which V. International planned to enter," and "divert[ed] customers away from licensing artwork from V. International," causing V. International to suffer damages).

Here, this Court cannot conclude that any amendment would be futile. Accordingly, leave to amend will be granted.  Plaintiff will file any Second Amended Complaint by September 10, 2018.

## **CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss Counts Nine, Ten, and Eleven of the Amended Complaint is granted.  Plaintiff's request for leave to amend is granted.  Any Second Amended Complaint will be filed by September 10, 2018.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 39).

Dated: New York, New York
       August 27, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge

15