## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

INSIGHT GLOBAL, LLC,

      *Plaintiff*,

v.

DANIEL WENZEL, LUKE NORMAN,
LAUREN SUTMAR, and
BEACON HILL STAFFING GROUP, LLC,

      *Defendants*.

CASE NO. 1:17-CV-8323

## DEFENDANTS' TRIAL MEMORANDUM OF LAW

ECKERT SEAMANS CHERIN & MELLOTT, LLC

/s/ Charlotte L. Bednar
Geraldine A. Cheverko (gcheverko@eckertseamans.com)
Charlotte L. Bednar (cbednar@eckertseamans.com)
Anthony M. Moccia (amoccia@eckertseamans.com)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
10 Bank Street, Suite 700
White Plains, NY 10606
Telephone: (914) 949-2909
Facsimile: (914) 949-5424

*Attorneys for Defendants Daniel Wenzel, Luke Norman,*
*Lauren Sutmar, and Beacon Hill Staffing Group, LLC*

## TABLE OF CONTENTS

**No table of contents entries found.**

I.    **PRELIMINARY STATEMENT** ..................................................................... 1

II.   **SUMMARY OF FACTS AT TRIAL** ............................................... 4

III.   **SUMMARY OF DEFENDANTS' CASE AT TRIAL** .................................... 7

   A.  **Insight's breach of contract claims fail** ........................................ 7

     1.  Insight's breach of contract claims against Mr. Norman fail. ........................ 8

       a.  *Insight's claim that Mr. Norman breached his Employment Agreement fails.* ........... 8

       b.  *Insight's claim that Mr. Norman breached the Separation Agreement fails.* ........... 10

     2.  Insight's breach of contract claims against Mr. Wenzel and Ms. Sutmar fail. ............. 10

       a.  *The post-employment restrictive covenants in Mr. Wenzel's and Ms. Sutmar's Employment Agreements are unenforceable* ............................................ 11

         i.  Insight has no legitimate business interest in client relationships and goodwill. . 15

         ii.  Insight has no legitimate business interest in confidential information. ............... 21

         iii.  Insight has no legitimate business interest in a stable workforce. ...................... 27

         iv.  The non-compete covenants are not reasonably necessary. .................................. 30

         v.  The non-solicit covenants are not reasonably necessary ...................................... 34

         vi.  The non-recruit covenants are not reasonably necessary. ..................................... 36

         vii.  The tolling clauses are not reasonably necessary. ................................................ 36

         viii. The non-disclosure clauses are not reasonably necessary. .................................. 37

         ix.  The covenants are not supported by consideration. .............................................. 38

b.   *Mr. Wenzel and Ms. Sutmar did not breach the restrictive covenants in their Employment Agreements.* ................................................................. 42

c.   *Insight did not suffer any damages from Mr. Wenzel's or Ms. Sutmar's alleged breaches of the restrictive covenants in their Employment Agreements.* ........................ 44

**B.   Insight's trade secret misappropriation claims fail.** .................................................. 47

1.   Insight's Trade Secret Misappropriation Claims Against Mr. Wenzel Fail. ................. 48

2.   Insight's trade secret misappropriation claims against Ms. Sutmar fail. ....................... 52

**C.   Insight's fraudulent inducement claim fails.** ................................................................. 54

**D.   Insight's claim for breach of the duty of loyalty fails.** ................................................. 56

**E.   Insight's tortious interference with contract claims fail.** ............................................. 57

**F.   Insight's tortious interference with business relationship claims fail.** ....................... 60

**G.   Insight's claims fail because it has released them.** ....................................................... 64

**III.   CONCLUSION** ........................................................................................................... 66

# TABLE OF AUTHORITIES

**Cases**

*Ability Search, Inc. v. Lawson,*
   556 F. Supp. 9 (S.D.N.Y. 1981)................................................................. 23

*All-Pak, Inc. v. Johnston,*
   694 A.2d 347 (Pa. Super. Ct. 1997) ........................................................ 13

*AM Medica Commc'ns Grp. v. Kilgallen,*
   261 F. Supp. 2d 258 (S.D.N.Y. 2003)...................................................... 41

*Am. Broadcasting Cos., Inc. v. Wolf,*
   420 N.E.2d 363 (N.Y. 1981)..................................................................... 13

*Am. Ctr. for Excellence in Surgical Assisting Inc. v. Cmty. Coll. Dist. 502,*
   315 F. Supp.3d 1044 (N.D. Ill. 2018) ...................................................... 12

*Am. Cyanamid Co. v. Elizabeth Arden Sales Corp.,*
   331 F. Supp. 597 (S.D.N.Y. 1971) ........................................................... 60

*Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.,*
   682 F.2d 382 (2d Cir. 1982)............................................................... 13, 30

*Am. Transp. Grp., LLC v. Power,*
   No. 17 C 7962, 2018 WL 1993204 (N.D. Ill. Apr. 27, 2018).................. 14

*ATC Healthcare Servs., Inc. v. RCM Techs., Inc.,*
   192 F. Supp.3d 943 (N.D. Ill. 2016) .................................................. 16, 23

*Banner Indus. of N.E., Inc. v. Wicks,*
   71 F. Supp.3d 284 (N.D.N.Y. Dec. 1, 2014) ........................................... 58

*BDO Seidman v. Hirshberg,*
   712 N.E.2d 1220 (N.Y. 1999)............................................................ passim

*Bigsby v. Barclays Cap. Real Estate, Inc.,*
   329 F.R.D. 78 (S.D.N.Y. 2019) ................................................................ 39

*Brown & Brown, Inc. v. Johnson,*
   34 N.E.3d 357 (N.Y. 2015)...................................................... 11, 14, 34

*Brown & Brown, Inc. v. Mudron,*
   887 N.E.2d 437 (Ill. App. Ct. 2008) ........................................................ 38

*Buhler v. Michael P. Maloney Consulting, Inc.,*
   299 A.D.2d 190 (N.Y. Sup. Ct. 2002) ...................................................... 49

*Can't Stop Prods., Inc. v. Sixuvus, Ltd.,*
   295 F. Supp.3d 381 (S.D.N.Y. 2018)........................................................ 11

*Carvel Corp. v. Noonan,*
   818 N.E.2d 1100 (N.Y. 2004).................................................................... 61

*Catalogue Serv. of Westchester, Inc. v. Henry,*
   107 A.D.2d 783 (N.Y. Sup. Ct. 1985) ...................................................... 26

*CCM Rochester, Inc. v. Federated Inv'rs, Inc.,*
   234 F. Supp.3d 501 (S.D.N.Y. 2017)........................................................ 54

*Century Pac., Inc. v. Hilton Hotels Corp.,*
   528 F. Supp. 2d 206 (S.D.N.Y. 2007)....................................................... 55

*Cerciello v. Admiral Ins. Brokerage Corp.,*
   936 N.Y.S.2d 224 (N.Y. App. Div. 2011) ................................................ 56

*Colorcon, Inc. v. Lewis,*
    792 F.Supp.2d 786 (E.D. Pa. 2011) ............................................................... 13
*CSM Bakery Sols., LLC v. Debus,*
    No. 1:16-cv-03732-TCB, 2017 WL 2903354 (N.D. Ga. Jan. 25, 2017) ............................ 9, 10
*Curtis 1000, Inc. v. Suesss,*
    24 F.3d 941 (7th Cir. 1994) ............................................................... 38
*Delta Filter Corp. v. Morin,*
    108 A.D.2d 991 (N.Y. Sup. Ct. 1985) ............................................................... 53
*Delville v. Firmenich Inc.,*
    920 F. Supp. 2d 446 (S.D.N.Y. 2013) ............................................................... 52, 57
*Design Strategy, Inc. v. Davis,*
    469 F.3d 284 (2d Cir. 2006) ............................................................... 56
*Dewitt Stern Grp., Inc. v. Eisenberg,*
    257 F. Supp.3d 542 (S.D.N.Y. 2017) ............................................................... 56
*Diederich Ins. Agency, LLC v. Smith,*
    952 N.E.2d 165 (Ill. App. Ct. 2011) ............................................................... 38
*Diodato v. Wells Fargo Insurance Services, USA, Inc.,*
    44 F.Supp.3d 541 (M.D. Pa. 2014) ............................................................... 11, 14
*DiPerna v. Chi. Sch. of Prof'l Psychology,*
    893 F.3d 1001 (7th Cir. 2018) ............................................................... 12
*Dobson v. Milton Hershey Sch.,*
    --- F.Supp.3d ---, 2018 WL 6436718 (M.D. Pa. 2018) ............................................................... 11
*EarthWeb, Inc. v. Schlack,*
    71 F. Supp. 2d 299 (S.D.N.Y. 1999) ............................................................... 24
*Ehrlich for Hoffmans Trade Grp. LLC v. McLane Global,*
    No. 1:17-CV-28(LEK), 2017 WL 2633528 (N.D.N.Y. June 19, 2017) ............................................................... 49
*Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.,*
    719 N.E.2d 1141 (Ill. App. Ct. 1999) ............................................................... 31, 34, 35
*Elsevier Inc. v. Doctor Evidence, LLC,*
    No. 17-cv-5540(KBF), 2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ............................................................... 48
*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009) ............................................................... 48, 52
*Farrar v. Hobby,*
    506 U.S. 103 (1992) ............................................................... 46
*Free Country Ltd. v. Drennen,*
    235 F. Supp.3d 559 (S.D.N.Y. 2016) ............................................................... 22, 49
*Geritrex Corp. v. Dermarite Indus., LLC,*
    910 F. Supp. 955 (S.D.N.Y. 1996) ............................................................... 51
*Hess v. Bresney,*
    784 F.3d 1154 (7th Cir. 2015) ............................................................... 12
*Hess v. Gebhard & Co. Inc.,*
    808 A.2d 912 (Pa. 2002) ............................................................... 13, 14, 31
*Hill v. Brown,*
    520 N.E.2d 1038 (Ill. App. Ct. 1988) ............................................................... 12, 65, 68
*Ikon Office Sols., Inc. v. Usherwood Office Tech., Inc.,*
    875 N.Y.S.2d 820 (N.Y. Sup. Ct. 2008) ............................................................... 35

*ILG Indus., Inc. v. Scott,*
  273 N.E.2d 393 (Ill. 1971) ........................................................................ 26
*Illinois Courts in Robert Half International, Inc. v. Dunn,*
  No. 5:13-cv-974, 2013 WL 10829925 (N.D.N.Y. Oct. 29, 2013) ................................... passim
*In re Bernard L. Madoff Inv. Sec. LLC,*
  440 B.R. 282 (S.D.N.Y. 2010) ...................................................................... 61
*In re Ill. Bell Tel. Link-Up II,*
  994 N.E.2d 553 (Ill. App. Ct. 2013) ............................................................... 12
*Insight. See Marsh USA Inc. v. Doerfler,*
  9 N.Y.S.3d 594 (N.Y. Sup. Ct. 2015) ................................................ 41, 43, 52, 65
*Instant Tech. LLC v. DeFazio,*
  793 F.3d 748 (7th Cir. 2015) .................................................................. 17, 23
*Instant Tech., LLC v. DeFazio,*
  40 F. Supp.3d 989 (N.D. Ill. 2014) ............................................................ passim
*Int'l Paper Co. v. Suwyn,*
  951 F. Supp. 445 (S.D.N.Y. 1997) ............................................................. 39, 44, 50
*Ipcon Collections LLC v. Costco Wholesale Corp.,*
  698 F.3d 58 (2d Cir. 2012) .......................................................................... 54
*Iron Mountain Info. Mgmt., Inc. v. Taddeo,*
  455 F. Supp. 2d 124, 140 (E.D.N.Y. 2006) ....................................................... 22, 49
*JamSports & Entm't, LLC v. Paradrama Prods., Inc.,*
  336 F. Supp. 2d 824 (N.D. Ill. 2004) ............................................................. 12
*JEDA Capital-56, LLC v. Vill. of Potsdam, New York,*
  661 F. Appx. 20 (2d Cir. 2016) ................................................................... 66
*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,*
  323 F. Supp. 2d 525 (S.D.N.Y. 2004) ............................................................ 15
*Johnson v. Nextel Commc'ns,*
  660 F.3d 131 (2d Cir. 2011)........................................................................ 56
*Kenford Co. v. Cty. of Erie,*
  493 N.E.2d 234 (N.Y. 1986)......................................................................... 12
*Kirch v. Liberty Media Corp.,*
  449 F.3d 388 (2d Cir. 2006)........................................................................ 58
*L.M. Rabinowitz & Co. v. Dasher,*
  82 N.Y.S.2d 431 (N.Y. Sup. Ct. 1948) ........................................................ 27, 53
*Lama Holding Co. v. Smith Barney Inc.,*
  668 N.E.2d 1370 (N.Y. 1996)........................................................................ 58
*Lawrence & Allen, Inc. v. Cambridge Human Res. Grp., Inc.,*
  685 N.E.2d 434 (Ill. App. Ct. 1997) ...................................................... 15, 16, 17, 22
*Lehman v. Dow Jones & Co.,*
  783 F.2d 285 (2d Cir. 1986)........................................................................ 48
*Levine v. Bochner,*
  132 A.D.2d 532 (N.Y. Sup. Ct. 1987) ............................................................. 26
*Lifetec, Inc. v. Edwards,*
  880 N.E.2d 188 (Il. App. Ct. 2007) .............................................................. 21
*LinkCo, Inc. v. Fujitsu Ltd.,*
  230 F. Supp. 2d 492 (S.D.N.Y. 2002).............................................................. 48

*LSSi Data Corp. v. Time Warner Cable, Inc.,*
892 F. Supp. 2d 489 (S.D.N.Y. 2012) .................................................................. 41

*Marsh USA, Inc. v. Alliant Ins. Servs., Inc.,*
26 N.Y.S.3d 725 (N.Y. Sup. Ct. 2015) ...................................................... 22, 41, 49

*MasterCard Int'l Inc. v. Nike, Inc.,*
164 F. Supp.3d 592 (S.D.N.Y. 2016) .................................................................... 28

*Mattesich v. Hayground Cove Asset Mgmt., LLC,*
876 N.Y.S.2d 405 (N.Y. App. Div. 2009) ............................................................ 58

*McInnis v. OAG Motorcycle Ventures, Inc.,*
35 N.E.3d 1076, 87-88 (Ill. App. Ct. 2015) .................................................... 38, 39

*Medix Staffing Solutions, Inc. v. Dumrauf,*
No. 17 C 6648 (N.D. Ill. Apr. 17, 2018) .............................................................. 32

*Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman,
P.C.,*
137 A.3d 1247 (Pa. 2016) ..................................................................................... 11

*Morgan's Home Equip. Corp. v. Martucci,*
136 A.2d 838 (Pa. 1957) ...................................................................................... 13

*Morris v. Schroder Cap. Mgmt. Int'l,*
859 N.E.2d 503 (N.Y. 2006) ................................................................................. 13

Ms. Sutmar's Employment Agreement. See *Prairie Rheumatology Assocs., S.C. v.
Francis,*
24 N.E.3d 58 (Ill. App. Ct. 2014) .................................................................. 39, 52

*N. Atl. Instruments, Inc. v. Haber,*
188 F.3d 38 (2d Cir. 1999) ............................................................................ 48, 52

*Nat'l Bus. Servs., Inc. v. Wright,*
2 F.Supp.2d 701 (E.D. Pa. 1998) .......................................................................... 13

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,*
392 F.3d 520 (2d Cir. 2004) .......................................................................... 12, 47

*Nature's Plus Nordic A/S v. Nat. Organics, Inc.,*
980 F. Supp. 2d 400 (E.D.N.Y. 2013) .................................................................. 12

*Next Commc'ns, Inc. v. Viber Media, Inc.,*
2017 WL 4402540 (S.D.N.Y. Sept. 30, 2017) ...................................................... 47

*Next Commc'ns, Inc. v. Viber Media, Inc.,*
No. 14-cv-8190(RJS), 2016 WL 1275659 (S.D.N.Y. Mar. 30, 2016) .................. 48

*Northrup Contracting, Inc. v. Village of Bergen,*
514 N.Y.S.2d 306 (N.Y. App. Div. 1987) ............................................................ 64

*NY Customers. See RFP LLC v. SCVNGR, Inc.,*
788 F. Supp. 2d 191 (S.D.N.Y. 2011) .................................................................. 63

*Oliver Wyman, Inc. v. Eielson,*
282 F. Supp.3d 684 (S.D.N.Y. 2017) .............................................................. 28, 36

*Overseas) Ltd. v. Gen. Elec. Co.,*
No. 05 Civ. 9478(GEL), 2009 WL 399221 (S.D.N.Y. Feb. 18, 2009) .................. 25

*Pampered Chef v. Alexanian,*
804 F. Supp. 2d 765 (N.D. Ill. 2011) ................................................................... 29

*Papa John's Int'l, Inc. v. Rezko,*
No. 04 C 3131, 2006 WL 1697134 (N.D. Ill. June 14, 2006) ............................... 37

*Paramount Pad Co. v. Baumrind,*
    151 N.E.2d 609 (N.Y. 1958) ............................................................ 27
*PepsiCo, Inc. v. Redmond,*
    54 F.3d 1262 (7th Cir. 1995) ........................................................... 25
*Perma Research & Dev. Co. v. Singer Co.,*
    410 F.2d 572 (2d Cir. 1969).............................................................. 40
*PharMethod, Inc. v. Caserta,*
    382 F. App'x 214 (3d Cir. 2010) ...................................................... 13
*Pino v. Locascio,*
    101 F.3d 235 (2d Cir. 1996)............................................................. 46
*Plasticware, LLC v. Flint Hills Res., LP,*
    852 F. Supp. 2d 398 (S.D.N.Y. 2012)....................................... 62, 63
*Poller v. BioScrip, Inc.,*
    974 F. Supp. 2d 204 (S.D.N.Y. 2013)........................... 13, 26, 38, 56
*Prairie Rheumatology Assocs., S.C. v. Francis,*
    24 N.E.3d 58 (Ill. App. Ct. 2014) .................................................... 40
*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,*
    813 F. Supp. 2d 489 (S.D.N.Y. 2011)............................................... 49
*Quinn v. Bupp,*
    955 A.2d 1014 (Pa. Super. Ct. 2008)............................................... 12
*Raedle v. Credit Agricole Indosuez,*
    670 F.3d 411 (2d Cir. 2012).............................................................. 61
*Reading Aviation Serv., Inc. v. Bertolet,*
    311 A.2d 628 (Pa. 1973) ................................................................... 13
*Reed Elsevier Inc. v. Transunion Holding Co., Inc.,*
    No. 13 Civ. 8739(PCK), 2014 WL 97317 (S.D.N.Y. Jan. 9, 2014) ...... 28
*Reed, Roberts Assocs., Inc. v. Strauman,*
    353 N.E.2d 590 (N.Y. 1976).............................................................. 26
*Reilly v. NatWest Market Grp., Inc.,*
    181 F.3d 253 (2d Cir. 1999)........................................................ 39, 41
*Reliable Fire Equip. Co. v. Arredondo,*
    965 N.E.2d 393 (Ill. 2011)...................................................... 14, 15, 30
*Ride the Ducks, L.L.C. v. Duck Boat Tours, Inc.,*
    No. Civ.A. 04-CV-5595, 2005 WL 670302 (E.D. Pa. 2005)......... 13, 26
*Roberts v. Karimi,*
    251 F.3d 404 (2d Cir. 2001).............................................................. 12
*Roche Diagnostics GmbH v. Enzo Biochem, Inc.,*
    992 F. Supp. 2d 213 (S.D.N.Y. 2013)......................................... 58, 60
*Rotberg v. Dodwell & Co.,*
    152 F.2d 100 (2d Cir. 1945).............................................................. 64
*Rusiski v. Pribonic,*
    515 A.2d 507 (Pa. 1986) ................................................................... 12
*SAWS at Seven Hills, LLC v. Forestar Realty, Inc.,*
    805 S.E.2d 270 (Ga. Ct. App. 2017) ................................................... 8
*Socko v. Mid-Atl. Sys. of CPA, Inc.,*
    126 A.3d 1266 (Pa. 2015) ................................................................. 14

*Springfield Rare Coin Galleries, Inc. v. Mileham,*
  620 N.E.2d 479 (Ill. App. Ct. 1993) .................................................................... 16, 26
*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada,*
  374 F.3d 158 (2d Cir. 2004)....................................................................................... 62
*Stenstrom Petroleum Servs. Grp., Inc. v. Mesch,*
  874 N.E.2d 959 (Ill. App. Ct. 2007) ..................................................................... 24, 25
*Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.,*
  154 F. Supp. 2d 586 (S.D.N.Y. 2001)................................................................... 26, 52
*Thermo-Guard, Inc. v. Cochran,*
  596 A.2d 188 (Pa. Super. Ct. 1991).......................................................................... 26
*TNS Media Research, LLC v. TRA Global, Inc.,*
  977 F. Supp. 2d 281 (S.D.N.Y. 2013), *rev'd on other grounds*, 629 Fed. Appx. 916,
  932 (Fed. Cir. 2015).............................................................................................. 50, 53
*Tri-Star Lighting Corp. v. Goldstein,*
  58 N.Y.S.3d 448 (N.Y. App. Div. 2018) .................................................................. 62
*Troy News Co., Inc. v. City of Troy,*
  563 N.Y.S.2d 301 (N.Y. App. Div. 1990) ............................................................... 64
*Unisource Worldwide, Inc. v. Carrara,*
  244 F. Supp. 2d 977 (C.D. Ill. 2003) ....................................................................... 21
*Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.,*
  455 Fed. App'x 102 (2d Cir. 2012)........................................................................... 63
*Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC,*
  No. 14-cv-7529(RJS), 2016 WL 5414979 (S.D.N.Y. 2016) ................................... 58
*Wesley-Jessen, Inc. v. Armento,*
  519 F. Supp. 1352 (N.D. Ga. 1981) .......................................................................... 37
*Wild Bunch, SA v. Vendian Entm't, LLC,*
  No. 17 Civ. 1383, 2018 WL 1365690 (S.D.N.Y. Feb. 26, 2018) ........................... 54
*Winders v. State Farm Fire & Cas. Co.,*
  --- F. Supp.3d ---, 2018 WL 6380769 (N.D. Ga. 2018)........................................... 8
*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC,*
  898 F.3d 1279 (11th Cir. 2018) ................................................................................ 51
*Zellner v. Stephen D. Conrad,*
  589 N.Y.S.2d 903 (N.Y. Sup. Ct. 1992) ................................................................... 39

## Statutory Authorities

18 U.S.C. § 1839(3)(A)-(B) ........................................................................................ 47
Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq ...................................... 47

## Additional Authorities

Restatement (Second) of Agency § 396........................................................................ 27
Restatement (Second) of Contracts § 188.................................................................... 14

Defendants Daniel Wenzel, Luke Norman, and Lauren Sutmar (collectively, the "Former Employees") and Beacon Hill Staffing Group, LLC ("Beacon") respectfully submit this Trial Memorandum of Law (the "Memorandum") for the bench trial scheduled for April 15, 2019, in this action. In this Memorandum, Defendants summarize the evidence that they expect (or do not expect) at trial and, in light of that evidence (or the lack thereof), explain that Plaintiff Insight Global, LLC ("Insight") will be unable to sustain its burden of proof, that all claims in Insight's Second Amended Complaint (the "SAC") must fail, that Insight is not entitled to any damages whatsoever, and that a judgment on all counts in favor of Defendants must enter.

## I.    PRELIMINARY STATEMENT.

In this case, Insight, a staffing agency, is suing the Former Employees, individuals who used to work for Insight, and Beacon, another staffing agency, because Beacon hired the Former Employees after their employment with Insight ended. *See* ECF No. 65. In retaliation for this purportedly improper act, Insight brought this suit, in which it attempted to assert many unsuccessful claims against Defendants in several successive complaints.[1] Insight's surviving claims in the SAC that remain for trial include: trade secret misappropriation under Federal statutory law (Count I) and New York common law (Count II) against Mr. Wenzel and Ms. Sutmar; breach of certain restrictive covenants in employment agreements against the Former Employees (Count III); breach of a separation agreement (Count IV) and fraudulent inducement

---

[1] In its ongoing effort to state legally viable claims against Defendants, Insight has been compelled to amend its complaint twice, as many of the claims in its initial complaint, ECF No. 1, and its first amended complaint, ECF No. 27, were dismissed as legally insufficient. ECF Nos. 25, 63. Insight filed its SAC after the completion and with the benefit of discovery in this matter. Defendants' motion to dismiss Counts IX and X of Insight's SAC remains pending. ECF No. 92. Defendants have not yet had an opportunity to answer certain of the allegations in Insight's SAC, assert affirmative defenses to those allegations, or take discovery on those new allegations made for the first time after the close of discovery.

related to that agreement (Count V) against Mr. Norman; breach of the duty of loyalty to Insight against Mr. Wenzel and Ms. Sutmar (Count VI); tortious interference with the Former Employees' employment agreements against Beacon (Count VII) and with Mr. Norman's employment agreement against Mr. Wenzel (Count VIII); and tortious interference with business relationships with certain New York clients against Mr. Wenzel (Count IX) and Beacon (Count X).[2] *See id.*

As set forth in Defendants' most recent motion to dismiss and supporting filings, ECF Nos. 92-94, Defendants' summary judgment motion and supporting filings, ECF Nos. 96-101, Defendants' opposition to Insight's partial summary judgment motion and supporting filings, ECF Nos. 104-106, and Defendants' proposed findings of fact and conclusions of law, all of which are incorporated herein by reference, and as further explained below, the evidence at trial will not support the essential elements that Insight must prove to prevail on its claims in the SAC. Specifically, Insight's claims fail for the following reasons:

- Insight's breach of contract claims (Counts III and IV) fail because the restrictive covenants in the Former Employees' employment agreements and in Mr. Norman's separation agreement are unenforceable and, even if they were enforceable, Insight cannot prove that the Employees breached them, and/or that Insight has suffered any damages from any alleged breach.

---

[2] In accordance with the Court's scheduling orders, Defendants moved to dismiss Counts IX and X of Plaintiff's SAC on February 15, 2019, *see* ECF No. 92, and for summary judgment on all counts of Plaintiff's SAC on February 25, 2019. *See* ECF No. 96. The resolution of these pending motions could narrow the issues for trial.

- Insight's trade secret misappropriation claims (Counts I and II) fail because the information at issue does not constitute a trade secret and because Insight failed to take reasonable measures to keep such information secret.

- Insight's fraudulent inducement claim (Count V) fails for the following reasons: the provision in Mr. Norman's separation agreement affirming the non-compete covenant in his employment agreement is unenforceable; Mr. Norman did not knowingly make a false statement with the intent to induce Insight's reliance; and Insight suffered no injury from any alleged false statement.

- Insight's breach of the duty of loyalty claim (Count VI) fails because it is premised on Insight's flawed trade secret misappropriation claim and, in any event, Insight has suffered no damages attributable to any alleged breach.

- Insight's tortious interference with contractual relationship claims (Counts VII and VIII) fail because: Insight did not suffer any damages from any alleged interference; Beacon and Mr. Wenzel did not interfere with any enforceable restrictive covenants; Beacon and Mr. Wenzel did not know the terms of the restrictive covenants; and Beacon and Mr. Wenzel did not intentionally procure a breach of Insight's restrictive covenants.

- Insight's tortious interference with business relationship claims (Count IX and X) fail because there is no evidence that Mr. Wenzel or Beacon: interfered with Insight's business relationships; acted for any improper purpose or used improper means; or caused injury to any of Insight's business relationships.

- All of Insight's claims against all Defendants fail because it has released them.

Defendants are, therefore, entitled to judgment on all counts of Insight's SAC.

## II.   SUMMARY OF FACTS AT TRIAL.[3]

In this case, all of the parties are involved in the information technology ("IT") staffing industry. Companies seeking employees, the clients in this industry, have non-exclusive relationships with staffing agencies. Clients typically work with multiple agencies to fill job openings, thereby sharing their preferences and needs with multiple agencies. *See* Wenzel Trial Decl.; Sutmar Trial Decl.; Cuppy Dep. at 59:17-22. Typically, there is no agreement to provide such information to only one agency or to keep such information confidential because the clients want to find the best candidate for the job. *See* SAC, at ¶ 4. Clients also post openings online. Cuppy Dep. at 174:9-24. To make the placement and earn the commission, the agency must be the first to find the best candidate that matches the job posting, regardless of the agency's prior relationship with the client. SAC, at ¶ 7; Cuppy Dep. at 179:16-20, 180:19-181:13.

Information about clients and prospective clients, including the job openings and the contact information for the hiring managers, is publicly available. Such information can be found by any staffing agency, through publicly available sources and through general canvassing, such as cold calling, online research, and subscription services such as DiscoverOrg, LinkedIn Sales Navigator, and Rainking. Cuppy Dep., at 170:2-172:20; IG Dep. Vol. I, at 44:24-45:9, 137:4-16, 178:5-8. Information about client preferences, hiring needs, and hiring personnel can change quickly and needs to be updated. Cuppy Dep., at 178:8-179:20.

The job seekers, referred to as "candidates" in this industry, also have non-exclusive relationships with staffing agencies. Candidates will typically work with multiple agencies. IG

---

[3] This Memorandum will address additional relevant evidence (or the lack thereof) in the context of the specific issues discussed below.

Dep. Vol. I at 44:7-13. Information about candidates is also publicly available.  Candidates post their resumes on publicly accessible websites, such as monster.com.

Insight is an IT staffing agency. It generates its sales leads using the above-described methods, which are not proprietary to Insight, and which are accessible to any staffing agency. IG Dep. Vol. I, at 44:7 - 45:9, 178:5-8; Cuppy Dep., at 172:21-174:17. Insight does not inform its clients that it considers their contact information to be a trade secret or confidential information belonging to Insight, and it does not ask its clients to not share their contact information with other staffing agencies. IG Dep. Vol. I, at 141:12-20. Insight also identifies candidates through the above-described public sources.

At Insight, recruiters identify potential candidates. Norman Trial Decl. There are approximately thirty recruiters in Insight's New York office. Norman Trial Decl. Insight hires ███████████ new recruiters annually, IG Dep. Vol. I, at 120:19-24, ███████████ of whom leave insight before advancing to a sales position, such as an account manager.  *Id.*; *see also* First Requests for Admission to Plaintiff Insight Global, *LLC by Defendant Beacon Hill Staffing Group, LLC, at Request No.* 3 (██████████ employees left Insight between January 1, 2016 and April 16, 2018). Insight's account managers primarily communicate with clients, obtain job requisitions from clients, and present candidates to clients. Cuppy Dep., at 206:19-207:22.

Insight required the Former Employees to sign multiple At-Will Employment Agreements (the "Employment Agreements") during their employment with Insight. *See* SAC, Exs. A-C. The Employment Agreements generally purport to prohibit the following relevant post-employment activities: (a) use or disclosure of Insight's purported trade secret or confidential information; (b) for a one-year period after leaving Insight, soliciting clients with

whom the employee had material contact for two years before leaving Insight; (c) for a one-year period after leaving Insight, recruiting Insight employees to resign; and (d) for a one-year period, and within a defined geographical area, competing with Insight. *See id.* The Employment Agreements also purport to "toll" the one-year period applicable to the non-compete, non-recruit, and non-solicit provisions, for up to two years from the end of the Former Employees' employment with Insight, in the event that the Former Employees breach such covenants or in the event that Insight, in its sole discretion, commences litigation concerning the covenant. *See* SAC, Exs. A-C, at ¶ 10.

Mr. Wenzel worked for Insight from June 17, 2013 through July 10, 2017.  He began working in its New York office, but, between January of 2016 and March of 2017, he worked as a Sales Manager in its Philadelphia office. On or about March 27, 2017, having been demoted to the position of Account Manager, he returned to the New York office, where he worked for less than 4 months until his departure in July of 2017. His last Employment Agreement is dated on or about November 21, 2016, and, by its terms, supersedes all prior Employment Agreements and is governed by Pennsylvania law, without regard to conflicts of laws provisions. *See* SAC, Ex. A.

Ms. Sutmar worked for Insight between February 3, 2014 and March 6, 2017, and, for most of that time, she was an Account Manager working in Insight's Chicago office, transferring to the New York office in August of 2016. Her last Employment Agreement is dated April 6, 2016, and, by its terms, supersedes all prior Employment Agreements and is governed by Illinois law, without regard to conflicts of laws provisions. SAC, Ex. C. Ms. Sutmar no longer works for Beacon.

Mr. Norman worked for Insight between January 5, 2015 and September 18, 2017, as a Recruiter, in which capacity he identified candidates that account managers could then present to

clients to fill job openings. Cuppy Dep. at 119:14-123:24; 194:13-196:6; Norman Trial Decl. He

did not customarily or regularly solicit clients or potential clients, and he did not make even a

single sale to Insight's clients or obtain a single order, contract, or job requisition from Insight's

clients. Norman Trial Decl. He had no managerial authority over other Insight employees, and he

had the same job responsibilities as other Insight recruiters. Norman Trial Decl. His last

Employment Agreement is dated February 8, 2016, and, by its terms, is governed by Georgia

law, without regard to conflicts of laws provisions. SAC, Ex. B. He also signed a Separation

Agreement with Insight dated September 18, 2017 (the "Separation Agreement"), which, by its

terms, is also governed by Georgia law, without regard to conflicts of laws provisions. Ratner

Dep. at 23:14-24:3; 25:8-15. The Separation Agreement purports to reaffirm the restrictive

covenants in his Employment Agreement. *See* SAC, Ex. D.

Notably, it has been over a year since each of the Former Employees left Insight. The

one-year non-compete, non-recruit, and non-solicit periods in each of their Employment

Agreement has expired. At no time during this period did Insight ever seek preliminary

injunctive relief.

## III.    SUMMARY OF DEFENDANTS' CASE AT TRIAL.

### A.    Insight's breach of contract claims fail.

Insight claims that Mr. Norman breached his Employment Agreement (Count III) and his

Separation Agreement (Count IV) by breaching the non-compete covenant in his Employment

Agreement, and that Mr. Wenzel and Ms. Sutmar breached their Employment Agreements by

breaching the non-compete, non-disclosure, non-recruit, and non-solicit covenants therein (Count

III). Insight's breach of contract claims must fail, as the restrictive covenants are unenforceable.

Even if they were enforceable, the Former Employees did not breach them, and Insight has not

suffered any damages from any alleged breach. For these reasons, the Court must find for the

Former Employees on Count III and for Mr. Norman on Counter IV of Insight's SAC.

        1.      <u>Insight's breach of contract claims against Mr. Norman fail.</u>

                a.     *Insight's claim that Mr. Norman breached his Employment*
                        *Agreement fails.*

Insight claims that Mr. Norman breached the non-compete covenant in his Employment

Agreement (Count III).[4] It is undisputed that Mr. Norman's Employment Agreement includes a

non-compete covenant, and that it is governed by Georgia law. *See* SAC, Ex. B. Because

Georgia law prohibits non-compete covenants for employees like Mr. Norman, Insight is not

entitled to judgment on this claim.

Under Georgia law, the elements of a breach of contract claim are: "'the (1) breach and

the (2) resultant damages (3) to the party who has the right to complain about the contract being

broken.'" *Winders v. State Farm Fire & Cas. Co.*, --- F. Supp.3d ---, 2018 WL 6380769, at *2

(N.D. Ga. 2018) (quoting *SAWS at Seven Hills, LLC v. Forestar Realty, Inc.*, 805 S.E.2d 270,

274 (Ga. Ct. App. 2017)). Georgia law enforces post-employment non-compete covenants only

against an employee who, in relevant part, does the following: "(1) Customarily and regularly

solicit for the employer customers or prospective customers; [or] (2) Customarily and regularly

engage in making sales or obtaining orders or contracts for products or services to be performed

by others . . .". Ga. Code Ann. § 13-8-53(a).

---

[4] Insight does not – and cannot – claim that Mr. Norman breached any other restrictive covenant in his Employment Agreement. *See* Insight MOL, at n.25. There is no evidence that he disclosed any of Insight's information, recruited any of Insight's employees, or solicited any of Insight's clients. IG Dep. Vol. I, 93:5-9, 145:1-6. In fact, soliciting clients is not his among his responsibilities at Beacon. Norman Trial Decl.

Mr. Norman worked as a Recruiter at Insight, and, in that role, he did not customarily or regularly (i) solicit clients or prospective clients, or (ii) engage in making sales or obtaining orders or contracts for services to be performed by others. Norman Trial Decl. He was not an account manager, and he did not sell business to Insight's clients or obtain job requisitions from Insight's clients; rather, his responsibility was to identify candidates that Insight's account managers could then present to its clients.[5] *See id.* Therefore, Mr. Norman was not the type of employee as to which Georgia law allows a post-employment non-competition agreement. *See*, *e.g.*, *CSM Bakery Sols., LLC v. Debus*, No. 1:16-cv-03732-TCB, 2017 WL 2903354, at *3-5 (N.D. Ga. Jan. 25, 2017) (holding non-compete covenant unenforceable under Ga. Code Ann. § 13-8-53(a)(1)-(2) because, in part, employee "had an important role with what products [the employer] sold to its customers", but "was still a subordinate who sought permission from [the employer's account manager] on matters of sales").

Any argument that Mr. Norman fits within Ga. Code Ann. § 13-8-53(a)(2) because his primary duty was recruiting candidates who might then go on to work for Insight's clients must fail. Insight has no evidence that Mr. Norman himself even made a single sale to Insight's clients or obtained a single order or contract from Insight's clients. *Compare* Ga. Code Ann. § 13-8-53(a)(2) (allowing non-compete covenants for employees who "[c]ustomarily and regularly

---

[5] Insight does not and cannot argue that Mr. Norman qualifies as either of the two other types of employees against whom a non-compete covenant may be enforced under Georgia law. There is no evidence that, at Insight, Mr. Norman held primarily a managerial role, regularly directed the work of other employees, and had the authority to hire or fire other employees. *See* Ga. Code Ann. § 13-8-53(3). Instead, he was one of approximately thirty other recruiters in Insight's New York office, and he was performing work that was the same or similar to the work of any other Insight recruiter. Norman Trial Decl. There was also no evidence that, at Insight, he performed the duties of a key or professional employee, *see id.* at § 13-8-53(a)(4); *see also* Norman Trial Decl. Insight hires over a thousand new recruiters – like Mr. Norman – on an annual basis. IG Dep. Vol. I, at 120:22-24.

engage in making sales or obtaining orders or contracts for products or services to be performed

by others") (emphasis added). At Insight, it is the account managers who primarily communicate

with clients, obtain job orders, and present candidates to clients. Cuppy Dep. at 206:19-207:22.

Mere participation or assistance in some aspect of a company's sales does not make an employee

subject to an enforceable non-competition agreement. *See Debus*, 2017 WL 2903354, at \*5-7

(non-compete covenant unenforceable against "sales representative" who "would help with

preparation" but whose "superior would actually carry out the sale"). Judgment must enter for

Mr. Norman on Count III of Insight's SAC.

        b.    *Insight's claim that Mr. Norman breached the Separation Agreement fails.*

Insight also claims that Mr. Norman breached his Separation Agreement by breaching the

provision that affirms the non-compete covenant in his Employment Agreement (Count IV).

There is no dispute that his Separation Agreement, which is also governed by Georgia law,

purports to reaffirm the non-compete covenant in his Employment Agreement. *See* SAC, Ex. D.

As explained above, the non-compete covenant in Mr. Norman's Employment Agreement is

unenforceable as a matter of law. Therefore, Insight's claim that he breached the Separation

Agreement, which purports to reimpose this same unenforceable prohibition on him, also fails,

and judgment must enter in his favor on Count IV of Insight's SAC.

        2.    <u>Insight's breach of contract claims against Mr. Wenzel and Ms. Sutmar fail.</u>

Insights claims that Mr. Wenzel and Ms. Sutmar breached the non-compete, non-

disclosure, and non-solicit covenants in their Employment Agreements. Insight has no evidence

that: (i) the restrictive covenants in the Employment Agreements are enforceable; (ii) they

breached the restrictive covenants in the Employment Agreements; or (iii) it suffered damages

from any alleged breach of the restrictive covenants in the Employment Agreements. Thus,

Insight's claims fail.

> a.   *The post-employment restrictive covenants in Mr. Wenzel's and Ms. Sutmar's Employment Agreements are unenforceable.[6]*

Mr. Wenzel's Employment Agreement purports to be governed by Pennsylvania law, *see*

SAC, at Ex. A, but it is actually governed by New York law.[7] Under New York law, "'[t]o

establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the

existence of a contract; (2) a breach of that contract; and (3) damages resulting from the

breach.'"[8] *Can't Stop Prods., Inc. v. Sixuvus, Ltd.*, 295 F. Supp.3d 381, 400 (S.D.N.Y. 2018)

---

[6] The arguments in this subsection focus on the post-employment restrictive covenants in Mr. Wenzel's and Ms. Sutmar's Employment Agreements.  These arguments would apply to Mr. Norman, as well, if Georgia law did not prohibit his restrictive covenants outright.

[7] Pennsylvania's law on restrictive covenants violates the fundamental principles of justice on which New York's law on restrictive covenants is based. *See Brown & Brown, Inc. v. Johnson*, 34 N.E.3d 357, 360 (N.Y. 2015) ("While parties are generally free to reach agreements on whatever terms they prefer, courts will not enforce agreements . . . where the chosen law violates some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.") (quotation omitted). For example, under Pennsylvania law, the <u>employee</u> bears the burden of proving that the covenant is unreasonable, while under New York law, the <u>employer</u> bears the burden of proving that the covenant is reasonable. *Compare Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F.Supp.3d 541, 568 (M.D. Pa. 2014) *with Brown & Brown, Inc.*, 34 N.E.3d at 361. As another example, in Pennsylvania, the enforceability of a covenant does not depend on whether it imposes an undue hardship on the employee, while in New York, it does. *Compare Diodato*, 44 F.Supp.3d at 568 *with Brown & Brown, Inc.*, 34 N.E.3d at 361. In light of these legal differences, New York law – not Pennsylvania law – must be applied to the interpretation of Mr. Wenzel's contract. *See Brown & Brown, Inc.*, 34 N.E.3d at 360-61 (holding that New York law applied to restrictive covenants in employment agreement governed by Florida law because Florida law shifts burden to employee after employer establishes legitimate business interest and because Florida law does not require consideration of employee hardship). To the extent that the Court nonetheless determines that Pennsylvania law should be applied to the restrictive covenants in Mr. Wenzel's Employment Agreement, the relevant law is provided in the footnotes of this Memorandum.

[8] "A breach of contract claim under Pennsylvania law consists of three elements: (1) the existence of a contract that includes its essential terms; (2) a breach of that contract; and (3) damages resulting from the breach". *Dobson v. Milton Hershey Sch.*, --- F.Supp.3d ---, 2018 WL 6436718, at *4 (M.D. Pa. 2018) (citing *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)).

(quoting *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004)). The plaintiff must also show that the contract is enforceable. *See Roberts v. Karimi*, 251 F.3d 404, 407 (2d Cir. 2001). The "'damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes'".[9] *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 980 F. Supp. 2d 400, 414 (E.D.N.Y. 2013) (quoting *Kenford Co. v. Cty. of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986)).

Ms. Sutmar's Employment Agreement is governed by Illinois law. *See* SAC, at Ex. C. There are four elements for a breach of contract claim under Illinois law: "'(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff'". *Am. Ctr. for Excellence in Surgical Assisting Inc. v. Cmty. Coll. Dist. 502*, 315 F. Supp.3d 1044, 1052 (N.D. Ill. 2018) (quoting *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015)). "'Damages are an essential element of a breach of contract action and a claimant's failure to prove damages entitles the defendant to judgment as a matter of law.'" *DiPerna v. Chi. Sch. of Prof'l Psychology*, 893 F.3d 1001, 1006 n.6 (7th Cir. 2018) (quoting *In re Ill. Bell Tel. Link-Up II*, 994 N.E.2d 553, 559 (Ill. App. Ct. 2013)). The "general rule" is that "speculative damages are not recoverable". *JamSports & Entm't, LLC v. Paradama Prods., Inc.*, 336 F. Supp. 2d 824, 849 (N.D. Ill. 2004) (citing *Hill v. Brown*, 520 N.E.2d 1038, 1043 (Ill. App. Ct. 1988)).

---

[9] Under Pennsylvania law, damages "'must be capable of being proved with reasonable certainty'", and speculative damages are not recoverable. *Quinn v. Bupp*, 955 A.2d 1014, 1021 (Pa. Super. Ct. 2008) (quoting *Rusiski v. Pribonic*, 515 A.2d 507, 512 (Pa. 1986)).

New York law disfavors and limits post-employment restrictive covenants.[10] *See Morris v. Schroder Cap. Mgmt. Int'l*, 859 N.E.2d 503, 506 (N.Y. 2006) ("[N]oncompete clauses in employment contracts are not favored[.]"); *Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 386-87 (2d Cir. 1982) ("New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with 'the general public policy favoring robust and uninhibited competition,' and 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood.'") (quoting *Am. Broadcasting Cos., Inc. v. Wolf*, 420 N.E.2d 363, 368 (N.Y. 1981)). Restrictive covenants must be supported by consideration.[11] *See generally Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 223-24 (S.D.N.Y. 2013). To be enforceable, a covenant must be reasonably necessary to protect an employer's legitimate business interest.[12] *See BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y.

---

[10] Pennsylvania law is comparable to New York law in this regard. *See Colorcon, Inc. v. Lewis*, 792 F.Supp.2d 786, 797 (E.D. Pa. 2011) (explaining that post-employment restrictive covenants "'are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living'") (quoting *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 917 (Pa. 2002)); *see also id.* ("[B]ecause non-competition agreements restrain an employee's ability to practice his or her chosen trade, they are 'strictly construed against the employer.'") (quoting *All-Pak, Inc. v. Johnston*, 694 A.2d 347, 351 (Pa. Super. Ct. 1997)); *PharMethod, Inc. v. Caserta*, 382 F. App'x 214, 219 (3d Cir. 2010) ("[Restrictive covenants] are closely scrutinized because Pennsylvania courts recognize 'the inherently unequal bargaining positions' of employer and employee,' . . . and the significant hardship that can result when an employee is bound by such an agreement") (quoting *Reading Aviation Serv., Inc. v. Bertolet*, 311 A.2d 628, 630 (Pa. 1973) and citing *Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838, 846 (Pa. 1957)).

[11] Pennsylvania courts also require restrictive covenants to be "supported by adequate consideration". *Ride the Ducks, L.L.C. v. Duck Boat Tours, Inc.*, No. Civ.A. 04-CV-5595, 2005 WL 670302, at *11 (E.D. Pa. 2005) (citing *Nat'l Bus. Servs., Inc. v. Wright*, 2 F.Supp.2d 701, 707 (E.D. Pa. 1998)).

[12] "[C]urrently in Pennsylvania, restrictive covenants are enforceable only if they are: (1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) the restrictions are reasonably limited in duration and geographic extent; and (4) the restrictions are designed to protect the legitimate interests of the employer."

1999) ("A restraint is reasonable only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public.") (citing, *inter alia*, Restatement (Second) of Contracts § 188); *see also id.* (holding that an enforceable post-employment restrictive covenant must also be "reasonable in time and area"). The former employer bears the burden of establishing every element of the enforceability of the covenant.[13] *See Brown & Brown, Inc.*, 34 N.E.3d at 361.

Under Illinois law, covenants also "are disfavored and held to a high standard". *See Am. Transp. Grp., LLC v. Power*, No. 17 C 7962, 2018 WL 1993204, at *4 (N.D. Ill. Apr. 27, 2018) (citing, *inter alia*, *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 522 (Ill. App. Ct. 2007)). An enforceable covenant must be "ancillary to a valid employment relationship", "supported by consideration", and "reasonable" in that it: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee", which interest "may be limited by type of activity, geographical area, and time"; "(2) does not impose undue hardship on the employee-promisor; and (3) is not injurious to the public". *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396-97 (Ill. 2011) (citing, *inter alia*, *BDO Seidman*, 712 N.E.2d at 1223). The former employer "faces a heavy burden to ultimately prevail" in enforcing such covenants, *Am. Transp. Grp., LLC*, 2018 WL 1993204, at *4, and must demonstrate that "the full extent of the restraint is necessary for protecting its interests", *Cambridge Eng'g, Inc.*, 879 N.E.2d at 522 (citation omitted).

---

*Socko v. Mid-Atl. Sys. of CPA, Inc.*, 126 A.3d 1266, 1274 (Pa. 2015) (citing, *inter alia*, *Hess*, 808 A.2d at 917).

[13] In Pennsylvania, "[t]he burden is on the employee seeking to avoid the covenant to demonstrate that [it] is unreasonable". *Diodato*, 44 F.Supp.3d at 568 (quotation omitted).

New York law has recognized that an employer may have certain legitimate business interests based "on the particular facts and circumstances giving context to the agreement", *BDO Seidman*, 712 N.E.2d at 1224 (citations omitted), including: "(1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, . . . (3) in those cases where the employee's services to the employer are deemed special or unique", or (4) to "prevent[] former employees from exploiting or appropriating the goodwill of a client", *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 535-36 (S.D.N.Y. 2004) (quotations omitted).

Under Illinois law, "whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case", including, but not limited to, "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Reliable Fire Equip. Co.*, 965 N.E.2d at 403.

Insight has no legitimate business interests at issue here. Even if it did, the covenants are not reasonably necessary to protect any alleged interest. In any event, the covenants are not supported by consideration.

> i.   Insight has no legitimate business interest in client relationships and goodwill.

Insight claims that it has a legitimate business interest in client relationships and goodwill. Whether client relationships and goodwill qualify as a legitimate business interest "'turns in large degree on the nature of the business involved, and certain businesses are just more [or less] amenable to success under it'". *Instant Tech., LLC v. DeFazio*, 40 F. Supp.3d 989, 1012 (N.D. Ill. 2014) (quoting *Lawrence & Allen, Inc. v. Cambridge Human Res. Grp., Inc.*, 685 N.E.2d 434, 444 (Ill. App. Ct. 1997)). A protectable client relationship "is generally absent from

businesses engaged in sales". *Lawrence & Allen, Inc.*, 685 N.E.2d at 444 (citing *Springfield Rare Coin Galleries, Inc. v. Mileham*, 620 N.E.2d 479, 488 (Ill. App. Ct. 1993)). It is similarly missing "'where the nature of the plaintiff's business does not engender customer loyalty by providing a unique product or personal service and customers utilize many suppliers simultaneously to meet their needs'". *Instant Tech., LLC*, 40 F. Supp.3d at 1012 (quoting *Lawrence & Allen, Inc.*, 685 N.E.2d at 444); *see also BDO Seidman*, 712 N.E.2d at 1224 (explaining that the purpose is to protect "*information* or *relationships* which pertain peculiarly to the employer" and have been developed "over a long period of time") (quotation omitted).

In *DeFazio*, the District Court for the Northern District of Illinois analyzed whether the plaintiff IT staffing agency had a legitimate business interest in its client relationships, focusing on whether the plaintiff enjoyed long-term and exclusive relationships with its clients. 40 F. Supp.3d at 1011-12. The court found that the staffing industry, "by [its] nature and practice . . . is non-exclusive", as clients work with multiple staffing agencies simultaneously. *Id.* The court reasoned that, "[t]he IT staffing market is highly competitive", clients "typically use between five and ten different staffing firms simultaneously to fill their employment needs", and the execution of a Master Service Agreement ("MSA") between an agency and client "does not guarantee that any IT staffing provider . . . will receive <u>any</u> business from that company". *Id.* The court concluded that the plaintiff did not have the requisite relationships with its clients or a legitimate business interest in protecting client relationships. *Id; see also ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 192 F. Supp.3d 943, 960-61 (N.D. Ill. 2016) (relying on *DeFazio* and finding that a staffing agency lacked the necessary relationships with its clients and thus a legitimate business interest in its client relationships).

The Seventh Circuit affirmed. *Instant Tech. LLC v. DeFazio*, 793 F.3d 748, 752 (7th Cir. 2015). The Court of Appeals agreed that "[t]ech-staffing firms do not build relationships with clients that would justify restricting their employees from setting out on their own". *Id.* at 750. It observed that the District Court had found that "clients barely show any loyalty to the firms they use; larger organizations routinely request service from five to ten firms at once[;] and a firm can expect compensation only a tenth of the time it recommends a candidate for a position". *Id.* (citation omitted). The Court of Appeals found no error in these findings by the District Court. *Id.* at 751.

The Appellate Court of Illinois reached the same result in another staffing industry case, affirming the trial court's grant of summary judgment in favor of a defendant staffing agency based on its conclusion that the plaintiff staffing agency had no near-permanent relationship with its clients and thus no legitimate business interest. *See Lawrence & Allen, Inc.*, 685 N.E.2d at 437, 45. That court observed that "the corporate employee outplacement industry is highly competitive". *Id.* at 444. It noted that "[b]usinesses in need of outplacement services are well known in the industry", and "names of human resource directors are easily ascertainable". *Id.* It found that "[b]usinesses use many different outplacement firms, on the same project or on different projects", and that "[s]uccess on one project does not guarantee success on the next project". *Id.* Thus, the court held that the requisite near-permanent relationship was missing. *Id.* at 445.

The District Court for the Southern District of New York agreed with these analyses by Illinois Courts in *Robert Half International, Inc. v. Dunn*, No. 5:13-cv-974, 2013 WL 10829925 (N.D.N.Y. Oct. 29, 2013). There, a staffing agency sued its former employee and sought a preliminary injunction to prevent her from using or disclosing its client list, a purported trade

secret. *Id.* at *1, 5. The court found that the staffing agency did not have exclusive relationships with its clients, the names of the clients and their key contact persons "are easily ascertained from non-confidential sources" and are "well known or easily learned" by others inside and outside of the industry, and that information concerning job openings "is readily available on Internet job sites" and "developed by simply reviewing online job postings and contacting the potential employer". *Id.* at *5-6. Thus, the court rejected the argument that the agency's client information was confidential and protectable. *Id.*

Insight does not have a legitimate business interest in protecting client goodwill – Insight will not be able to prove that it has a long-term relationship with any of its claimed clients, that any of its claimed clients are not working simultaneously with multiple staffing agencies, or that it has an exclusive relationship with any of the clients with which it seeks to bar Defendants from working. In fact, Beacon had pre-existing master service agreements with many of the clients at issue <u>before</u> it hired the Former Employees. A staffing agency's ability to find the right candidate for any given job opening is what leads to a job placement and a commission, and a placement by one agency does not preclude another agency from finding the next candidate for the client's next job opening. Wenzel Trial Decl.; *see* Cuppy Dep. 179:16-20, 180:19-181:13.

To the extent that Insight attempts to claim that it has a legitimate business interest in its <u>non</u>-exclusive client relationships, such a claim must fail. *See Instant Tech., LLC*, 40 F. Supp.3d at 1012 (holding staffing agency had no near-permanent relationship and thus no legitimate business interest where it had no non-exclusive client relationship); *see also Robert Half Int'l, Inc.*, 2013 WL 10829925, at *5 (holding staffing agency had no protectable interest in employment information where "[t]here was no testimony concerning the exclusivity" of the agency's client relationships). There is no evidence that Insight's services are unique from what

any other staffing agency provides, *see id.* at 1004 (finding that "the IT staffing industry is a very commoditized business", where no agency "enjoys a reputation for providing higher quality candidates than the rest", "partially because the staffing firms market and provide the same candidates"), or that it has any client loyalty or any "near-permanent" relationship with any client that depends on continued goodwill. Insight does not know how its methods are different or unique from what any other staffing agency does. *See* IG Dep. Vol. I, at 42:2-43:5; 44:7-22; 116:15-20; 125:5-8; 126:15-127:2; 127:22-128:1; 223:18-224:20. Insight has not shown a protectable interest as a matter of law.

Insight's high employee attrition rate also undermines Insight's argument that it must restrict its employees' post-employment work to protect its client relationships and goodwill. Insight operates its business with the expectation that it will lose most of its employees (as well as the alleged personal client relationships, if any, that they developed while with the company). Its own business model inherently leads to a high attrition rate. *See* IG Dep. Vol I, at 120:19-121:7 (about ▬ new recruiters are hired by Insight on an annual basis, and about ▬ of these employees will leave Insight before being promoted to a sales position); *see also* Defendants' First Requests for *Admission and Insight's Responses, at Request No.* 3 (approximately ▬ employees left Insight between January 1, 2016 and April 16, 2018). Insight cannot claim that it has a legitimate business interest in the client goodwill or relationships developed by each of its individual employees, where Insight experiences such a high rate of employee turnover.

Further, according to Insight, all or nearly all of these former employees entered into employment agreements that included the same or similar post-employment restrictive covenants. In light of this extraordinary attrition rate and the near-certainty that the majority of Insight's former employees continue to work in the staffing industry for its competitors, it would

be reasonable to expect thousands – or at least hundreds – of judicial decisions enforcing or refusing to enforce Insight's restrictive covenants. The lack of such decisions shows that, at most, Insight selectively enforces these covenants against only certain of its former employees, undermining its argument that such covenants protect its legitimate business interest in its employee relationships.

Insight will be unable to prove that it assigned Mr. Wenzel or Ms. Sutmar to exclusively handle any specific client, and, in fact, Insight frequently changes and re-assigns client accounts. *See* Sutmar Trial Decl.; *see also* Wenzel Trial Decl. Insight will not be able to establish that it cannot maintain any client relationship in its New York office because of Mr. Wenzel's or Ms. Sutmar's departures. Mr. Wenzel had been in Insight's New York office for only about three months before his departure.[14] Ms. Sutmar had been in Insight's New York office for less than a year before her departure, and her client accounts were changed on multiple occasions during her tenure in New York. Sutmar Trial Decl. When an account manager leaves, as happened in the case Mr. Wenzel and Ms. Sutmar, their client accounts are simply re-assigned. IG Dep. Vol. II, at 26:9-28:11; Ratner Dep., at 44:13-16. Because Insight has no legitimate business interest in its client relationships and goodwill, the restrictive covenants in Ms. Sutmar's employment agreement are unenforceable.

---

[14] Insight has alleged specific facts about only NBC Universal, as a client with which its relationship was allegedly affected by Mr. Wenzel's departure. However, the evidence will demonstrate that Insight still does business with NBC Universal, and it has no evidence as to *why* a single hiring manager in a single division of NBC Universal has not been in contact with Insight about job openings. *See* Cuppy Dep. 119:14-123:24, 124:21-125:17, 125:13-126:6, 135:25-137:8. Notably, after Mr. Wenzel moved to Insight's Philadelphia office, the NBC account at issue was transitioned to three different Insight employees, at least one of whom had a good relationship with the relevant hiring manager.

ii.     Insight has no legitimate business interest in confidential
information.

Insight will be unable to prove that it has a legitimate business interest in protecting

purported confidential information that it allegedly provided Mr. Wenzel and Ms. Sutmar.

Insight will argue that its confidential information includes potential sales leads as well as

"customers' IT systems, short- and long-term staffing needs, staffing preferences, and chain of

command for hiring decisions, as well as curated contact information for customers' and clients'

hiring managers and vendor managers and other personal information relating to such hiring

managers." *See* Insight's Memorandum of Law in Support of its Motion for Summary Judgment

("Insight MOL"), at 4. However, the nature of the staffing industry is such that most of the

information Insight claims to be protectable is publicly-available, is shared by clients with

multiple staffing agencies, and quickly becomes obsolete. *See supra, at* 3; Wenzel Trial Decl.

Under Illinois law, client information such as names, addresses, telephone numbers, and

key contact persons is not confidential information, even when assembled into a list. *Unisource*

*Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 986 (C.D. Ill. 2003). "'[C]ustomer information

[may] constitute confidential information only when the information has been developed by the

plaintiff over a number of years at great expense and kept under tight security.'" *Lifetec, Inc. v.*

*Edwards*, 880 N.E.2d 188, 196 (Il. App. Ct. 2007) (quoting *A.J. Dralle, Inc.*, 627 N.E.2d 690,

697 (Ill. App. Ct. 1994)). Where client information "has not been treated as confidential and

secret by the plaintiff, was generally available to other of plaintiff's employees and known by

persons in the trade, could easily be duplicated by reference to telephone directories or industry

publications," or "was known to the plaintiff's competitors because the customers did business

with more than one company or otherwise changed businesses frequently", it is not protectable.

*A.J. Dralle, Inc.*, 627 N.E.2d at 697 (citation omitted). Further, where, as here, there is no

evidence that Ms. Sutmar attempted to use Insight's purported confidential information, Insight cannot be found to have a legitimate business interest in such information. *Lawrence & Allen, Inc.*, 685 N.E.2d at 445.

If anything, New York law is even less favorable to protecting client information as confidential information. *See Iron Mountain Info. Mgmt., Inc. v. Taddeo*, 455 F. Supp. 2d 124, 138, 140 (E.D.N.Y. 2006) ("Customer lists are generally not considered confidential information," and, where "it would not be too difficult for someone to duplicate the names by again canvassing the market through phone calls and general research," the customer list is not considered a trade secret or confidential information.)  Where, as in this case, a "client list" consists of clients who are well-known, whose identities are not protected, and whose contact information is readily ascertainable by, for example, calling the company's general line, using external sources such as LinkedIn and Google, and directories of buyers in the industry, the list does not constitute confidential information under New York law. *See Free Country Ltd. v. Drennen*, 235 F. Supp.3d 559, 566 (S.D.N.Y. 2016); *see also Marsh USA, Inc. v. Alliant Ins. Servs., Inc.*, 26 N.Y.S.3d 725 (N.Y. Sup. Ct. 2015). In New York, like Illinois, where, as here, there is no evidence that Mr. Wenzel attempted to use Insight's purported confidential information, Insight cannot be found to have a legitimate business interest in such information. *See BDO Seidman*, 93 N.Y.2d at 391 ("If the employee abstains from unfair means in competing for [the employer's] clients, the employer's interest in preserving its clients base against the competition of the former employee is no more legitimate and worthy of contractual protection than when it view with unrelated competitors for those clients.").

In the specific context of the staffing industry, Illinois courts have determined that such client information is not confidential. *See, e.g., DeFazio*, 40 F. Supp.3d at 1016 ("The identity of

[a staffing agency's] clients[ and] the clients' hiring needs . . . are not secrets. Information regarding open positions is often available publicly, is provided to [the staffing agency's] competitors by [its] clients, and is provided by [the staffing agency] to potential candidates [it] would like to place."); *id.* at 1012 ("To the extent that job openings or hiring needs are not publicly posted elsewhere, the information is readily attainable using [the staffing agency's] traditional method: cold-calling and cold-emailing."); *DeFazio*, 793 F.3d at 750 ("Employees of tech-staffing firms also aren't exposed to important private information . . . [because] anybody can access most of that information with little work[.]"); *ATC Healthcare Servs., Inc.*, 192 F. Supp. 2d at 961 (holding that there was no protectable confidential information where a staffing agency's MSA did not require its client to keep that agreement confidential and where it was a matter of public knowledge that the staffing agency's client used staffing agencies to fill job openings).

New York courts have come to the same conclusion concerning the staffing industry. *See Ability Search, Inc. v. Lawson*, 556 F. Supp. 9, 15-16 (S.D.N.Y. 1981) ("Ability Search is not entitled to a permanent injunction with respect to information about corporate clients since it has failed to prove that defendants utilized any information about such clients which was not available from public sources or readily ascertainable by defendants in conducting their own business."); *see also Dunn*, 2013 WL 10829925, at *6 ("Given the vast amount of employment information on the Internet and high competition in the field, the Court finds that the names of the clients at issue here and their key contact persons, are known outside of the business, are known by employees and others involved in the business, have limited value to the business and its competitors, and are easily ascertained from non-confidential sources," and thus that the information is not secret.).

The trial evidence of Insight's own conduct will show that it does not treat such information as confidential. For example, information about clients, their hiring managers, and the open job positions or job requisitions that the client is trying to fill is displayed in Insight's New York office, including on marker erase boards ("white boards"). Cuppy Dep., at 43:21-46:21. Insight allows individuals who are not Insight employees (including individuals interviewing for a job at Insight, Insight's clients, friends and family of Insight employees, and building management and cleaning staff) to come into the office where the white boards are displayed, and these individuals are not required to sign a confidentiality or non-disclosure agreement or told that the information is confidential or a trade secret. Cuppy Dep., at 46:22-49:8, 49:15-52:3, 68:8-69:10; *see* IG Dep. Vol. I, at 135:3-136:23, 140:20-141:11.

To the extent that Insight claims it requires non-competitive restrictions to prevent alleged inevitable disclosure of information to which its employees had access during their employment, this argument also fails. As an initial matter, there can be no inevitable disclosure where, like here, there is no confidential information. *See Stenstrom Petroleum Servs. Grp., Inc. v. Mesch*, 874 N.E.2d 959, 977 (Ill. App. Ct. 2007) (declining to reach an inevitable disclosure argument premised on an unproven trade secret claim). Under Illinois law, "[t]he fact that a former employee accepted a similar position with a competitor, without more, will not demonstrate inevitable disclosure." *Id.* at 976 (citation omitted). "Courts also consider the level of competition between the parties and the new employer's actions to prevent unlawful disclosure of trade secrets." *Id.* (citation omitted).

New York law is even less favorable than Illinois law to an inevitable disclosure theory. Application of the inevitable disclosure doctrine "treads an exceedingly narrow path though judicially disfavored territory" and "should be applied in only the rarest of cases." *EarthWeb,*

*Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999). The doctrine is typically used in the context of whether there is a risk of irreparable harm to support a preliminary injunction, and "extension of the doctrine" to post-preliminary injunction contexts, "if ever appropriate, would at a minimum require a very strong showing that disclosure is truly inevitable." *See Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05 Civ. 9478(GEL), 2009 WL 399221, at *11 (S.D.N.Y. Feb. 18, 2009) (citations omitted). Where, as in this case, the parties entered into a contract containing a confidentiality agreement which "clearly anticipated that [the employee] may change his employment," such contract demonstrates that the disclosure of trade secrets or confidential information would <u>not</u> be inevitable, *id.* at *12, and "'the mere fact that a person assumed a similar position at a competitor does not, without more, make it inevitable that he will use or disclose . . . trade secret information'", *id.* (quoting *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995)).

Here, Beacon is not Insight's direct competitor, as the agencies target different tiers of the IT staffing market. Further, to the extent staffing agencies "compete", such competition would depend on the circumstances of each specific job requisition and which company is able to find the right candidate first. Moreover, Beacon specifically instructed Mr. Norman, Mr. Wenzel and Ms. Sutmar, at the commencement of their employment with Beacon, that they were not to use any of Insight's confidential or trade secret information that they may have possessed.

Similarly, to the extent that Insight claims it requires non-competitive restrictions to protect its alleged interest in the efforts and expense it invested in Mr. Wenzel's and Ms. Sutmar's instruction, training, or experience, this argument also fails. Under Illinois law, an employee's knowledge of non-confidential information that she acquired during her employment does not constitute protectable confidential information. *Stenstrom*, 874 N.E.2d at 1093-1094

(holding that employee's memory of employer's profit margin was not protectable confidential information). Moreover, "when the employee merely learns the trade during h[er] term of employment," such as the IT staffing sales trade, "the employee has not learned confidential information" that Illinois courts are willing to protect. *See Springfield Rare Coin Galleries, Inc.*, 620 N.E.2d at 486. These rules are founded upon strong policy considerations:

> "[T]he right of an individual to follow and pursue the particular occupation for which he is best trained is a most fundamental right. Our society is extremely mobile and our free economy is based upon competition. One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience. These skills are valuable to such employee in the market place for his services. Restraints cannot be lightly placed upon his right to compete in the area of his greatest worth."

*Id.* (quoting *ILG Indus., Inc. v. Scott*, 273 N.E.2d 393, 396 (Ill. 1971).

Similarly, in New York, "'the use of information about an employer's customers which is based on casual memory is not actionable.'"[15] *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 218 (S.D.N.Y. 2013) (quoting *Levine v. Bochner*, 132 A.D.2d 532, 533 (N.Y. Sup. Ct. 1987). "[W]ith respect to customer preferences, 'remembered information as to specific needs and business habits of particular customers is not confidential.'" *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 606 (S.D.N.Y. 2001) (quoting *Catalogue Serv. of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 784 (N.Y. Sup. Ct. 1985)); *see also Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.E.2d 590, 594 (N.Y. 1976) ("[A]bsent any wrongdoing, we cannot agree that [a

---

[15] Pennsylvania law, likewise, only protects "specialized training" or training that imparts "proprietary knowledge or skills". *Ride the Ducks, L.L.C.*, 2005 WL 670302, at *12. In contrast, Pennsylvania law refuses to protect training that only involves general sales and marketing techniques. *See id.* at *13 (holding there was no specialized training where the skills involved were "no more complicated or specialized" than other tasks required of the specific profession and where the information presented during training "is readily available" to the public); *see also Thermo-Guard, Inc. v. Cochran*, 596 A.2d 188, 193-94 (Pa. Super. Ct. 1991) (holding no specialized training where the employees did not "receive any sales training that could be considered materially different from that received by any salesman").

former employee] should be prohibited from tuilizing [*sic*] his knowledge and talents in this area . . . [and] see now reason to inhibit the employee's ability to realize his potential both professionally and financially by availing himself of opportunity.") (citing Restatement (Second) of Agency § 396 cmt. b (1958)); *Paramount Pad Co. v. Baumrind*, 151 N.E.2d 609, 610 (N.Y. 1958) ("Absent a breach of confidence, an employer cannot exact from a former employee an agreement to refrain from putting to use the experience gained while working at his trade.") (citations omitted); *L.M. Rabinowitz & Co. v. Dasher*, 82 N.Y.S.2d 431, 439 (N.Y. Sup. Ct. 1948) ("It is true . . . that [the employee] was entitled to take with him to new employment the general knowledge and greater experience and skill gained in his old employment.").

Insight has no evidence that it provided specialized or extensive training to Mr. Wenzel or Ms. Sutmar, and there is no evidence that the training Insight provides to its employees is unique from the kind of training other staffing agencies provide. Insight's corporate representative testified that he does not know how other staffing agencies do things, and he does not know how Insight's methods or training is different from other agencies. *See* IG Dep. Vol. I, at 42:2-43:5; 44:7-22; 116:15-20; 125:5-8; 126:15-127:2; 127:22-128:1; 223:18-224:20. In fact, at least one page of the Insight training manual that it alleges was taken by Ms. Sutmar is a direct copy of publicly available information. Insight will be unable to demonstrate a legitimate business interest in protecting the information it claims is confidential, and thus the restrictive covenants in Mr. Wenzel and Ms. Sutmar's Employment Agreements are unenforceable.

      iii.    Insight has no legitimate business interest in a stable workforce.

Insight seeks to enforce its non-recruitment provision prohibiting the solicitation of employees to, in relevant part, resign from Insight or provide staffing services to Beacon. Insight's corporate representative testified that the purpose of the non-recruitment clause is to

ensure a stable work force.  IG Dep. Vol. I, at 184:9-24. Nonetheless, Insight has no evidence

that this covenant is enforceable to protect a legitimate business interest in maintaining a stable

workforce or any other legitimate business interest.

Under New York law, maintaining a stable workforce is not, in and of itself, a legitimate

business interest capable of sustaining covenants. *See Reed Elsevier Inc. v. Transunion Holding*

*Co., Inc.*, No. 13 Civ. 8739(PCK), 2014 WL 97317, at *12-13 (S.D.N.Y. Jan. 9, 2014) (holding

that "protection against a general risk of possible future employee attrition is not among the four

legitimate interests recognized by New York courts to justify a restrictive covenant"). Rather, it

must be a factor in another recognized legitimate business interest, *see MasterCard Int'l Inc. v.*

*Nike, Inc.*, 164 F. Supp.3d 592, 600 (S.D.N.Y. 2016) (holding that the non-recruitment

provisions must be analyzed in light of legitimate business interests necessary to sustain any

other post-employment restrictive covenant), such as protecting client goodwill and relationships

or protecting against the loss of "unique or extraordinary" employees, meaning those employees

"whose services are practically irreplaceable based on their unique relationships with the

customers with whom they deal", *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp.3d 684, 694

(S.D.N.Y. 2017) (quotation omitted).

Here, even assuming that Insight had a legitimate business interest in client goodwill and

relationships – and it does not – the non-recruitment clause is not necessary to sustain such

interest, as described above. Nor is such a clause necessary to retain Insight's "unique or

extraordinary" employees. Insight has no such "unique or extraordinary" employees at or below

the level of Mr. Wenzel and Ms. Sutmar. Insight has multiple account managers in its New York

office, and as the experiences of Mr. Wenzel and Ms. Sutmar demonstrate, Insight freely

transfers client accounts between account managers. Certainly, Mr. Norman, the only former

Insight employee allegedly improperly recruited by either Mr. Wenzel or Ms. Sutmar, as one of the thirty recruiters in Insight's New York office, Norman Trial Decl., and one of the one thousand recruiters that Insight hires annually, IG Dep. Vol. I, at 120:19-24, cannot qualify as "unique or extraordinary". Thus, the non-recruitment clause is unenforceable as applied to Mr. Wenzel.

Under Illinois law, "[i]n certain circumstances, maintaining stability within an employer's workforce can be a legitimate business interest and thus the basis for a restrictive covenant." *Instant Tech., LLC*, 40 F. Supp.3d at 1013 (citations omitted). However, the "interest underlying this covenant must also be real—not merely aspiration". *Id.* at 1014. Thus, "[t]he 'maintenance of a stable work force . . . requires a work force that is stable in the first instance or at least one whose stability will likely result from the restrictive covenant'". *Id.* (quoting *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 787 (N.D. Ill. 2011).

"The reality is that [Insight]'s business relies on a high volume of direct sales, which is a business model traditionally characterized by 'massive' turnover." *Id.* (quoting *Pampered Chef*, 804 F. Supp. 2d at 788). Insight's experience is consistent with this generalization. Insight hires approximately 1,000 recruiters annually, IG Dep. Vol. I, at 120:19-24, and churns through approximately 75% of them, *id.*; *see also* Defendants' First Requests for Admission to Insight and Insight's Responses, at Request No. 3, indicating that Insight does not have a stable workforce. *See id.* (concluding that workforce with 77% turnover was not stable); *see also Pampered Chef*, 804 F. Supp. 2d at 787-88 (finding unstable workforce where employer replaced 50% to 60% of its employees annually). Moreover, even those employees who remain are inherently unstable, frequently moving between offices, like Mr. Wenzel and Ms. Sutmar.

Insight's account managers primarily communicate with clients, obtain job requisitions from clients, and present candidates to clients. Cuppy Dep. at 206:19-207:22.

Therefore, Insight cannot claim that it has a legitimate business interest in or based on a stable workforce, and thus the non-recruitment restrictive covenant is unenforceable and judgment must enter in favor of Mr. Wenzel and Ms. Sutmar on Count III.

                                  iv.     The non-compete covenants are not reasonably necessary.

Even if Insight had a legitimate business interest sufficient to justify the restrictive covenants[16] – and it does not – the covenants are unenforceable because they are greater than required to protect any such interest. *See Reliable Fire Equip. Co.*, 965 N.E.2d at 396 (holding that a "reasonable" post-employment restrictive covenant must be "<u>no greater than is required</u> for the protection of a legitimate business interest", including in terms of "type of activity, geographical area, and time"); *see also BDO Seidman*, 93 N.Y.S.2d at 388-89 (holding that a covenant will only be enforced to the extent it is "*no greater* than is required for the protection of the *legitimate interest* of the employer" and "reasonable in time and area") (quotation and citations omitted). The restrictive covenants Insight seeks to enforce are not narrowly tailored to protect the claimed business interests of preventing exploitation of client goodwill or confidential information. Insight impermissibly seeks to prevent fair competition and to restrict the ability of its at-will employees to continue working in their chosen field of employment after departing

---

[16] The court need not consider the reasonableness of the covenants unless it finds – contrary to the available evidence – that Insight has a legitimate business interest underlying the covenants. *Am. Inst. of Chem. Eng'rs*, 682 F.2d at 387 ("In the case before us we need not reach the question of reasonableness in scope of the covenant because legitimate business interests of the employer are not implicated.") (quotations and citation omitted).

from or being terminated by Insight.[17] *See Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1147 (Ill. App. Ct. 1999) ("Courts uphold only those noncompetition agreements which protect the employer's legitimate proprietary interests and not those whose effect is to prevent competition *per se*.") (quotation omitted).

Insight seeks to enforce a non-compete covenant, which prohibits Mr. Wenzel and Ms. Sutmar, for a period of one year, from providing "job duties or functions equivalent to those that Employee performed for [Insight] at any point during the last twenty-four (24) months of Employee's employment with [Insight]" to "any corporation, individual, enterprise, entity or association that competes with [Insight] in [Insight's] Business," which Business is defined as "staffing services including, without limitation, temporary staff augmentation, contingent recruitment, and permanent placement." *See* SAC, Exs. A and C, at ¶ 4. The form Employment Agreement does not define "compete" and does not include a list identifying the businesses which Insight considers to be its competitors. The covenant applies to a "Territory", defined in Ms. Sutmar's Employment Agreement as follows:

> "Territory" shall mean the area around the Business Location defined by a radius that is in length equal to the lesser of (a) thirty-five (35) miles, or (b) the actual length of a straight line drawn between such Business Location and the most distant customer or client location for which Employee, alone or with other employees regularly working in the Business Location, has provided [staffing] [s]ervices during the most recent twenty-four (24) months of Employee's employment with [Insight].

SAC, at Ex. C (emphasis added). In contrast, Mr. Wenzel's Employment Agreement defines "Territory" as follows:

> "Territory" shall mean the area around the Business Location defined by a radius that is in length equal to the lesser of (a) thirty-five (35) miles, or (b) the actual

---

[17] Pennsylvania courts agree that a post-employment restrictive covenant that merely seeks to eliminate or repress competition or "to keep the employee from competing so that the employer can gain an economic advantage" is unenforceable. *Hess*, 808 A.2d at 920-21.

length of a straight line drawn between such Business Location and the most distant
customer or client location for which <u>employees regularly working in the Business
Location</u> have provided staffing services <u>generating at least $5,000 in gross revenue</u>
during the most recent <u>twelve (12) months</u> of Employee's employment with
[Insight].

*Id.*, at Ex. A (emphasis added). Both Employment Agreements define "Business Location" as

"[T]he office location of [Insight] to which Employee is assigned to perform duties under this

Agreement on the date Employee signs this Agreement, as well as any additional office

location(s) of [Insight] in which Employee regularly performs duties during Employee's

employment with [Insight]." *Id.*, at Exs. A, C.

This covenant is over-broad in that it goes beyond simply prohibiting Mr. Wenzel and

Ms. Sutmar from exploiting Insight's client goodwill or confidential information after leaving

Insight. First, it is overbroad in scope of activity, as it purports to prohibit them from working for

a staffing agency that provides services in any field, not just the IT field. *See Medix Staffing

Solutions, Inc. v. Dumrauf*, No. 17 C 6648, slip op. at 5 (N.D. Ill. Apr. 17, 2018) (finding

unenforceable a non-compete clause that, "in essence, bars [the employee] from being employed

by any company that also works in the same fields as [the employer] . . . whether that company is

an actual competitor or not"). Even within the IT field, Beacon is not a direct competitor of

Insight. *See*, *e.g.* McLaren Dep. at 90:5-25. Whether staffing agencies are competing with each

other is determined on a "case-by-case basis" depending on the specific client. McLaren Dep.

90:5-25. With respect to at least one company that Insight claims as its client, KPMG Advisory,

Insight does not and cannot actually compete because of a conflict. Wenzel Dep. 218:23-219:24.

In any event, as a general proposition, Beacon "tend[s] to go for higher-level positions. . .

Whereas . . . Insight . . . hire[s] people more low level: PC techs, help desk professionals,

customer service professionals." Kaplan Dep. 14:8-13, 23:3-19.

Second, it is overbroad in geographical scope. Even though he is a recruiter, Mr. Norman's Employment Agreement includes similar language, but purports to impose a 50-mile radius non-compete "Territory", *see* SAC, Ex. B, at ¶ 4, while Mr. Wenzel and Ms. Sutmar, account managers, are only subject to a 35-mile radius non-compete "Territory". Insight has no evidence demonstrating why these defined "Territories" are necessary to protect Insight's interests in preserving client goodwill and confidential information, and no explanation for this variance in territory range, indicating that the size of the "Territory" is arbitrary. Insight's corporate representative will not be able to explain why some Employment Agreements included a 35-mile radius and others included a 50-mile radius. *See* IG Dep. Vol. I, at 60:3-17; 50:10-56:15. Moreover, his deposition testimony indicated that the "Territory" could potentially extend to multiple areas across the country, because an account manager could make job placements for clients served out of other Insight offices, *see* IG Dep. Vol. I, at 60:3-17; 50:10-56:15, or, like Ms. Sutmar, work out of multiple Insight offices. Additionally, the "Territory" is not even consistent as between account managers; Mr. Wenzel's "Territory" could be either larger than Ms. Sutmar's (because it is based on the location of the farthest client for which anyone in his office worked) or smaller than Ms. Sutmar (because it is based on the location of only those clients who generated $5,000 or more in gross annual revenue). These inconsistencies are an effective admission by Insight that one of the provisions is broader than necessary.

Third, it is overbroad in temporal scope. The radius of Ms. Sutmar's non-compete is defined in terms of the most distant client she serviced in the last twenty-four months of her employment, whereas Mr. Wenzel's radius is limited to the most distant client he serviced during the last twelve months of his employment. This difference is all the more unreasonable in light of the fact that Mr. Wenzel (temporarily) achieved a higher level of seniority than Ms. Sutmar, and

yet Insight is apparently less concerned about preventing his competitive activities. This

difference shows that, in light of the fast pace of the IT staffing industry, at a minimum, the

second twelve month period in Ms. Sutmar's Employment Agreement is not necessary to protect

any purported client relationship or goodwill. *See Instant Tech., LLC*, 40 F. Supp.3d at 1006,

1013 (finding that IT staffing information "becomes stale after one or two months" and that is

"two years later, out of date").

> v.     The non-solicit covenants are not reasonably necessary.

Mr. Wenzel's and Ms. Sutmar's Employment Agreements additionally include a client

non-solicitation clause, but this provision is broadly worded and is not limited to protecting

client goodwill and relationships or Insight's confidential information. The provision prohibits

post-employment solicitation of any "actual or prospective customer or client" of Insight's, with

whom the employee had "Material Contact" in the last two years of his or her employment, and

there is "Material Contact" where the employee:

> (a) communicated with one or more representatives of the actual or prospective
> customer or client on behalf of [Insight], (b) coordinated, managed, or oversaw
> dealings with the actual or prospective customer or client on behalf of [Insight], (c)
> received compensation, commissions, or earnings within two years prior to the date
> of Employee's separation from employment with [Insight] on account of the sale
> or provision of products or services to the customer or client, or (d) obtained
> Confidential Business Information or Trade Secrets about the actual or prospective
> customer or client in the ordinary course of business as a result of Employee's
> employment with [Insight].

The actual restrictions are, on their face, overly broad. Courts "are hesitant to enforce

noncompetition agreements that prohibit employees from soliciting and servicing not only

customers with whom they had direct contact, but also customers they never solicited or had

contact with while employed." *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d

1141, 1147 (Ill. App. Ct. 1999); *see also Brown & Brown, Inc.*, 34 N.E.3d at 362 ("Under New

York law, the restrictive covenant was overbroad to the extent that it prohibited [the employee] from working with *any* of [the employer's] New York customers, even those [the employee] had never met, did not know about and for whom she had done no work.") (citations omitted); *Ikon Office Sols., Inc. v. Usherwood Office Tech., Inc.*, 875 N.Y.S.2d 820 (N.Y. Sup. Ct. 2008) ("A covenant will be rejected as overly broad . . . if it seeks to bar the employee from soliciting or providing services to clients with whom the employee never acquired a relationship through his or her employment or if the covenant extends to personal clients recruited through the employee's independent efforts.") (citing *BDO Seidman*, 712 N.E.2d at 1125-26). Here, sub-clause (d) would prohibit Mr. Wenzel and Ms. Sutmar from soliciting a client with whom they did not work at Insight, but information about whose hiring manager they may have once seen on the white board in the "P zone". *See Eichmann*, 719 N.E.2d at 1148 (finding non-solicitation agreement unreasonable where it included "any customer, *regardless* of whether [the employee] developed a relationship with that customer during his period of working for defendant"). As another example, this clause purports to apply to prospective – or not actual – clients, and, "[a]s a matter of law, [an employer] cannot have a protectable interest in future customers who do not yet exist". *Id.*

Tellingly, Insight seeks to restrict solicitation by recruiters like Mr. Norman, who did not develop client relationships or solicit clients. *See* Norman Trial Decl.; IG Dep. Vol. I, at 99:2-100:14. Insight is not just seeking to enforce restrictive covenants against high-level employees with unique knowledge of confidential business information or years of client goodwill built up with a specific client – it requires even entry-level employees to agree to broadly-worded post-employment restrictions as a matter of course. The non-solicitation provision extends well beyond actual clients with which the employee actually developed a relationship or goodwill,

extends even to Insight's "prospective" clients, and is not limited to reasonable and necessary protection of actual client goodwill and confidential information.

vi.     The non-recruit covenants are not reasonably necessary.

Mr. Wenzel's and Ms. Sutmar's Employment Agreements contain clauses purporting to prohibit them, for one year, "directly or indirectly, or in concert with others, solicit[ing] or encourag[ing] any person who is an employee of, or contractor or consultant for, [Insight] with whom Employee had direct contact during Employee's employment, to resign from or terminate such employment or consulting relationship with [Insight]". SAC, at Exs. A, C. As an initial matter, this clause is unenforceable, as Insight has no legitimate interest in having a stable workforce to preserve client goodwill and relationships or confidential information, as explained above. If it were enforceable, it "would certainly be overly broad, impose undue hardship on the co-worker, and be injurious to the public". *Oliver Wyman, Inc.*, 282 F. Supp.3d at 695. "Taken to its extremes, this provision could be read to bar even the most innocuous conversations between coworkers regarding professional and personal advice", such as "scenarios in which an employee might seek advice from a co-worker concerning a job opportunity, headhunter call, or contemplated life change that would inevitably result in separation from the firm—perhaps to become a full-time parent, go back to school for a degree, pursue a career in the arts or a religious vocation, or some other radical career change". *Id.*

vii.    The tolling clauses are not reasonably necessary.

Mr. Wenzel's and Ms. Sutmar's Employment Agreements also contain tolling clauses that purport to toll the period in which the non-compete, non-recruit, and non-solicit covenants are enforceable for the duration of any breach of the covenants by Mr. Wenzel or Ms. Sutmar and/or for the duration of any litigation, including any appeal, brought by Insight to enforce such

covenants, up to a maximum of two years from the termination of their employment. This provision should be held to be unenforceable, as it allows Insight to unilaterally double the duration of the restrictive covenants at its sole discretion by filing suit. *See Wesley-Jessen, Inc. v. Armento*, 519 F. Supp. 1352, 1358 (N.D. Ga. 1981) (holding that a tolling provision that extended the covenant until after the conclusion of litigation to enforce the covenant was unenforceable "because if this provision were upheld, an employer could unilaterally extend the restrictive period simply by bringing an action seeking enforcement of this covenant"). Even if it were enforceable, it makes the duration of such covenants even less reasonable than they would otherwise be. *See Papa John's Int'l, Inc. v. Rezko*, No. 04 C 3131, 2006 WL 1697134, at *2, 4 (N.D. Ill. June 14, 2006) (where the period of a non-compete covenant was tolled during breach and/or litigation, "consider[ing] the extended duration of the non-compete as a factor in assessing its reasonableness").

        viii.    The non-disclosure clauses are not reasonably necessary.

      Mr. Wenzel's and Ms. Sutmar's Employment Agreement also includes a separate provision prohibiting the use, disclosure, or exploitation of Insight's Confidential Business Information, belying Insight's claim that it must enforce overly broad non-competitive and other post-employment restrictions in order to protect its confidential information. As discussed above, the specific information Insight actually argues is at stake – client staffing needs and contact information – is not actually confidential because it is shared with multiple staffing agencies or can be obtained through publicly available sources. *See* Insight MOL, at 4; *see also supra* at 2-3; *Instant Tech., LLC*, 40 F. Supp.3d at 1012-13.  Because the restrictive covenants are not reasonably necessary, they are unenforceable, and judgment must enter for Mr. Wenzel and Ms. Sutmar on Count III.

ix.     The covenants are not supported by consideration.

In Illinois, in order to be enforceable, post-employment restrictive covenants must be "supported by adequate consideration".[18] *McInnis v. OAG Motorcycle Ventures, Inc.*, 35 N.E.3d 1076, 1082, 87-88 (Ill. App. Ct. 2015) (citation omitted). Though courts generally do not review the adequacy of consideration, such an analysis is necessary in this context "because it has been recognized that a promise of continued employment may be an illusory benefit where the employment is at-will", such as Ms. Sutmar's employment with Insight. *Id.* at 1082-83 (citation omitted). Illinois courts require "continued employment for a substantial period of time beyond the threat of discharge" as adequate consideration for a restrictive covenant in a post-hire employment agreement, and they have "[g]enerally . . . held that continued employment for two years or more constitutes adequate consideration". *Id.* (citing *Diederich Ins. Agency, LLC v. Smith*, 952 N.E.2d 165, 168 (Ill. App. Ct. 2011); *see also Brown & Brown, Inc. v. Mudron*, 887 N.E.2d 437, 440 (Ill. App. Ct. 2008)); *Curtis 1000, Inc. v. Suesss*, 24 F.3d 941, 947 (7th Cir. 1994).

New York courts similarly require consideration to support post-employment restrictive covenants.[19] *See generally Poller*, 974 F. Supp. 2d at 223-24. Employment must continue "for a

---

[18] If they are not, there is no need to consider the reasonableness of the covenants. *McInnis*, 35 N.E.3d at 1082, 87-88 (citation omitted).

[19] Pennsylvania courts require restrictive covenants to be "supported by adequate consideration". *Ride the Ducks, L.L.C.*, 2005 WL 670302, at *11 (citing *Nat'l Bus. Servs., Inc.*, 2 F.Supp.2d at 707). Additionally, they require "new and valuable consideration" when entering into an agreement containing a restrictive covenant after the initiation of employment". *Socko*, 126 A.3d at 1275 (Pa. 2015)). "Without new and valuable consideration, a restrictive covenant is unenforceable." *Id.* (citation omitted). "[T]he mere continuation of the employment relationship at the time of entering into the restrictive covenant is insufficient to serve as consideration for the new covenant, despite it being an at-will relationship terminable by either party.") (citations omitted).

substantial period after the covenant is given", so that the employer's forbearance from firing the employee "is 'real, not illusory and the consideration given for the promise is validated'". *Int'l Paper Co. v. Suwyn*, 951 F. Supp. 445, 448 (S.D.N.Y. 1997) (holding 17 months continued employment constituted adequate consideration) (quoting *Zellner v. Stephen D. Conrad*, 589 N.Y.S.2d 903, 907 (N.Y. Sup. Ct. 1992)).

Here, Ms. Sutmar executed her last Employment Agreement on April 6, 2016, SAC, Ex. C, and she left Insight 11 months later, on March 6, 2017. Mr. Wenzel executed his last Employment Agreement on November 21, 2016, SAC, at Ex. A, and he left Insight less than 8 months later, on July 10, 2017. As a matter of law, this is inadequate consideration to support the restrictive covenants in Ms. Sutmar's Employment Agreement. *See Prairie Rheumatology Assocs., S.C. v. Francis*, 24 N.E.3d 58, 62-63 (Ill. App. Ct. 2014) (finding inadequate consideration for post-employment restrictive covenant where employee resigned 15 months after executing agreement and left employment after 19 months). The fact that Ms. Sutmar may have left Insight voluntarily is irrelevant. *McInnis*, 35 N.E.3d at 1085 (citations omitted).

Insight has no credible evidence that it provided any additional consideration to Mr. Wenzel or Ms. Sutmar in exchange for the restrictive covenants. Insight's corporate representative testified that Insight was not aware of any additional consideration or compensation paid to Mr. Wenzel or Ms. Sutmar in exchange for their signing additional Employment Agreements after they were already employed by Insight. *See* IG Dep. Vol. I, at 68:11-24. Insight is bound by this admission. *See Bigsby v. Barclays Cap. Real Estate, Inc.*, 329 F.R.D. 78, 80 (S.D.N.Y. 2019) (explaining that a corporate deponent has an affirmative duty to give "'binding answers'") (quoting *Reilly v. NatWest Market Grp., Inc.*, 181 F.3d 253, 268 (2d

Cir. 1999); *see also Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) (holding that a party may not vary sworn deposition testimony by a sham affidavit).

Insight asserted, for the first time in its summary judgment motion papers, that Ms. Sutmar received $250 as consideration for signing her last Employment Agreement.[20] This claim is not supported by Insight's purported and only recently proffered evidence of a "miscellaneous" payment allegedly made to Ms. Sutmar <u>nine</u> days after she signed the Employment Agreement. *See* IG Dep. Vol. I, 68:11-24; Sutmar Trial Decl.  Moreover, this *de minimis* payment is no more than illusory consideration, in light of the compensation Ms. Sutmar could expect to receive during the two years of employment that would qualify as adequate consideration. *See Prairie Rheumatology Assocs., S.C. v. Francis*, 24 N.E.3d 58, 62-63 (Ill. App. Ct. 2014) (finding partial payment of a credentialing fee to be "little to no additional benefit").

Insight also asserts that Mr. Wenzel's promotion to Sales Manager served as consideration for the last and operative Employment Agreement he signed, but it alleged that he was given this promotion "[o]n or around September 28, 2015," a date more than one year before he executed his last Employment Agreement, dated November 21, 2016. *See* SAC, at ¶ 56.[21] In any event, after his promotion to Sales Manager, Wenzel was demoted to an account manager role. *See* IG Dep. Vol. I, at 68:25-72:20. All of Insight's claims are inconsistent with the binding

---

[20] Beacon has had no opportunity to take discovery on this new allegation.

[21] Insight claims, for the first time in its summary judgment papers, that Mr. Wenzel actually received *another* promotion, to "Sales Manager II" on October 8, 2016, and that, subsequent to that promotion, he executed the Employment Agreement on November 21, 2016. *See* January 4, 2019 Declaration of Katie Archer, Ex. 1 to Filusch Declaration in support of Insight's Motion. This claim is inconsistent with the allegations of the SAC, and with the testimony of Insight's corporate representative. SAC, at ¶ 56; IG Dep. Vol. I, at 68:11-24. Further, Wenzel disputes these purported and belated factual claims, *See* Wenzel Trial Decl., for which Beacon has had no opportunity to take discovery.

testimony of Insight's corporate representative. *LSSi Data Corp. v. Time Warner Cable, Inc.*, 892 F. Supp. 2d 489, 516-17 (S.D.N.Y. 2012) (Rule 30(b)(6) designee's testimony that he "assume[d]" a fact was an "effective denial that . . . binds the company") (citing, *inter alia*, *Reilly*, 181 F.3d at 268).

Moreover, the circumstances in which Mr. Wenzel's Employment Agreement was executed render the restrictive covenants unenforceable. New York courts have refused to enforce covenants in these circumstances. In *BDO Seidman*, the Court of Appeals of New York identified several factors that "militate[d] in favor of partial enforcement", including that the covenant at issue "was not imposed as a condition of the [employee's] . . . continued employment", and that there was "no evidence of coercion". 93 N.Y.2d at 395. Here, the Employment Agreement and the covenants therein were clearly a condition to his continued employment with Insight. *See Marsh USA Inc. v. Doerfler*, 9 N.Y.S.3d 594 (N.Y. Sup. Ct. 2015) (declining to enforce non-solicitation and confidentiality agreements where there was "some indication that the imposition of the servicing restriction . . . were imposed as a condition of [the employee's initial employment with plaintiff"); *see also Marsh USA, Inc. v. Alliant Ins. Servs., Inc.*, 26 N.Y.S.3d 725 (N.Y. Sup. Ct. 2015) (declining to enforce non-solicitation agreements where employer failed to show that it did not require employees to sign agreements as a condition of their continued employment). Further, his Employment Agreement and the covenants therein were form documents, the terms of which were not subject to negotiation. *See AM Medica Commc'ns Grp. v. Kilgallen*, 261 F. Supp. 2d 258, 262-64 (S.D.N.Y. 2003) (denying motion for preliminary injunction and dismissing complaint because, in part, the employee "signed a pre-printed form contract, and there was no indication that she was able to negotiate any of its terms").

Because there is no consideration, the restrictive covenants in Mr. Wenzel's and Ms. Sutmar's Employment Agreements are unenforceable, and they are entitled to judgment in their favor on Count III.

    b.  *Mr. Wenzel and Ms. Sutmar did not breach the restrictive covenants in their Employment Agreements.*

Even if the restrictive covenants in Mr. Wenzel's and Ms. Sutmar's Employment Agreements were reasonably necessary to support a legitimate business interest and were supported by consideration, Insight will be unable to demonstrate that they breached the non-compete, non-solicitation, and non-disclosure provisions.

Mr. Wenzel and Ms. Sutmar did not breach the non-compete covenants in their Employment Agreements because Beacon is not a direct competitor of Insight, as explained above.

With respect to Insight's claim that Mr. Wenzel and Ms. Sutmar solicited Insight's clients, Insight has not established with actual evidence that, for each such client allegedly solicited, they had "Material Contact", as defined in the Employment Agreements, within the last two years of their employment with Insight. *See* Wenzel Dep. at 181:16-182:16; 218:23-219:24; Sutmar Dep. at 149:9-151:6; 105:19-106:6; 176:2-179:20.

There is no evidence that Ms. Sutmar violated the non-disclosure provision of her Employment Agreement. She did not "use[], disclose[] or exploit[]" information that, in relevant part, "has value to [Insight]" and that is "not generally known to competitors of Employer." *See* SAC, Ex. A-C. Insight's corporate representative admitted at deposition that there is no evidence Ms. Sutmar used or disclosed or shared with anyone at Beacon or outside of Insight the only two documents she allegedly retained in her possession, or the information in those documents. *See* IG Dep. Vol. I, at 143:3-144:25; Sutmar Dep., at 139:14-140:6, 141:6-13.

With respect to Insight's claim that Mr. Wenzel breached the non-recruitment provision, Insight will be unable to prove that Mr. Wenzel caused Mr. Norman to leave Insight. Mr. Norman was already unhappy at Insight, and he advised Mr. Wenzel that he was "looking to make a move". *See* Wenzel Dep., at 221:18-222:18.

Insight will not be able to prove that either Mr. Wenzel or Ms. Sutmar violated the non-disclosure provisions of their Employment Agreements. There is no evidence that either of them "used, disclosed or exploited" information that, in relevant part, "has value to [Insight]" and which is "not generally known to competitors of Employer." *See* SAC, Exs. A-C. Insight's corporate representative admitted at deposition that there is no evidence Ms. Sutmar used or disclosed or shared with anyone at Beacon Hill the only two documents she allegedly retained in her possession, or the information in those documents, outside of Insight. *See* IG Dop. Vol. I, at 143:3-144:25; Sutmar Dep., at 139:14-140:6, 141:6-13. Insight's corporate representative also admitted at deposition that Insight was not aware of any information that Mr. Wenzel took from Insight and was not aware of any information that Mr. Wenzel had used or disclosed at Beacon Hill. *See* IG Dep. Vol. I, at 145:1-6, 220:6-221:22.

To the extent that Insight claims Mr. Wenzel and Ms. Sutmar used contact information for certain clients after leaving Insight, the actual information allegedly taken is not confidential, and Insight will be unable to prove that they used *Insight's* information to contact or solicit clients. *See* Insight MOL, at 11.[22]  As explained above, the identity of hiring managers and client

---

[22] Insight claims that Ms. Sutmar emailed a "Call Sheet" and a "Designee Packet" to her personal email while still employed at Insight. The "Call Sheet" is simply a list of names and numbers to call in an effort to generate sales leads, and it contains no information about client preferences, pricing or sale information, or any other information about clients other than the names of certain of their employees and contact information. *See* "Call Sheet"; IG Dep. Vol. I, 146:9-147:3. The list of names and contact information on a "Call Sheet" is derived from publicly available sources, including websites such as LinkedIn or Discover.org, and information obtained through

contact information is not confidential information belonging to Insight, as it is information that is generally known or "readily ascertainable" by the public. *See Instant Tech., LLC*, 40 F. Supp.3d at 1012-13; *see also Robert Half Int'l, Inc.*, 2013 WL 10829925, at *8 (The mere fact that the defendant had solicited plaintiff's clients did not, standing alone, "demonstrate that she used confidential information in doing so.").

        c.      *Insight did not suffer any damages from Mr. Wenzel's or Ms. Sutmar's alleged breaches of the restrictive covenants in their Employment Agreements.*

Even if the restrictive covenants in the Employment Agreements were enforceable, and even if Mr. Wenzel and Ms. Sutmar breached those covenants, Insight is not entitled to judgment on Count III because it has no evidence that it suffered any actual, non-speculative damages. The only damages Insight argues that it has suffered are replacement costs and unquantified irreparable harm from the alleged theft of its purportedly proprietary information. *See* Insight MOL, at 23-24. Not only are these claimed damages speculative and hypothetical, but they cannot under any circumstances be causally connected to the claimed breaches of the Employment Agreements.

Insight's purported damages include Insight's estimated "Replacement Cost" for Mr. Wenzel and Ms. Sutmar, IG Dep. Vol. II, at 26:9-28:11; Ratner Dep., at 44:13-16; IG Dep. Vol. I, at 114:12-13; 114:16-21; 115:19-116:14, including its estimated cost to replace them by hiring multiple new entry-level employees, training them, and – over a period of years and taking into

---

phone calls and other general research. *See* IG Dep. Vol. I, at 42:2-43:5; 44:24-45:9; Sutmar Dep., at 143:3-22. Such information is not confidential. *See Instant Tech., LLC*, 40 F.Supp.3d at 1012-13. With respect to the Designee Packet, a training document, there is no evidence whatsoever that Sutmar ever used it, and Insight has no evidence that the training it provides to its employees is any different from that provided at other staffing agencies. *See* IG Dep. Vol. I, at 123:1 – 128:1.

account its attrition rate – promoting them to reach the same level of "tenure" as Mr. Wenzel and Ms. Sutmar had attained in their positions by the time they left Insight. *See* Ratner Report, at 20-21. This "Replacement Cost" theory of damages is based on a "hypothetical model", does not reflect actual incurred expenses, and is unsupported by any evidence that Insight changed its hiring targets or practices to account for the Former Employees' departures from Insight. Ratner Dep., 23:14-24:3,141:23-142:3. Insight had no agreement with Mr. Wenzel or Ms. Sutmar that they would work for Insight for any additional amount of time – it is undisputed that their Employment Agreements specified that they were an "at-will" employees, who could have left Insight or been terminated at any time. *See* IG Dep. Vol. I, 175:2-176:6. It is also undisputed that Insight's estimated cost to replace an employee who leaves Insight is the same whether the employee complies or does not comply with the restrictive covenants in the Employment Agreements. *See* Ratner Dep., at 142:20-143:1.  In fact, Insight's corporate representative admitted that the cost would be the same if the Former Employees went to work as a barista at Starbucks. Thus, Insight's "Replacement Costs" for her are wholly speculative and unrelated to the alleged breaches of contract. Insight has admitted that these damages are purely hypothetical, as it has <u>not</u> hired any new employee to replace Mr. Wenzel or Ms. Sutmar, and their accounts were simply re-assigned internally.

There is also no evidence that any alleged breach of the Employment Agreements caused Insight to lose any profits. Insight's only specific claim of damage to its business – that it has not had the opportunity to submit candidates for job requisitions from NBC Universal's Analytics Technology Department – is completely speculative. Insight has essentially admitted that it does not know why it has not obtained recent business from this department. *See* IG Dep. Vol II, at 21:23-22:2; Cuppy Dep., at 124:21-125:17. There is no evidence that Defendants have caused

Insight to lose business from any client. *See* IG Dep. Vol. II, at 21:11-23:6; IG Dep. Vol. I, at 162:13-15; 177:7-13. One of Insight's Sales Managers in its New York office testified at deposition that she is not aware of any clients, clients, or candidates that Insight lost as a result of any conduct by any of the Defendants, any job orders or job requisitions that Insight did not get as a result of any conduct by any of the Defendants, any job placements Insight would have filled but for any conduct of the Defendants, or any money Insight lost because of anything the Defendants did. Cuppy Dep., at 194:13 – 196:6. She further testified that between 2017 and 2018 the revenue of Insight's New York office had grown by approximately ███████████ and the office was, on average, meeting its quarterly revenue growth targets. Cuppy Dep., at 187:11-189:10.

As explained above, there is no evidence that Ms. Sutmar used or disclosed Insight's confidential information. Insight does not attempt to quantify, describe, or demonstrate any actual damage caused by any alleged use, disclosure, or exploitation of its purportedly confidential information. Notably, while Insight claims that the disclosure of its information causes irreparable harm, Insight did not seek a preliminary injunction enjoining Ms. Sutmar's disclosure of such information.

To the extent that Insight claims it is entitled to attorneys' fees, such fees may be awarded only if Insight *prevails* on its claims. *See* SAC, Exs. A-C, at ¶ 16).[23] Because there is no evidence of damages proximately caused by any breach of the Employment Agreements, Defendants are entitled to judgment on Count III.

---

[23] *Pino v. Locascio,* 101 F.3d 235, 237-38 (2d Cir. 1996) (An award of attorney's fees is only warranted where the party is a "prevailing party", and the requested fee is reasonable; "'[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, . . . the only reasonable fee is usually no fee at all.'") (quoting *Farrar v. Hobby*, 506 U.S. 103, 115 (1992)).

**B.     Insight's trade secret misappropriation claims fail.**

Insight claims that Mr. Wenzel and Ms. Sutmar misappropriated its trade secrets under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA") (Count I) and under New York common law (Count II). Insight's trade secret misappropriation claims must fail because Insight's information is not a trade secret, and Insight failed to adequately safeguard such information. For these reasons, the Court must find for Mr. Wenzel and Ms. Sutmar on Counts I and II of Insight's SAC.

The DTSA defines a trade secret, in pertinent part, as certain information that "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not be readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information". 18 U.S.C. § 1839(3)(A)-(B). Misappropriation in violation of the DTSA is "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty". *Syntel Sterling Best Shores Mauritius Ltd. v. The Trizetto Grp., Inc.*, No. 15-CV-211 (LGS) (RLE), 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (citing 18 U.S.C. § 1839(3)(A)-(B)).

New York common law defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Next Commc'ns, Inc. v. Viber Media, Inc.*, 2017 WL 4402540, at *3–4 (S.D.N.Y. Sept. 30, 2017) (quoting Restatement

(First) of Torts § 757, cmt. b (1939)). A claim for misappropriation requires that a party show

"(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of

an agreement, confidential relationship or duty, or as a result of discovery by improper means".

*Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-cv-8190 (RJS), 2016 WL 1275659, at *3

(S.D.N.Y. Mar. 30, 2016) (quotations omitted); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38,

43–44 (2d Cir. 1999).

> When determining whether information constitutes a trade secret under either the DTSA or common law, New York courts consider the following factors:

> > (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 WL 557906, at *3-4

(S.D.N.Y. Jan. 23, 2018); *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d

Cir. 2009). "[T]he most important consideration [is] whether the information was secret",

*Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986), and "the primary consideration

in determining secrecy is whether the information is easily ascertainable by the public", *LinkCo,*

*Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 499 (S.D.N.Y. 2002).

       2.      <u>Insight's Trade Secret Misappropriation Claims Against Mr. Wenzel Fail.</u>

Insight claims that Mr. Wenzel misappropriated its trade secrets by communicating with

certain hiring managers at companies that Insight claims are its clients. *See* Ratner Report, at 25-

26, Schedule 2.2. As an initial matter, there is no evidence that he took any client list belonging

to Insight. As explained above, to the extent Mr. Wenzel relied on his memory of such

information, Insight's claim fails. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 510-511 (S.D.N.Y. 2011) ("[F]ormer employees can use their recollection of information about customers, and such recollected information is not considered confidential for purposes of enforcing restrictive employment covenants.") (citing *Buhler v. Michael P. Maloney Consulting, Inc.*, 299 A.D.2d 190, 191 (N.Y. Sup. Ct. 2002)). Further undermining any claim that Mr. Wenzel improperly used Insight's information is the fact that Beacon had pre-existing relationships with these clients, as reflected in the Master Service Agreements.  Any pre-existing relationship negates any argument that Mr. Wenzel's knowledge of these hiring managers produced the connection between Beacon and the Insight client, or that Beacon obtained the business through improper means.  *See Ehrlich for Hoffmans Trade Grp. LLC v. McLane Global*, No. 1:17-CV-28 (LEK), 2017 WL 2633528, at *7 (N.D.N.Y. June 19, 2017) ("Servicing former customers of a competitor, without more, does not suggest McLane obtained HTG's customer information or did so through improper means.").

Even if Mr. Wenzel had taken a client list, which he did not, there is no evidence that the names of client hiring managers is secret. "[C]ustomer lists are generally not considered confidential information", and this is especially true where "it would not be too difficult for someone to duplicate the names by again canvassing the market through phone calls and general research". *Iron Mountain Info. Mgmt., Inc. v. Taddeo*, 455 F. Supp. 2d 124, 138, 140 (E.D.N.Y. 2006). Where, as here, a "client list" consists of clients who are well-known, whose identities are not protected, and whose contact information is readily ascertainable by, for example, calling the company's general line, using external sources such as LinkedIn and Google, and subscription directories of buyers in the industry, the list is not a trade secret that can be misappropriated. *Free Country Ltd. v. Drennen,* 235 F. Supp.3d 559, 566 (S.D.N.Y. 2016); *see also Marsh USA,*

*Inc. v. Alliant Ins. Servs., Inc.*, 26 N.Y.S.3d 725 (N.Y. Sup. Ct. 2015); *TNS Media Research, LLC v. TRA Global, Inc.*, 977 F. Supp. 2d 281, 314 (S.D.N.Y. 2013), *rev'd on other grounds*, 629 Fed. Appx. 916, 932 (Fed. Cir. 2015).

As explained above, courts that have examined this issue in the specific context of staffing agencies have also determined that such client list information, including the names of clients and their hiring managers, is not a trade secret. *See*, *e.g.*, *Instant Tech., LLC*, 40 F. Supp.3d at 1012, 1016 (rejecting argument that the names of a staffing agency's clients and its contact people at its clients were confidential or a trade secret). In a similar case involving the staffing industry, the court reasoned that "[g]iven the vast amount of employment information on the Internet and high competition in the field, the Court finds that the names of the clients at issue here and their key contact persons, are known outside of the business, are known by employees and others involved in the business, have limited value to the business and its competitors, and are easily ascertained from non-confidential sources," and that the staffing agency had, accordingly, failed to show that such information constituted trade secrets. *Robert Half Int'l, Inc.*, 2013 WL 10829925, at *6. The "mere fact" that the defendant had solicited plaintiff's clients did not, standing alone, "demonstrate that she used confidential information in doing so." *Id.* at *8.

It is indisputable in this case that contact information for hiring managers at client companies can be found by any staffing agency, through publicly available sources and through general canvassing, such as cold calling, internet research, referrals, or online databases such as DiscoverOrg, LinkedIn Sales Navigator, and Rainking. Cuppy Dep., at 170:2 -172:20; IG Dep. Vol. I, at 44:24 – 45:9, 137:4-16. Insight generates its sales leads using these methods, they are not proprietary to Insight, and they are accessible to any staffing agency, including Beacon. *See*

IG Dep. Vol. I, at 44:7 - 45:9, 178:5-8; Cuppy Dep., at 172:21-174:17. There is no evidence that any client contact information is Insight's secret.

Not only is such general information about the identity of clients and hiring managers readily derived from public sources, the evidence in the record shows that Insight does not actually take substantial – or even reasonable – measures to preserve the alleged secrecy of such information. *Geritrex Corp. v. Dermarite Indus., LLC,* 910 F. Supp. 955, 961 (S.D.N.Y. 1996). For example, there is no evidence that Insight contractually required its clients to keep the names of their hiring managers confidential. *See Instant Tech., LLC*, 40 F. Supp.3d at 1012 (noting that "[n]o client would agree to such an arrangement because it would be inconsistent with the non-exclusive, competitive nature and practice in the industry, and would not be in any client's best interest"). As another example, information about clients, their hiring managers, and the open job positions or job requisitions that the client is trying to fill is displayed in Insight's New York office, including on marker erase boards ("white boards") in the "priority zone" or "P zone" of the office (the "P zone boards"). Cuppy Dep., at 43:21-46:21; SAC at ¶ 21. Insight allows individuals who are not Insight employees (including individuals interviewing for a job at Insight, Insight's clients, friends and family of Insight employees, and building management and cleaning staff) to come into the office where the P zone boards are displayed, and these individuals are not required to sign a confidentiality or non-disclosure agreement or told that the information is confidential or a trade secret. *See* Cuppy Dep., at 46:22-49:8, 49:15-52:3, 68:8-69:10; *see* IG Dep. Vol. I, at 135:3-136:23, 140:20-141:11. An additional example is that Insight does not label such information as confidential, allows them to store such information on their personal devices, and does not require them to delete such information from their personal devices at the end of their employment. *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC,*

898 F.3d 1279, 1299-1300 (11th Cir. 2018). Hiring manager names are not trade secrets

protected by Insight, and Mr. Wenzel is entitled to judgment in his favor on Counts I and II.

        2.      <u>Insight's trade secret misappropriation claims against Ms. Sutmar fail.</u>

Insight claims that Ms. Sutmar emailed two documents to her personal email address

while employed by Insight: a "Call Sheet" and a "Designee Packet".[24] *See* Ratner Report, at 25-

26. As a preliminary matter, Ms. Sutmar has testified that she has no memory of having emailed

the two documents to herself, Sutmar Dep., at 139:14-140:6, 141:6-13, and there is no evidence

she ever used these documents after leaving Insight or disclosed them to anyone outside of

Insight. *See* IG Dep. Vol. I, at 143:3-144:25. Because she did not use or disclose the Call Sheet

or Designee Packet, she is entitled to judgment on Count II, because New York common law

requires use or disclosure to support a misappropriation claim. *See N. Atl. Instruments, Inc.*, 188

F.3d at 43–44; *Faiveley*, 559 F.3d at 117; *see also Delville v. Firmenich Inc.*, 920 F. Supp. 2d

446, 470 (S.D.N.Y. 2013) (granting summary judgment on misappropriation counterclaim where

defendant "proffered *no* evidence that, as a result of [plaintiff's] actions, [defendant's]

confidential or proprietary information was used to solicit clients for, or otherwise benefit,

[plaintiff's] subsequent employers.").

       There is no evidence that the documents allegedly taken by Ms. Sutmar constitute trade

secrets. The "Call Sheet" is simply a list of names and numbers to call in an effort to generate

sales leads, and it contains no information about client preferences, pricing, or sale information,

or any other information about clients other than the names of certain of their employees and

contact information. *See* the "Call Sheet"; IG Dep. Vol. I, 146:9-147:3. The list of names and

---

[24] There is no evidence to suggest that she kept or took anything else from Insight. IG Dep. Vol. I, 157:1-6.

contact information on the Call Sheet is derived from publicly available sources, including websites such as LinkedIn or Discover.org, and information obtained through phone calls and other general research. *See* IG Dep. Vol. I, at 42:2-43:5; 44:24-45:9; Sutmar Dep., at 143:3-22. The Call Sheet is thus the kind of client or "customer list" based on publicly accessible information that courts have found is not a trade secret, as explained in detail above. *See, e.g. Instant Tech.,* 40 F. Supp.3d at 1016; *TNS Media Research,* 977 F. Supp. 2d at 314.

The Designee Packet, in turn, is used in the training of employees at Insight, but Insight has no evidence that the training it provides to its employees is any different from that provided at other staffing agencies. *See* IG Dep. Vol. I, at 123:1 – 128:1. There is no evidence that the Designee Packet consists of anything other than the kind of basic sales advice that any company could develop, and such information that provides no competitive advantage to Insight, could be independently developed or "reverse engineered" by any other company, and is not a trade secret. *See*, *e.g.*, *Delta Filter Corp. v. Morin,* 108 A.D.2d 991, 992–94 (N.Y. Sup. Ct. 1985) (lack of evidence of trade secret where Delta failed to prove that its filter production process was materially different from those of its competitors, that its equipment was generally unavailable and not easily assembled, or that any distinctive feature gave Delta any significant competitive advantage). To the extent that this type of training information has also been internalized by Ms. Sutmar, and she cannot be prevented from relying on her training in performing any subsequent jobs. *L.M. Rabinowitz & Co. v. Dasher*, 82 N.Y.S.2d 431, 439 (N.Y. Sup. Ct. 1948) ("It is true . . . that [the employee] was entitled to take with him to new employment the general knowledge and greater experience and skill gained in his old employment.").

Moreover, there is no information that Insight took reasonable measures to preserve the secrecy of such information. Insight's lack of care concerning client information comparable to

the information in its "Call Sheet" is described above. Insight has no evidence concerning any alleged efforts it takes to preserve the secrecy of its training materials, which is unsurprising as at least part of the Designee Packet is identical to material from a publicly available source that is not proprietary or exclusive to Insight. *Compare* https://blog.classesandcar eers.com/advisor/what-you-wish-youd-known-before-your-job-interview, accessed on December 31, 2018, *to* the "Designee Packet", at Bates-stamped page LS000048.

###    C.    Insight's fraudulent inducement claim fails.

Insight claims that Mr. Norman fraudulently induced it into executing the Separation Agreement (Count V) because he intended to violate the provision of the Separation Agreement affirming the non-compete covenant in his Employment Agreement. The affirmation provision in the Separation Agreement is unenforceable because the underlying non-compete covenant in the Employment Agreement is unenforceable, as discussed above. Even if the affirmation provision in the Separation Agreement were enforceable, there is also no evidence that Mr. Norman knowingly made a false statement with the intent to induce Insight's reliance, or that Insight suffered any injury from any such statement in connection with the Separation Agreement.

Fraudulent inducement requires: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wild Bunch, SA v. Vendian Entm't, LLC*, No. 17 Civ. 1383, 2018 WL 1365690, at *3 n.1 (S.D.N.Y. Feb. 26, 2018). The plaintiff must prove these elements by clear and convincing evidence. *See CCM Rochester, Inc. v. Federated Inv'rs, Inc.*, 234 F. Supp.3d 501, 506 (S.D.N.Y. 2017) (quoting *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) (citation omitted). "To sustain a fraudulent inducement claim without direct

evidence, the plaintiff must provide 'evidence of facts that support a strong inference that the defendants possessed the requisite fraudulent intent.'" *Id.* at 507 (quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 222–23 (S.D.N.Y. 2007).

There is no evidence that Mr. Norman knowingly made false statements with the intent to induce Insight to enter into the Separation Agreement, or to induce reliance from Insight with respect to the Separation Agreement. The Separation Agreement is a form document that Insight presents to every employee who resigns or is fired from Insight, and which is not negotiated by the parties. *See* Cuppy Dep., at 100:3-19. The Sales Manager who presented the document to Mr. Norman recalls telling him to review and sign the Separation Agreement. See Cuppy Dep., at 147:11 – 148:18. Mr. Norman was confused about what he was signing at the time he signed it, and he was not aware that he could revoke the agreement after signing it because he was not given a copy. Norman. Dep. at 187:16-191:13; *see also* Insight's Responses to Beacon's First Requests for Admissions, Request No. 18-19.  The Separation Agreement itself is ambiguous, as it refers to prior employment agreements and restrictive covenants without defining these terms or reciting the language of the restrictive covenants the Separation Agreement purports to affirm. Thus, there is no evidence – much less clear and convincing evidence – that Mr. Norman intended to deceive Insight in order to induce Insight to enter into the Separation Agreement.

Moreover, there is no evidence that any alleged false statement made by Mr. Norman caused Insight any harm. The Sales Manager who presented the document to Mr. Norman recalls telling him that she would "countersign and send back to you so that we can make sure that your two weeks from your commission gets paid out for you," and there is no evidence that she told him that it was a severance payment or a payment that would be made in exchange for his signing of the Separation Agreement. See Cuppy Dep., at 147:11 – 148:18. Because there is no

evidence that Insight suffered any harm, and no evidence that Mr. Norman intended to deceive Insight, Insight's fraudulent inducement claim fails, and judgment must be entered in his favor on Count v. of the SAC.

> **D.      Insight's claim for breach of the duty of loyalty fails.**

Insight claims that Mr. Wenzel and Ms. Sutmar breached their duty of loyalty to Insight. However, this claim is premised on the flawed trade secret misappropriation claim and, in any event, Insight has suffered no damages attributable to the alleged breach by Mr. Wenzel and Ms. Sutmar. Therefore, the Court must find for Mr. Wenzel and Ms. Sutmar on Count IV of Insight's SAC.

Insight's claim for breach of the duty of loyalty must be based upon the conduct of Mr. Wenzel and Ms. Sutmar while employed by Insight as "employees owe a duty of loyalty . . . to their employer *in the performance of their duties*." *Cerciello v. Admiral Ins. Brokerage Corp.*, 936 N.Y.S.2d 224 (N.Y. App. Div. 2011) (emphasis added); *see also Design Strategy, Inc. v. Davis*, 469 F.3d 284, 300 (2d Cir. 2006). "A breach of . . . loyalty[] occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity." *Dewitt Stern Grp., Inc. v. Eisenberg*, 257 F. Supp.3d 542, 585 (S.D.N.Y. 2017) (quoting *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013)). To state a claim for breach of the duty of loyalty, "a plaintiff must show the existence of a fiduciary duty, a knowing breach of that duty, and damages resulting from the breach." *Id.* (citing *Johnson v. Nextel Commc'ns*, 660 F.3d 131, 138 (2d Cir. 2011)). The duty of loyalty "has been limited to cases where the employee, acting as the agent of the employer,

unfairly competes with his employer, diverts business opportunities to himself or others to the financial detriment of the employer, or accepts improper kickbacks." *Delville v. Firmenich Inc.*, 920 F. Supp. 2d 446, 469 (S.D.N.Y. 2013) (internal quotation omitted).

It is undisputed that there is no evidence that either Mr. Wenzel or Ms. Sutmar were working for Beacon while still working for Insight, were talking to Insight's clients about the fact that they were considering going to Beacon, or asked Insight's clients to move their business to Beacon while they were still employed by Insight. IG Dep. Vol. I, 226:9-25. Count IV is premised, at best, on the claims of misappropriation of trade secrets during the Former Employees' employment at Insight (*see* SAC, at ¶¶ 2, 151), but, as explained above, the misappropriation claims fail and, to the extent Count IV depends upon these claims, it also fails.

Insight has also failed to present any evidence of damages caused by any breach of the duty of loyalty. There is no evidence that Mr. Wenzel or Ms. Sutmar used or disclosed any information belonging to Insight. The other damages Insight has identified – the purported cost to replace the Former Employees and alleged loss of business because of alleged *post-*employment competition with Insight – are all speculative and hypothetical, as explained above, and even if such damages were actual and calculable, they were not caused by any alleged conduct of the Former Employees *during* their employment with Insight.

**E.    Insight's tortious interference with contract claims fail.**

Insight claims that Beacon and Mr. Wenzel tortiously interfered with its Employment Agreements. However, Insight will not be able to establish that: it suffered any damages from any such interference; Beacon and Mr. Wenzel interfered with any enforceable post-employment restrictive covenants; Beacon and Mr. Wenzel knew the terms of the restrictive covenants; and Beacon and Mr. Wenzel intentionally procured a breach of Insight's restrictive covenants. Thus,

the Court must find for Beacon and Mr. Wenzel on Counts VII and VIII, respectively, of Insight's SAC.

Under New York law, a plaintiff must prove the following elements to support a claim for tortious interference with a contract: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting from the breach. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (citing *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)). Damages are an essential element of any tortious interference claim. *See Mattesich v. Hayground Cove Asset Mgmt., LLC*, 876 N.Y.S.2d 405 (N.Y. App. Div. 2009); *Banner Indus. of N.E., Inc. v. Wicks*, 71 F. Supp.3d 284, 305 (N.D.N.Y. Dec. 1, 2014).

Two initial flaws foreclose Insight's claim. First, as explained in detail above, there is no evidence of actual damages suffered by Insight as a result of any alleged breach of the Employment Agreements. Second, the restrictive covenants in the Employment Agreements are unenforceable, and Beacon and Mr. Wenzel cannot be held liable for tortiously interfering with invalid restrictive covenants. On these grounds alone, Beacon and Mr. Wenzel are entitled to judgment in their favor.

Further, there is no evidence that Beacon or Mr. Wenzel had actual knowledge of the terms of the Employment Agreements or intentionally procured a breach of such terms. A plaintiff "must show that Defendants had <u>actual knowledge of the terms of the contract</u> and of the contractual obligation that was allegedly breached." *Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, No. 14-cv-7529 (RJS), 2016 WL 5414979, *4 (S.D.N.Y. 2016); *see also Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013)

("[C]onstructive knowledge is inadequate to demonstrate [party's] knowledge for purposes of tortious interference.").

There is no evidence that Mr. Wenzel was aware of the specific terms of Mr. Norman's Employment Agreement, or that he used any of Insight's information to cause Mr. Norman to resign and join Beacon. *See* Wenzel Dep. at 223:20-23, 224:19-225:6. The language in Mr. Wenzel's Employment Agreement is not identical to that in Mr. Norman's Employment Agreement. *Compare* SAC, Ex. A (defining the term "Territory" as thirty-five (35) miles") *with id.*, Ex. B (defining the term "Territory" as fifty (50) miles). Additionally, Mr. Wenzel did not sign a Separation Agreement, such as that executed by Mr. Norman. SAC, Ex. D. Even assuming Mr. Wenzel recalled the terms of *his* Employment Agreement, there is no evidence that he knew the terms of *Mr. Norman's* Employment Agreement or Separation Agreement, especially where Mr. Norman had different job responsibilities than Mr. Wenzel.

There is likewise no evidence that Beacon knew the terms of the Employment Agreements. Insight claims that Beacon is aware of Insight's agreements with its employees because Insight has sued Beacon before, and that "prior to their employment of the Former Employees, Beacon had active knowledge that these agreements include, among other things, the Non-Competition clause, the Non-Solicitation covenant, and the Non-Disclosure and Trade Secret Provisions." SAC, at ¶100. However, the evidence establishes that the Former Employees did not discuss the terms of their particular Employment Agreements with Beacon, and that Beacon did not have knowledge of the actual terms of the Employment Agreements when hiring the Former Employees. *See* BH Dep., Vol. I, at 118:14-119:12, 125:2-7, 180:15-181:15, 187:24-188:8; Kaplan Dep., at 47:22-48:7; 53:13-54:10; 97:2-21; Ocampo Dep., 40:19-41:23; Wenzel Dep., 57:10-58:21, 148:2-6, 169:9-16, 142:11-17; Sutmar Dep. 49:18-50:3, 138:5-14.

There is also no evidence that Beacon and Mr. Wenzel *intentionally* induced any alleged breach of any of these Employment Agreements. "[I]t is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third-party's contract with the plaintiff; instead, the evidence must show that the defendant's objective was to procure such a breach." *Roche Diagnostics GmbH*, 992 F. Supp. 2d at 221; *see also Am. Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F. Supp. 597, 608 (S.D.N.Y. 1971). In fact, the evidence shows that there was a lack of such intent. For example, Beacon specifically instructs new employees, including the Former Employees, not to take or use information belonging to their former employer. Ocampo Dep., 62:3-63:5, 137:15-24, 138:5-8; BH Dep. Vol. I, 126:7-20. The Former Employees' supervisors at Beacon also testified that they instruct employees not to solicit clients with which they worked at their prior staffing agency. Kaplan Dep., 55:21-56:6; Ocampo Dep., 43:10-24, 45:21-25, 56:12-19, 75:20-24, 76:10-14, 95:19-96:2, 98:17-23, 115:24-116:4, 142:16-143:21. Insight admits that it does not have any facts or evidence suggesting that any of the Former Employees hid the fact of their employment with Beacon, or that Beacon conspired with them to hide the fact that they were working for Beacon. *See* IG Dep. Vol. I, 222:15-223:16, 225:23-226:8. There is no evidence that Beacon or Mr. Wenzel had knowledge of the terms of the Employment Agreements or intent to procure a breach of the Employment Agreements, and Beacon and Mr. Wenzel are entitled to judgment in their favor on Counts VII and VIII, respectively, of Insight's SAC.

   **F.    Insight's tortious interference with business relationship claims fail.**

Insight alleges that Mr. Wenzel and Beacon tortiously interfered with its business relationships with the following nine companies: NBC Universal, Compass, Time Warner, the New York Times, Charter, Sony Music Entertainment, KPMG, Revlon and ABC (collectively,

the "NY Companies).[25] SAC, at ¶¶ 86. There is no evidence that either Mr. Wenzel or Beacon interfered with these business relationships, acted for any improper purpose or used improper means, or caused injury to <u>any</u> of Insight's business relationships. For these reasons, Insight's claims for tortious interference with business relationships claims against Mr. Wenzel and Beacon, Counts IX and X, respectively, of Insight's SAC, must fail.

The essential elements of this claim are that: (1) the plaintiff has business relations with a third party; (2) the defendant interferes with those business relations; (3) the defendant acts with the <u>sole</u> purpose of harming the plaintiff, or if the defendant acts to advance its own competing interests, it uses wrongful means (such as <u>criminal</u> or <u>independently tortious conduct</u>); and (4) the defendant's actions cause injury to the relationship. *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012). The conduct must be egregious and, in the context of business competitors, "wrongful means" includes "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004) (quotation omitted); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 282, 296 (S.D.N.Y. 2010). A plaintiff must show "*both* wrongful means *and* that the wrongful acts were the *proximate cause* of the rejection of the

---

[25] Insight waited to assert its allegations concerning seven of the nine NY Companies (Compass, Time Warner, the New York Times, Charter, KPMG, Revlon and ABC) until it filed the SAC, its third complaint, *compare* Amended Complaint, at ¶¶ 86, 88 *with* SAC, at ¶ 86, in September of 2018, after the close of all discovery in August of 2018. The allegations of the SAC provide no details identifying the alleged facts upon which Insight bases its claims with respect to these companies. Defendants will be severely prejudiced if Insight is allowed to assert these claims at trial, as Defendants have not had the opportunity to answer Insight's new allegations, assert affirmative defenses to Insight's new allegations, or to take any discovery concerning Insight's new allegations, including discovery as to Insight's alleged business relationships with these companies, and as to any damage caused to Insight's relationships with these companies caused by conduct of any Defendants.

plaintiff's proposed contractual relations." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171 (2d Cir. 2004) (quotation omitted). "[C]onduct constituting tortious interference with business relationships is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 403 (S.D.N.Y. 2012).[26]

There is no evidence that either Mr. Wenzel or Beacon engaged in any wrongful conduct, directed such conduct at any of Insight's clients or prospective clients, or acted out of malice, intended to injure Insight, or did anything unlawful. It is undisputed that there is no evidence that any of Defendants disparaged Insight to any client. IG Dep. Vol. I, at 177:25-178:4.   There is similarly no evidence that Mr. Wenzel and Beacon were "motivated solely by malice or intended to inflict injury by unlawful means." *Tri-Star Lighting Corp. v. Goldstein*, 58 N.Y.S.3d 448, 454 (N.Y. App. Div. 2018).

Even if Mr. Wenzel and Beacon solicited business from certain of the same clients that Insight targets, Insight admittedly has no evidence that they acted to inflict any injury on Insight or did so for any purpose other than to advance their own economic interest. *See* IG Dep. Vol. I, 197:8-24. "Actions intended to solicit business, which are motivated by economic self-interest, cannot be characterized as malicious". *Tri-Star Lighting Corp.*, 151 A.D.3d at 1106. Further, a desire to advance one's own economic interest does not constitute "wrongful means" under New York law. *See Plasticware*, 852 F. Supp. 2d at 403.

---

[26]  Insight alleges that Beacon caused Insight to lose "expected revenue from" the Former Employees and investment in training, goodwill, and client relationships allegedly developed by the Former Employees. *See* SAC, at ¶ 182. To the extent that Insight alleges Beacon's hiring of the Former Employees is improper, this is not conduct <u>directed at the NY Customers</u> or tortious interference.

To the extent Insight argues that Mr. Wenzel violated an enforceable contractual obligation not to compete with Insight or to solicit certain clients, a breach of contract does not rise to the level of "improper means". The "defendant's conduct must amount to a crime or an independent tort," and "[c]onduct that is not criminal or tortious will generally be 'lawful'; and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 Fed. App'x 102, 106 (2d Cir. 2012) (quoting *Carvel Corp.,* 3 N.Y.3d at 190). An alleged breach of contract does not suffice as underlying tortious conduct "unless a legal duty independent of the contract itself has been violated." *See Plasticware*, 852 F. Supp. 2d at 403 (internal citations omitted). While the SAC alleges that Wenzel used misappropriated trade secrets to solicit the NY Customers, the information Insight claims Wenzel has used is not, as a matter of fact and law, a trade secret or confidential information belonging to Insight, as explained above.

Finally, and fatally, there is no evidence that any alleged tortious interference caused injury or loss to Insight's business relationships with any of the NY Customers. *See RFP LLC v. SCVNGR, Inc.,* 788 F. Supp. 2d 191, 198 (S.D.N.Y. 2011) (tortious interference claim is "fatally defective" without injury to the underlying business relationship). There is no evidence that Defendants have caused Insight to lose business from any client. *See* IG Dep. Vol. II, at 21:11-23:6; *see* IG Dep. Vol. I, at 162:13-15; 177:7-13. The only specific "injury" Insight has claimed is that it "has not had an opportunity to submit candidates to any open requisition for NBC Universal's Analytics Technology department, while Wenzel has submitted candidates to these requisitions on behalf of Beacon Hill." SAC, ¶ 172. However, there is no evidence that <u>Mr. Wenzel</u> did anything to cause Insight's alleged lack of opportunity to submit candidates. Insight

has continued to obtain business from NBC Universal. Cuppy Dep., at 135:25-137:8. Insight's
Master Services Agreement with NBC Universal is not exclusive and allows NBC Universal to
work with other staffing agencies. IG Dep.Vol. I, 157:10-158:15. Insight has done no analysis of
whether there has been any actual decrease in revenue or profit from its relationship with NBC
Universal. *See* IG Dep. Vol. II, 21:11-21. Insight essentially admits that it does not know why it
has not obtained recent business from this department. *See* IG Dep. Vol II, at 21:23-22:2; Cuppy
Dep., at 124:21-125:17. There is no evidence of damage, and Mr. Wenzel and Beacon are
entitled to judgment on Insight's claims for tortious interference with business relationships
against them.

> **G.    Insight's claims fail because it has released them.**

It is undisputed that, on April 11, 2016, Beacon and Insight entered into a Settlement
Agreement (the "Settlement Agreement") to resolve disputes between Beacon, Insight, and
certain of Insight's former employees. Defendant's First Requests for Admissions to Insight and
Insight's Responses, at Request No. 23; April 11, 2016 Settlement Agreement. The Settlement
Agreement on its face applies to future claims, and Insight's claims against Beacon and the
Former Employees are therefore barred because such claims are subject to the Settlement
Agreement's release. "[A]lthough a general release usually includes only claims in existence at
the time it is executed, it may bar contingent and future claims when the intent of the parties to
that effect is clear." *Rotberg v. Dodwell & Co.*, 152 F.2d 100, 101 (2d Cir. 1945); *Troy News
Co., Inc. v. City of Troy*, 563 N.Y.S.2d 301 (N.Y. App. Div. 1990); *Northrup Contracting, Inc. v.
Village of Bergen*, 514 N.Y.S.2d 306, 308 (N.Y. App. Div. 1987).

The Settlement Agreement provides, in part: "For the period from April 1, 2016 through
February 15, 2017 (the "No-Hire Restriction Period"), Beacon Hill shall not Hire any individual

Permanent Employee of Insight Global which employment would result in a violation of the Permanent Employee's written non-compete covenant to which they are bound with Insight Global". April 11, 2016 Settlement Agreeemnt, at ¶ 13. Ms. Sutmar, the first Individual Defendant to leave Insight's employ, did not do so until almost a month later, on March 6, 2017. *See* SAC at ¶ 43. There is thus no evidence Beacon did not comply with this restriction.

The Settlement Agreement, at Paragraph 20, also provides as follows:

> Insight Global, including its subsidiaries, parent companies, predecessors, successors, divisions, affiliates, officers, members, managers, directors, employees and attorneys (collectively, the "Insight Global Release Parties") hereby release and forever discharge the Former Insight Global Employees, Beacon Hill and their respective heirs and personal representatives, subsidiaries, predecessors, successors, parent companies, divisions, affiliates, officers, members, managers, directors, employees and attorneys (collectively the "Beacon Hill Release Parties"), from any and all manner of claims, disputes, liabilities, causes of action, suits, set-offs, contracts, agreements, counterclaims, demands or damages, whatsoever, based on any legal or equitable theory, right of action or otherwise (whether arising under federal, state or local law or regulation or common law), foreseen or unforeseen, known or unknown, matured or unmatured, accrued or not accrued, which one or more of the Insight Global Release Parties ever had, or now has or may have against one or more of the Beacon Hill Release Parties from the beginning of time, including, without limitation, any claim or damage arising from, relating to, or concerning (a) any employment agreement, employment or affiliation with Insight Global or Beacon Hill; (b) the events and agreements which formed the basis for the allegations, defenses, or counterclaims in one or more of the Actions; and (c) the Actions.

Settlement Agreement, at Paragraph 20. Beacon also released all claims, including future claims, arising from, relating to, or concerning "any employment agreement, employment or affiliation with Insight Global or Beacon Hill." April 11, 2016 Settlement Agreement, at ¶ 22.

The plain meaning of these provisions is that Beacon would not hire any employee or former employee of Insight in contravention of Insight's employment agreements for only the specified "No Hire Restriction Period," and that Insight (and Beacon) released all claims, including unknown, unforeseen, unmatured, and unaccrued claims "from the beginning of time" concerning either parties' employment agreements and employment or affiliation with Insight or

Beacon. The Beacon Hill Release Parties, as defined in the Release, include the Former

Employees. Similar language has been upheld as barring all claims, including unknown future

claims, under New York law. *See JEDA Capital-56, LLC v. Vill. of Potsdam, New York*, 661 F.

Appx. 20, 24 (2d Cir. 2016) (broad language of the release, releasing all "claims of any kind

which . . . JEDA has ever had *or shall have"* indicated the parties' intent to release future

claims); *Gerszberg v. Iconix Brand Grp., Inc.*, No. 17-cv-8421 (KBF), 2018 WL 2108239, at *3–

4 (S.D.N.Y. May 7, 2018).

"Generally, a valid release constitutes a complete bar to an action on a claim which is the

subject of the release." *Gerszberg*, 2018 WL 2108239, at *3 (quotation omitted). All of Insight's

claims against Defendants in this action "aris[e] from, relat[e] to, or concern[]" the Former

Employees' employment with Insight and/or Beacon and their Employment Agreements with

Insight. The Release therefore constitutes a complete bar to all of Insight's claims in the SAC.

## III.    CONCLUSION

For the foregoing reasons, and for the reasons set forth in Defendants' most recent motion

to dismiss and supporting filings, Defendants' summary judgment motion and supporting filings,

Defendants' opposition to Insight's partial summary judgment motion and supporting filings, and

Defendants' Proposed Findings of Fact and Conclusions of Law, after trial, this Court should

adopt Defendants' Proposed Findings of Fact and Conclusions of Law, enter final judgment

against Insight on all of its claims, dismiss the SAC in its entirety, award Defendants their

attorneys' fees and costs, and award such further relief as the Court deems just and proper.

Defendants reserve the right to modify and/or renew this Memorandum, their Proposed

Findings of Fact and Conclusions of Law, and their motions *in limine* consistent with the

evidence at trial and this Court's rulings.

ECKERT SEAMANS CHERIN & MELLOTT, LLC

*/s/ Charlotte L. Bednar*
Geraldine A. Cheverko (gcheverko@eckertseamans.com)
Charlotte L. Bednar (cbednar@eckertseamans.com)
Anthony M. Moccia (amoccia@eckertseamans.com)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
10 Bank St., Suite 700
White Plains, NY 10606
Phone: (914) 949-2909
Facsimile: (914) 949-5424


***Attorneys for Defendants Daniel Wenzel, Luke Norman,
Lauren Sutmar and Beacon Hill Staffing Group, LLC***

Dated:  March 15, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served upon all counsel of via ~~electronic mail~~ on this 15th day of March 2019, upon the following counsel:

*Federal Express*

Edward Filusch
Jessica Rosenberg
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
*VIA EMAIL:* efilusch@kasowitz.com
        jrosenberg@kasowitz.com


Ariel D. Zion
Insight Global, LLC
4170 Ashford Dunwoody Road, NE
Suite 250
Atlanta, Georgia 30319
*VIA EMAIL:* Ariel.Zion@insightglobal.com




*/s/ Charlotte L. Bednar*