## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **INSIGHT GLOBAL, LLC,** | **CASE NO. 1:17-CV-8323** |
| *Plaintiff*, | |
| **v.** | |
| **DANIEL WENZEL, LUKE NORMAN, LAUREN SUTMAR, and BEACON HILL STAFFING GROUP, LLC,** | |
| *Defendants*. | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

ECKERT SEAMANS CHERIN & MELLOTT, LLC

*/s/ Charlotte L. Bednar*
Geraldine A. Cheverko (gcheverko@eckertseamans.com)
Charlotte L. Bednar (cbednar@eckertseamans.com)
Anthony M. Moccia (amoccia@eckertseamans.com)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
10 Bank Street, Suite 700
White Plains, NY 10606
Telephone: (914) 949-2909
Facsimile: (914) 949-5424

**Attorneys for Defendants Daniel Wenzel, Luke Norman, Lauren Sutmar, and Beacon Hill Staffing Group, LLC**

---

[1] Defendants reserve the right to amend, modify, revise, and/or renew their Proposed Findings of Fact and Conclusions of Law consistent with the evidence at trial and this Court's rulings.

{K0780521.1}

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

FINDINGS OF FACT ....................................................................................................... 2

I.     THE IT STAFFING INDUSTRY IS VERY COMPETITIVE, HIGHLY
COMMODITIZED, NON-EXCLUSIVE, AND FAST-PACED. ................................ 2

II.    INSIGHT'S BUSINESS IS CONSISTENT WITH STANDARD PRACTICE IN
THE IT STAFFING INDUSTRY. ................................................................................ 4

III.   THE FORMER EMPLOYEES DID NOT BREACH THEIR EMPLOYMENT
AGREEMENTS OR ENGAGE IN OTHER WRONGFUL CONDUCT DURING
THEIR EMPLOYMENT WITH INSIGHT. ................................................................ 8

     A.    Mr. Wenzel did not breach his Employment Agreement or engage in other
wrongful conduct during his employment with Insight. ................................... 8

     B.    Ms. Sutmar did not breach her Employment Agreement or engage in other
wrongful conduct during her employment with Insight. ................................. 16

     C.    Mr. Norman did not breach his Employment Agreement or engage in other
wrongful conduct during his employment with Insight. ................................. 20

IV.   DEFENDANTS DID NOT ENGAGE IN WRONGFUL CONDUCT AND THE
FORMER EMPLOYEES DID NOT BREACH THEIR EMPLOYMENT
AGREEMENTS AFTER THEIR EMPLOYMENT WITH INSIGHT. ................... 23

     A.    Mr. Wenzel did not breach his Employment Agreement or engage in other
wrongful conduct after his employment with Insight. .................................... 23

     B.    Ms. Sutmar did not breach her Employment Agreement or engage in other
wrongful conduct after her employment with Insight. .................................... 25

     C.    Mr. Norman did not breach his Employment Agreement or engage in other
wrongful conduct after his employment with Insight. .................................... 26

     D.    Beacon did not engage in wrongful conduct after the Former Employees'
employment with Insight. ................................................................................ 26

V.     INSIGHT PREVIOUSLY RELEASED ANY FUTURE CLAIMS AGAINST
BEACON AND BEACON'S EMPLOYEES. .............................................................. 27

VI.   INSIGHT HAS NOT SUFFERED ANY ACTUAL, NON-SPECULATIVE HARM
FROM ANY ALLEGEDLY WRONGFUL CONDUCT BY DEFENDANTS. ......... 29

**CONCLUSIONS OF LAW** ................................................................................................. 30

**I.**     **COUNTS I THROUGH X** ....................................................................................... 30

**II.**     **COUNT III** ................................................................................................................ 32

      **A.**     **Mr. Norman** ................................................................................................ 32

      **B.**     **Ms. Sutmar** ................................................................................................ 33

      **C.**     **Mr. Wenzel** ............................................................................................... 37

**III.**    **COUNT IV** ................................................................................................................ 41

**IV.**    **COUNTS I AND II** .................................................................................................. 42

**V.**     **COUNT V** ................................................................................................................. 45

**VI.**    **COUNT VI** ............................................................................................................... 46

**VII.**   **COUNTS VII AND VIII** ......................................................................................... 47

**VIII.**  **COUNTS IX AND X** ............................................................................................... 48

**CONCLUSION** ............................................................................................................... 50

## INTRODUCTION

Plaintiff Insight Global, LLC ("Insight"), an information technology ("IT") staffing agency, brought this suit against its former employees, Defendants Daniel Wenzel, Luke Norman, and Lauren Sutmar (collectively, the "Former Employees"), and another IT staffing agency, Defendant Beacon Hill Staffing Group, LLC ("Beacon"), which was the employer of the Former Employees when Insight commenced this action. After the dismissal of many of the claims in Insight's Complaint and First Amended Complaint, the Court held a bench trial on Insight's Second Amended Complaint (the "SAC"). In the SAC, Insight alleges that the Former Employees breached post-employment restrictive covenants, including non-compete, non-disclosure, non-recruit, and non-solicitation covenants, in their At-Will Employment Agreements (the "Employment Agreements") and, in the case of Mr. Norman, his Separation Agreement (the "Separation Agreement") with Insight, that Beacon intentionally encouraged the Former Employees to breach their covenants, and that Defendants engaged in other wrongful conduct arising from the Former Employees' employment with Insight. Insight asserts numerous claims flowing from these allegations, including claims for: trade secret misappropriation under the Federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*. (the "DTSA") (Count I) and New York common law (Count II) against Mr. Wenzel and Ms. Sutmar; breach of the Employment Agreements against the Former Employees (Count III); breach of the Separation Agreement (Count IV) and fraudulent inducement of the Separation Agreement (Count V) against Mr. Norman; breach of their duty of loyalty to Insight against Mr. Wenzel and Ms. Sutmar (Count VI); tortious interference with the Former Employees' Employment Agreements against Beacon (Count VII) and with Mr. Norman's Employment Agreement against Mr. Wenzel (Count VIII); and tortious interference with Insight's business relations with nine New York

clients (the "NY Clients")[2] against Mr. Wenzel (Count IX) and Beacon (Count X). Having heard

the evidence and upon due consideration, the Court enters judgment in favor of Defendants on all

of the counts in Insight's SAC and awards Defendants their attorneys' fees and costs for having

to defend against Insight's claims.

## **FINDINGS OF FACT**

### I.      THE IT STAFFING INDUSTRY IS VERY COMPETITIVE, HIGHLY COMMODITIZED, NON-EXCLUSIVE, AND FAST-PACED.

1.    All of the parties to this action participate in the very competitive, highly commoditized,

non-exclusive, and fast-paced IT staffing industry.

2.    In this industry, the clients are companies that have job openings. The vendors are

staffing agencies. The "products" are individuals with IT skills who are looking for job

opportunities.

3.    Staffing agencies earn commissions by successfully placing candidates with clients.

4.    Staffing agencies are a direct sales business, a model that is characterized by a dramatic

rate of employee turnover. Because staffing agency employees do not possess or require a

high degree of technical skill, they are easily replaceable.

5.    Clients do not have exclusive or permanent relationships with staffing agencies. A client

may have a Master Service Agreement ("MSA") with an agency. However, the MSA

only qualifies the agency to do business with that client; it does not require the client to

use only that agency. Clients frequently have MSAs and work with multiple agencies

simultaneously. Clients want to hire the most qualified candidates as quickly as possible.

It would not be in any client's interest to rely exclusively on any one agency for its

---

[2] The NY Clients include NBC Universal ("NBC"), Compass, Time Warner, the New York
Times, Charter, Sony Music Entertainment, KPMG Advisory ("KPMG"), Revlon, and ABC.

placement needs. The fact that an agency placed one candidate at a client does not guarantee that that agency will place another candidate at that client.

6. Because clients want to hire the most qualified candidates as quickly as possible, they widely disseminate information concerning themselves, their hiring managers, and their job openings, and this information is publicly available or easily ascertainable from non-confidential sources with minimal effort. An MSA does not require a client to share such information with only a single staffing agency; clients share their information with multiple agencies, and some clients even advertise job openings through group emails to and conference calls with multiple agencies. Clients send their information to numerous agencies, and they publish such information on their own websites, on online job boards, including, but not limited to, Dice, Monster, and CareerBuilder, and on social networks, including, but not limited to, LinkedIn.

7. Similarly, candidates do not have exclusive or long-term relationships with staffing agencies. Candidates frequently work with multiple agencies simultaneously. Because candidates want to maximize their earning potential by finding the best jobs as quickly as possible, it would not be in any candidate's interest to rely exclusively on one agency for her job search needs.

8. Because candidates want to find the best jobs as quickly as possible, they widely disseminate their own information, by handing out their resumes and by posting their information on online job boards, including, but not limited to, Dice, Monster, and CareerBuilder, and on social networks, including, but not limited to, LinkedIn.

9.  Due to the fact that candidates work with many staffing agencies simultaneously, several agencies often send the same candidate to a client. In this way, agencies are not providing unique services.

10. To the extent that information about clients or candidates is not otherwise provided to staffing agencies, they gather such information through online research and by cold-calling and cold-emailing clients and candidates. Staffing agencies also rely on subscription-based services, such as DiscoverOrg, LinkedIn Sales Navigator, and Rainking.

11. The pool of open jobs and available candidates changes quickly. The best jobs are quickly filled, and the best candidates are quickly hired. Jobs that take longer to fill and candidates that take longer to place are likely unattractive to the market. Thus, a staffing agency's information quickly becomes stale and worthless and must be constantly updated.

## II.  INSIGHT'S BUSINESS IS CONSISTENT WITH STANDARD PRACTICE IN THE IT STAFFING INDUSTRY.

12. Insight is a typical example of an IT staffing agency, as described above.

13. Insight agrees that its industry is extremely competitive.

14. Insight is headquartered in Georgia and has offices across the country, including in New York, Philadelphia, and Chicago.

15. Insight requires all of its employees to sign Employment Agreements that include post-employment restrictive covenants, including non-compete, non-disclosure, non-recruit, and non-solicitation covenants. However, the wording of the covenants is inconsistent. The terms of the agreements are not open to negotiation, and the execution of such agreements are a condition of employment.

16. Insight requests that all of its employees execute Separation Agreements at the conclusion of their employment with Insight. The terms of such agreements are not open to negotiation.

17. Insight's workforce is not stable. Insight hires ██████████ new Recruiters every year. ██████████ of these Recruiters (██████ will leave Insight before being promoted to account managers. For example, ██████████ employees left Insight between January 1, 2016 and April 16, 2018. When they leave Insight, these employees take with them any client goodwill they have been able to develop during their short time at Insight. Nonetheless, this high turnover rate does not disrupt Insight's business. In fact, Insight expects and plans for this high turnover rate, by, for example, requiring all of its employees to execute non-negotiable form Employment Agreements that include post-employment restrictive covenants similar to those executed by the Former Employees, by requesting that departing employees execute non-negotiable form Separation Agreements re-affirming the restrictive covenants in their Employment Agreements similar to that executed by Mr. Norman, and by frequently re-assigning client accounts, including, for example, when account managers leave Insight. Most of Insight's former employees continue to work in the staffing industry.

18. Insight typically hires Recruiters who have little to no experience in the industry. Insight teaches them only general recruiting skills, as it is not a position that requires a high degree of specialized skill.

19. There are approximately thirty Recruiters in Insight's New York office. They are responsible for identifying candidates and recommending them to account managers; they are not responsible for identifying clients or selling candidates to clients. They identify

candidates by searching job boards, including, but not limited to, Dice, Monster, and CareerBuilder, as well as social networks, including, but not limited to, LinkedIn. The information that Insight's Recruiters obtain from these publicly available resources is readily available to Insight's competitors or could be easily recreated with minimal effort from non-confidential sources by Insight's competitors.

20. Insight does not have exclusive or long-term relationships with its candidates. Insight does not prohibit its candidates from working with other staffing agencies. In fact, candidates simultaneously work with other agencies, as demonstrated by the fact that Insight sometimes submits to clients the same candidates as other agencies.

21. Insight's information about candidates is not confidential or a trade secret. Insight does not inform its candidates that it considers their information to be its confidential information or its trade secret, and it does not request that they refrain from sharing their information with other staffing agencies. Insight's candidates share their information freely with other agencies and with clients (potential employers).

22. Insight provides general sales and marketing training to its Account Managers. Insight's training is not unique to Insight or meaningfully different than the training provided by other staffing agencies to their sales staff. For example, some of the content in Insight's training manual is directly copied from a publicly available resource.

23. Insight has multiple Account Managers in its New York office. Insight's Account Managers are responsible for identifying clients and selling candidates to clients; they are not responsible for identifying and internally recommending candidates. They identify clients, hiring managers, and job openings by conducting online searches, by cold-calling and cold-emailing hiring managers, by searching online job boards, including, but not

limited to, Dice, Monster, and CareerBuilder, social networks, including, but not limited to, LinkedIn, and subscription services, including, but not limited to, DiscoverOrg, LinkedIn Sales Navigator, and Rainking. The information that Insight's Account Managers obtain from these publicly available resources is readily available to Insight's competitors or could be easily recreated with minimal effort from non-confidential sources by Insight's competitors.

24. Insight does not have exclusive or long-term relationships with its clients. For example, though Insight has MSAs with some of the NY Clients, none of Insight's MSAs require the NY Clients to use only Insight. In fact, the NY Clients work with other staffing agencies; for example, Beacon also has MSAs with many of the NY Clients, which Beacon entered into before hiring Insight's Former Employees. Neither Insight's MSAs nor its past successful placements with any of the NY Clients guarantees it any future placements with the NY Clients.

25. Insight's information about potential clients, hiring managers, and job openings is not confidential or a trade secret. None of Insight's MSAs prohibit the NY Clients from sharing such information with Insight's competitors. Further, Insight does not inform its clients that it considers their information to be its confidential information or its trade secret, and it does not request that they refrain from sharing their information with other staffing agencies. Insight's clients share their information freely with other agencies and with candidates (potential employees).

26. Insight does not protect the information that it receives from its clients and candidates as if it were confidential or a trade secret. Insight freely disseminates information about its clients to its candidates and information about its candidates to its clients. Insight displays

information about its clients, their hiring managers, and their job openings in plain sight on white boards in the "priority zone" of its New York office, and it allows individuals who are not Insight employees (including individuals interviewing for jobs at Insight, friends and families of Insight's employees, Insight's clients, and building management and cleaning staff) to enter the priority zone where the white boards are displayed, without requiring such individuals to sign confidentiality and non-disclosure agreements and without admonishing them that such information is confidential or a trade secret. Insight has no policy prohibiting its employees from emailing such information to their unsecured personal accounts and/or downloading such information to their unsecured portable media when working remotely. Insight allows its employees to store such information on their personal devices, and it does not verify that they have deleted all such information from their personal devices at the end of their employment.

III.  **THE FORMER EMPLOYEES DID NOT BREACH THEIR EMPLOYMENT AGREEMENTS OR ENGAGE IN OTHER WRONGFUL CONDUCT DURING THEIR EMPLOYMENT WITH INSIGHT.**

   A.  **Mr. Wenzel did not breach his Employment Agreement or engage in other wrongful conduct during his employment with Insight.**

27. Mr. Wenzel began working as a Recruiter-in-Training in Insight's New York office on June 17, 2013, and he executed his first Employment Agreement that same day. Mr. Wenzel had no opportunity to negotiate that form agreement, which he was required to execute as a condition of his employment. Mr. Wenzel had little to no experience in this industry before his employment with Insight, which provided him with basic training on recruiting techniques. In this position, Insight did not provide Mr. Wenzel with access to any confidential or trade secret information.

28. On August 12, 2013, Insight promoted Mr. Wenzel to the position of Recruiter. In this role, his primary responsibility was identifying candidates and recommending them to Insight's Account Managers. In this position, Insight did not provide him with any specialized training or with any confidential or trade secret information.

29. On February 4, 2014, Insight promoted Mr. Wenzel to the position of Account Manager. In this role, his primary responsibility was identifying clients and selling them Insight's candidates. Insight provided Mr. Wenzel with basic sales training. In this position, it did not provide him with access to any confidential or trade secret information. As an Account Manager, one of the clients that Insight assigned to Mr. Wenzel was the NBC Analytics Technology Department (the "Department") account.

30. On September 28, 2015, Insight promoted Mr. Wenzel to the position of Sales Manager.

31. On January 4, 2016, Insight transferred Mr. Wenzel to its Philadelphia office. As a Sales Manager, he was responsible for managing a team of Account Managers and Recruiters. In this position, Insight did not provide him with any specialized training. Although he had access to his team's client and candidate information, none of that information was confidential or a trade secret. While Mr. Wenzel was in Philadelphia office, Insight reassigned the Department's account to three different Account Managers in the New York office, at least one of whom had a good working relationship with the Department's hiring manager.

32. On April 5, 2016, Mr. Wenzel executed his second Employment Agreement, which was a form document that he had no opportunity to negotiate, and which he was required to execute as a condition of his employment.

33. Insight claims that, on October 8, 2016, it promoted Mr. Wenzel to the position of Sales Manager II, and that this promotion constituted consideration for Mr. Wenzel's subsequent execution of his third Employment Agreement. The Court does not credit Insight's claim. First, Insight did not make this claim in any of its three complaints, in which it otherwise extensively described his alleged employment history, and Insight's corporate representative testified as its deposition that it was not aware of any additional consideration that it provided to Mr. Wenzel in exchange for his execution of his third Employment Agreement; rather, it made this claim for the first time in its summary judgment papers and after the close of all discovery. Second, when Insight later demoted Mr. Wenzel, it demoted him to the position of Account Manager, and not Sales Manager I. Third, Mr. Wenzel testified credibly that he did not receive such a promotion. Thus, the Court finds that Insight did not promote Mr. Wenzel to the position of Sales Manager II on October 8, 2016.

34. On November 21, 2016, Mr. Wenzel executed his third and final Employment Agreement, which was a form document that he had no opportunity to negotiate, and which he was required to execute as a condition of his employment. That agreement expressly states that it supersedes all prior Employment Agreements between Mr. Wenzel and Insight, and that it is governed by Pennsylvania law.

35. Mr. Wenzel's Employment Agreement contains two non-disclosure covenants, a non-compete covenant, a non-recruit covenant, a non-solicitation covenant, a tolling provision, and an injunctive relief provision.

36. The first non-disclosure covenant purports to prohibit Mr. Wenzel's "use, dislos[ure] or exploit[ation] [of] any Confidential Business Information belonging to [Insight] . . .

except as necessary to perform [Mr. Wenzel's] duties on behalf of [Insight]". SAC, Ex.

A, at ¶ 2. The term "Confidential Business Information" is defined, in pertinent part, as

"any information (a) relating to the business of [Insight], (b) disclosed to [Mr. Wenzel] or

of which [Mr. Wenzel] is aware due to his employment with [Insight], (c) that has value

to [Insight], and (d) that is not generally known to competitors of [Insight]"; it

specifically includes "non-public information about . . . names of customers and clients

and prospective customers and clients specifically targeted by [Insight][ and] names,

responsibilities and needs and preferences of the personnel of [Insight's] current and

prospective customers and clients who purchase staffing services"; and it specifically

excludes "information . . . that has been independently developed and disclosed by others

with proper authority to do so[] or . . . that has otherwise entered the public domain

through lawful means". *Id.* (emphasis added). This covenant purports to survive the

termination of the Employment Agreement and Mr. Wenzel's employment with Insight

and to continue "for so long as such data or information meets the definition of

Confidential Business Information".

37. The second non-disclosure covenant purports to prohibit Mr. Wenzel's "use or

disclos[ure] [of] any Trade Secret of [Insight] without [Insight's] prior written consent".

*Id.* at ¶ 3. The term "Trade Secret" is defined, in pertinent part, as "a list of actual or

potential customers or clients or their personnel, consultants, or employees which: (i) is

not commonly known by or available to the public; (ii) derives economic value, actual or

potential, from not being generally known to, and not being readily ascertainable by

proper means by other persons who can obtain economic value from its disclosure or use;

and (iii) is the subject of efforts that are reasonable under the circumstances to maintain

<u>its secrecy</u>". *Id.* (emphasis added). This covenant purports to remain in effect "for as long as the information remains a Trade Secret <u>under applicable law</u>". *Id.* (emphasis added).

38. The non-compete covenant purports to prohibit Mr. Wenzel, "during the Restricted Period" and "within the Territory" from "provid[ing] Restricted Services . . . to a Competing Staffing Business". *Id.* at ¶ 4.

39. The term "Restricted Period" is defined as "the period of [Mr. Wenzel's] employment with [Insight] and continuing for one (1) year after termination of such employment". *Id.*

40. The term "Territory" is defined as "the area around the Business Location defined by a radius that is in length equal to the <u>lesser</u> of: (1) thirty-five (35) miles, or (b) the actual length of a straight line drawn between such Business Location and the most distant customer or client location for which employees regularly working in the Business Location have provided staffing services generating at least $5,000 in gross revenue during the most recent twelve (12) months of [Mr. Wenzel's] employment with [Insight]", where the term "Business Location" means "the office location to which [Mr. Wenzel] is assigned to perform additional duties under this Agreement on the date that [Mr. Wenzel] signs this Agreement, as well as any additional office location(s) of [Insight] in which [Mr. Wenzel] regularly performs duties during [Mr. Wenzel's] employment with [Insight]". *Id.* Insight believes that the term "Territory" can extend to multiple areas across the country because an Account Manager can make placements for clients served out of other Insight offices and because an Account Manager, like Mr. Wenzel, can work out of multiple Insight offices.

41. The term "Restricted Services" is defined as "jobs duties or functions equivalent to those that [Mr. Wenzel] performed for [Insight] at any point during the last twenty-four (24) months of [Mr. Wenzel's] employment with [Insight]". *Id.*

42. The term "Competing Staffing Business" is defined as "any corporation, individual, enterprise, entity or association that competes with [Insight] in Employer's Business", *id.*, but Insight does not provide a list identifying its perceived competitors. The term "Employer's Business" means "the business of providing staffing services including, without limitation, temporary staff augmentation, contingent recruitment, and permanent placement", *id.* at p. 23, and it is not limited to the <u>IT</u> staffing industry.

43. The non-recruit covenant, in pertinent part, purports to prohibit Mr. Wenzel, "during the Restricted Period", from "directly or indirectly, or in concert with others, solicit[ing] or encourag[ing] any person who is an employee of . . . [Insight] with whom [Mr. Wenzel] had direct contact during [Mr. Wenzel's] employment, to resign from or terminate such employment . . . relationship with [Insight]". *Id.* at ¶ 5.

44. The non-solicitation covenant purports to prohibit Mr. Wenzel, "during the Restricted Period", from "directly or indirectly solicit[ing], or attempt[ing] to solicit, on behalf of any Competing Staffing Business . . . any actual or prospective customer or client of Employer with whom [Mr. Wenzel] had Material Contact during the last two years of his employment with [Insight]", where the term "Material Contact" means that Mr. Wenzel:

> (a) communicated with one or more representatives of the actual or prospective customer or client on behalf of [Insight], (b) coordinated, managed, or oversaw dealings with the actual or prospective customer or client on behalf of [Insight], (c) received compensation, commissions, or earnings within two years prior to the date of [Mr. Wenzel's separation from employment with [Insight] on account of the sale or provision of products or services to the customer or client, or (d) <u>obtained Confidential Business Information or Trade Secrets about the actual or prospective customer or</u>

client in the ordinary course of business as a result of [Mr. Wenzel's] employment with [Insight].

*Id.* at ¶ 6 (emphasis added).

45. The tolling provision purports to allow Insight to extend the Restricted Period applicable to the non-compete, non-recruit, and non-solicitation covenants "for the duration of [any] breach" of such covenants by Mr. Wenzel and/or "during the period of time in which . . . litigation" concerning such covenants "is pending, including any appeal". *Id.* at ¶ 10. By its own terms, application of this tolling provision cannot extend the Restricted Period beyond "two (2) years from the termination of [Mr. Wenzel's] employment". *Id.* Thus, the litigation clause effectively allows Insight to unilaterally double the length (from one year to two years) of the Restricted Period applicable to the non-compete, non-recruit, and non-solicitation covenants merely by suing Mr. Wenzel.

46. The injunctive relief provision purports to evince Mr. Wenzel's agreement that, in the event he breaches or threatens to breach the non-compete, non-disclosure, non-recruit, and non-solicitation covenants, Insight "would be irreparably harmed thereby" and "any remedies at law would be inadequate". *Id.* at ¶ 7. The provision also purports to evince his agreement that Insight "shall be entitled to immediate injunctive or other equitable relief to restrain or enjoin any such breach", without "any requirement for a bond to be posted in conjunction with a request for a temporary, preliminary or permanent injunction." *Id.*

47. On February 17, 2017, Insight demoted Mr. Wenzel to the position of Account Manager.

48. On March 27, 2017, Insight transferred Mr. Wenzel back to its New York office. After Mr. Wenzel returned to the New York office, Insight reassigned the Department's

account back to him. Insight never, however, assigned Mr. Wenzel to exclusively handle any specific client, as his experience with the Department account demonstrates.

49. On July 10, 2017, less than 4 months after he transferred offices, and less than 8 months after he executed his third Employment Agreement, Mr. Wenzel's employment with Insight terminated. Insight had no agreement with Mr. Wenzel that he would work any additional amount of time, and it is undisputed that Mr. Wenzel could have resigned from Insight or could have been fired by Insight at any time. Insight requested that Mr. Wenzel execute a form separation agreement, but he declined to do so.

50. Insight admits that it has no evidence that, while Mr. Wenzel was working for Insight, he was also working for Beacon, he told Insight's clients that he was considering working for Beacon, or he asked Insight's clients to move their business to Beacon.

51. Insight admits that Mr. Wenzel did not take any of Insight's physical or electronic files during or after his employment with Insight. Insight further admits that it is not aware of any information that Mr. Wenzel took from Insight or used or disclosed at Beacon. The only thing that Mr. Wenzel took with him when he left Insight was his greater knowledge of and experience in the IT staffing industry.

52. Insight admits that Mr. Wenzel did not breach any of the restrictive covenants in his Employment Agreement or engage in any other wrongful conduct during his employment with Insight.

53. The Restricted Period in Mr. Wenzel's Employment Agreement has now expired, and, even if it were fully tolled, it would remain in effect for only four more months.

**B.      Ms. Sutmar did not breach her Employment Agreement or engage in other wrongful conduct during her employment with Insight.**

54.  Ms. Sutmar began working as a Recruiter-in-Training in Insight's Chicago office on February 3, 2014, and she executed her first Employment Agreement that same day. Ms. Sutmar had no opportunity to negotiate that form agreement, which she was required to execute as a condition of her employment. Ms. Sutmar had little to no experience in this industry before her employment with Insight, which provided her with basic training on recruiting techniques. In this position, Insight did not provide Ms. Sutmar with access to any confidential or trade secret information.

55.  On March 31, 2014, Insight promoted Ms. Sutmar to the position of Recruiter. In this role, her primary responsibility was identifying candidates and recommending them to Insight's Account Managers. In this position, Insight did not provide her with any specialized training or with any confidential or trade secret information.

56.  On June 30, 2014, Ms. Sutmar executed her second Employment Agreement, which was a form document that she had no opportunity to negotiate, and which she was required to execute as a condition of her employment.

57.  On July 1, 2014, Insight promoted Ms. Sutmar to the position of Account Manager. In this role, her primary responsibility was identifying clients and selling them Insight's candidates. Insight provided Ms. Sutmar with basic sales training. In this position, it did not provide her with access to any confidential or trade secret information.

58.  On April 6, 2016, Ms. Sutmar executed her third and final Employment Agreement, which was a form document that she had no opportunity to negotiate, and which she was required to execute as a condition of her employment. That agreement expressly states

that it supersedes all prior Employment Agreements between Ms. Sutmar and Insight, and

that it is governed by Illinois law.

59. Like Mr. Wenzel's Employment Agreement, Ms. Sutmar's Employment Agreement

contains two non-disclosure covenants, a non-compete covenant, a non-recruit covenant,

a non-solicitation covenant, a tolling provision, and an injunctive relief provision.

60. However, the covenants in Ms. Wenzel's Employment Agreement are not identical to

those in Mr. Wenzel's Employment Agreement. For example, Mr. Wenzel's Employment

Agreement defines the "Territory" over which the non-compete covenant purports to

apply, in part, as "the actual length of a straight line drawn between such Business

Location and the most distant customer or client location <u>for which employees regularly</u>

<u>working in the Business Location have provided staffing services generating at least</u>

<u>$5,000 in gross revenue during the most recent twelve (12) months</u> of [Mr. Wenzel's]

employment with [Insight]", SAC, Ex. A, at ¶ 4 (emphasis added), whereas Ms. Sutmar's

Employment Agreement defines the same term, in part, as "the actual length of a straight

line drawn between such Business Location and the most distant customer or client

location <u>for which [Ms. Sutmar], along or with other employees regularly working in the</u>

<u>Business Location, has provided Restricted Services during the most recent twenty-four</u>

<u>(24) months</u> of [Ms. Sutmar's] employment with [Insight]", *id.*, Ex. C, at ¶ 4. Thus, the

definition of the term "Territory" differs in three ways as between Mr. Wenzel's and Ms.

Sutmar's Employment Agreements. First, Ms. Sutmar's Territory is defined with respect

to the clients for whom she personally worked, whereas Mr. Wenzel's Territory is not

defined with respect to the clients for whom he personally worked. Second, Ms. Sutmar's

Territory is defined based on clients serviced during a two-year period, whereas Mr.

Wenzel's Territory is defined based on clients serviced during a one-year period. Third, Ms. Sutmar's Territory is defined without respect to the revenue generated by clients, whereas Mr. Wenzel's Territory is defined with respect to the revenue generated by clients.

61. Insight claims that, on April 15, 2016, nine days after Ms. Sutmar executed her third Employment Agreement, it paid her $250 as consideration for that agreement. The Court does not credit Insight's claim. First, Insight did not make this claim in any of its three complaints, in which it otherwise extensively described her alleged employment history, and Insight's corporate representative testified as its deposition that it was not aware of any additional consideration that it provided to Ms. Sutmar in exchange for her execution of her third Employment Agreement; rather, it made this claim for the first time in its summary judgment papers and after the close of all discovery. Second, the memo line on the check states only "miscellaneous". Third, Ms. Sutmar credibly disputed Insight's allegation. Thus, the Court finds that Insight did pay $250 to Ms. Sutmar as consideration for her third Employment Agreement.

62. In August of 2016, Ms. Sutmar transferred to Insight's New York Office.

63. Ms. Sutmar's client accounts were reassigned on multiple occasions during her time in Insight's New York office. Insight never assigned Ms. Sutmar to exclusively handle any specific client.

64. On March 6, 2017, less than 7 months after she transferred offices, and less than 12 months after she executed her third Employment Agreement, Ms. Sutmar's employment with Insight terminated. Insight had no agreement with Ms. Sutmar that she would work any additional amount of time, and it is undisputed that Ms. Sutmar could have resigned

from Insight or could have been fired by Insight at any time. Insight requested that Ms. Sutmar execute a form separation agreement, but she declined to do so.

65. Insight admits that it has no evidence that, while Ms. Sutmar was working for Insight, she was also working for Beacon, she told Insight's clients that she was considering working for Beacon, or she asked Insight's clients to move their business to Beacon.

66. Insight claims that Ms. Sutmar emailed two Insight documents to her personal email address during her employment with Insight: a "Call Sheet" and a "Designee Packet". Ms. Sutmar testified credibly that she has no memory of having emailed these two documents to herself.

67. Ms. Sutmar never used or disclosed these two documents or the information therein to anyone outside Insight or after her employment with Insight ended. The "Call Sheet" only contains a list of the names and contact information for certain clients. As explained above, this information is derived from publicly available sources, including job boards such as Discover, social media, such as LinkedIn, and cold-calls and online research. The Designee Packet contains basic sales advice, some of which is directly copied from publicly available sources, and Insight presented no evidence that it was different in any material way from the training provided at other staffing agencies.

68. These two documents do not constitute Insight's confidential information or trade secrets.

69. Insight admits that it has no evidence that Ms. Sutmar took any of Insight's other physical or electronic files during or after her employment with Insight. The only other thing that Ms. Sutmar took with her when she left Insight was her greater knowledge and experience of the IT staffing industry.

70. Insight admits that Ms. Sutmar did not breach any of the restrictive covenants in her Employment Agreement or engage in any other wrongful conduct during her employment with Insight.

71. The Restricted Period in Ms. Sutmar's Employment Agreement, even if it were fully tolled, has now expired.

   **C.   Mr. Norman did not breach his Employment Agreement or engage in other wrongful conduct during his employment with Insight.**

72. Mr. Norman began working as a Recruiter-in-Training in Insight's New York office on January 5, 2015, and he executed his first Employment Agreement on December 21, 2014. Mr. Norman had no opportunity to negotiate that form agreement, which he was required to execute as a condition of his employment. Mr. Norman had little to no experience in this industry before his employment with Insight, which provided him with basic training on recruiting techniques. In this position, Insight did not provide Mr. Norman with access to any confidential or trade secret information.

73. On March 2, 2015, Insight promoted Mr. Norman to the position of Recruiter. In this role, his primary responsibility was to identify candidates and recommend them to Insight's Account Managers, who would then present the candidates to Insight's clients. He rarely, if ever, solicited clients or potential clients, he did not develop client relationships, and he did not make even a single sale or obtain a single order, contract, or job requisition from any client. In this position, Insight did not provide him with any specialized training or with any confidential or trade secret information.

74. On February 8, 2016, Insight promoted Mr. Norman to the position of Professional Recruiter. In this role, his primary responsibility continued to be identifying candidates and recommending them to Insight's Account Managers, who would then present the

candidates to Insight's clients. He rarely, if ever, solicited clients or potential clients, he did not develop any client relationships, and he did not make even a single sale or obtain a single order, contract, or job requisition from any client. In short, he had the same job responsibilities as he had when he was a Recruiter, and he performed the same or similar work as the other thirty recruiters in Insight's New York office. In this position, Insight did not provide Mr. Norman with any specialized training or any confidential or trade secret information.

75. Insight never further promoted Mr. Norman, including to any sales position, such as an Account Manager position, or any managerial role, such as a role that would have allowed him to direct or supervise the work of other employees or hire or fire other employees.

76. On the same date, Mr. Norman executed his second and final Employment Agreement, which was a form document that he had no opportunity to negotiate, and which he was required to execute as a condition of his employment. That agreement expressly states that it supersedes all prior Employment Agreements between Mr. Norman and Insight, and that it is governed by Georgia law.

77. Like Mr. Wenzel's Employment Agreement, Mr. Norman's Employment Agreement contains two non-disclosure covenants, a non-compete covenant, a non-recruit covenant, a non-solicitation covenant, a tolling provision, and an injunctive relief provision.

78. However, the restrictive covenants in Mr. Norman's Employment Agreement are not identical to those in Mr. Wenzel's Employment Agreement. For example, Mr. Wenzel's Employment Agreement defines the "Territory" over which the non-compete covenant purports to apply, in part, as "thirty-five (35) miles", SAC, Ex. A, at ¶ 4, whereas Mr.

Norman's Employment Agreement defines the same term, in part, as "fifty (50) miles", *id.*, Ex. B, at ¶ 4. Thus, the Territory over which Mr. Norman's non-compete covenant purports to apply is potentially larger than the Territory over which Mr. Wenzel's non-compete covenant purports to apply. Insight could not offer any credible explanation why the Territory for a more junior employee like Mr. Norman needed to be larger than the Territory for a more senior employee like Mr. Wenzel.

79. On September 18, 2017, Mr. Norman's employment with Insight terminated. Insight had no agreement with Mr. Norman that he would work any additional amount of time, and it is undisputed that Mr. Norman could have resigned from Insight or could have been fired by Insight at any time.

80. On the same date, Mr. Norman executed the Separation Agreement, which also expressly states that it is governed by Georgia law. Mr. Norman testified credibly that he had no opportunity to negotiate that agreement, and that his Sales Manager handed him that form and told him to sign it in order to receive the last two weeks of commission which he was owed by Insight. Mr. Norman was confused about that agreement at the time he signed it, and he was unaware that he could revoke that agreement after signing it due to the fact that he did not receive a copy of it. There was no evidence that his Sales Manager informed him that the compensation he would receive was a severance payment or a payment that would be made in exchange for his execution of that agreement.

81. The Separation Agreement contains a provision purporting to re-affirm the restrictive covenants in Mr. Norman's Employment Agreement. Specifically, it purports to provide that Mr. Norman "affirms, acknowledges and agrees that the restrictive covenants in the At-Will Employment Agreement are valid and binding on [him] and that [he] intends to

comply fully with the entire requirements of these covenants", and that Mr. Norman "represents and warrants that [he] has not breached and has no intent to breach any of these covenants and has neither accepted nor intends to accept any offer of employment prohibited by any of these covenants". SAC, Ex. D., at ¶ 5(b).

82. Insight admits that Mr. Norman did not take any of Insight's physical or electronic files during or after his employment with Insight. The only thing that Mr. Norman took with him when he left Insight was his greater knowledge and experience of the IT staffing industry.

83. Insight admits that Mr. Norman did not breach any of the restrictive covenants in his Employment Agreement or engage in any other wrongful conduct during his employment with Insight.

84. The Restricted Period in Mr. Norman's Employment Agreement has now expired, and, even if it were fully tolled, it would remain in effect for only six more months.

## IV. DEFENDANTS DID NOT ENGAGE IN WRONGFUL CONDUCT AND THE FORMER EMPLOYEES DID NOT BREACH THEIR EMPLOYMENT AGREEMENTS AFTER THEIR EMPLOYMENT WITH INSIGHT.

### A. Mr. Wenzel did not breach his Employment Agreement or engage in other wrongful conduct after his employment with Insight.

85. After Mr. Wenzel left Insight, Insight re-assigned his client accounts to other Account Managers. Insight did not hire anyone specifically to replace Mr. Wenzel, and it did not change its hiring targets or practices to account for Mr. Wenzel's departure.

86. Mr. Wenzel did not start working for Beacon until his employment with Insight ended.

87. Insight offered no evidence that Mr. Wenzel hid or attempted to hide the fact of his employment with Beacon.

88. Insight offered no evidence that Mr. Wenzel used or disclosed any of its information that is actually confidential or a trade secret.

89. Insight offered no credible evidence that Mr. Wenzel recruited any Insight employee. Insight offered no evidence that Mr. Wenzel caused Mr. Norman to leave Insight; rather, Mr. Norman testified that he was already unhappy at Insight, and that he advised Mr. Wenzel that he was "looking to make a move". Insight also offered no evidence that Mr. Wenzel knew the specific terms of Mr. Norman's Employment Agreement, or that he used any of Insight's information that is actually confidential or a trade secret to cause Mr. Norman to resign from Insight and to apply to Beacon.

90. At Beacon, Mr. Wenzel has submitted candidates for open positions with the Department.

91. Insight claims that Mr. Wenzel improperly solicited the hiring managers of its clients, but Insight has failed to adduce evidence that Mr. Wenzel had "Material Contact", as that term is defined in his Employment Agreement, with each such client within the last two years of his employment with Insight. Thus, Insight offered no competent evidence that Mr. Wenzel solicited any Insight client.

92. Insight blames Mr. Wenzel for the fact that, since his departure, it has not had the opportunity to submit candidates to any open position with the Department. The Court does not find Mr. Wenzel to be responsible for Insight's alleged missed opportunity. Insight continues to do business with NBC, and it does not know whether it has experienced any decrease in revenue or profit from NBC. Its MSA with NBC is not exclusive and allows NBC to work with other staffing agencies. Insight has no evidence as to why the Department has not contacted Insight about job openings, and it has no evidence that Mr. Wenzel is responsible for the lack of contact.

93. Insight presented no evidence that Mr. Wenzel disparaged Insight to its clients, potential clients, candidates, or potential candidates, or that he acted with malice towards or an intent to inflict injury on Insight, or for any reason other than his own economic self-interest.

94. Insight has no evidence that Mr. Wenzel caused it to lose business from any client.

**B.    Ms. Sutmar did not breach her Employment Agreement or engage in other wrongful conduct after her employment with Insight.**

95. After Ms. Sutmar left Insight, Insight re-assigned her client accounts to other Account Managers. Insight did not hire anyone specifically to replace Ms. Sutmar, and it did not change its hiring targets or practices to account for Ms. Sutmar's departure.

96. Ms. Sutmar did not start working for Beacon until her employment with Insight ended.

97. Insight offered no evidence that Ms. Sutmar hid or attempted to hide the fact of her employment with Beacon.

98. Insight offered no evidence that Ms. Sutmar used or disclosed any of its information that is actually confidential or a trade secret.

99. There is no evidence that Ms. Sutmar recruited or attempted to recruit any of Insight's employees.

100.    Insight claims that Ms. Sutmar improperly solicited the hiring managers of its clients, but Insight has failed to adduce evidence that Ms. Sutmar had "Material Contact", as that term is defined in her Employment Agreement, with each such client within the last two years of her employment with Insight. Thus, Insight offered no competent evidence that Ms. Sutmar solicited any Insight client.

101.    Insight presented no evidence that Ms. Sutmar disparaged Insight to its clients, potential clients, candidates, or potential candidates.

102.     Insight has no evidence that Ms. Sutmar caused it to lose business from any client.

103.     Ms. Sutmar no longer works for Beacon.

**C.    Mr. Norman did not breach his Employment Agreement or engage in other wrongful conduct after his employment with Insight.**

104.     Insight did not hire anyone specifically to replace Mr. Norman, and it did not change its hiring targets or practices to account for Mr. Norman's departure.

105.   Mr. Norman did start working for Beacon until his employment with Insight ended.

106.     Insight offered no evidence that Mr. Norman hid or attempted to hide the fact of his employment with Beacon.

107.     Beacon admits that Mr. Norman did not breach the non-disclosure covenants in his Employment Agreement.

108.     Beacon admits that Mr. Norman did not breach the non-recruit covenant in his Employment Agreement.

109.     Beacon admits that Mr. Norman did not breach the non-solicitation covenant in his Employment Agreement.

110.     Insight presented no evidence that Mr. Norman disparaged Insight to its clients, potential clients, candidates, or potential candidates.

111.     Insight has no evidence that Mr. Norman caused it to lose business from any client.

**D.    Beacon did not engage in wrongful conduct after the Former Employees' employment with Insight.**

112.     Beacon is an IT staffing agency that is headquartered in Massachusetts and that has offices across the country, including in New York.

113.       Notwithstanding Beacon's claims, the Court finds that Beacon is not Insight's direct competitor. Generally, in the IT staffing industry, which is non-exclusive, whether one staffing agency competes with another depends on each specific job requisition and typically multiple agencies are simultaneously looking for candidates to fill the client's requisition.  Moreover, Insight does not and cannot compete with Beacon for at least one of the NY Clients (KPMG) because of a conflict issue.

114.       Insight offered no evidence that Beacon conspired with the Former Employees to hide the fact of their employment with Beacon.

115.       At the commencement of the Former Employees' employment with Beacon, Beacon instructed them that they were not to use any of Insight's confidential or trade secret information. Beacon also instructed them not to solicit clients with which they worked at Insight.

116.       The Former Employees did not discuss the terms of their Employment Agreements with Beacon. There is no evidence that Beacon knew the terms of the Former Employees' Employment Agreements when it hired them.

117.       Insight presented no evidence that Beacon disparaged Insight to Insight's clients, potential clients, candidates, or potential candidates, or that Beacon acted with malice towards or an intent to inflict injury on Insight, or for any reason other than its own economic self-interest.

## V.      INSIGHT PREVIOUSLY RELEASED ANY FUTURE CLAIMS AGAINST BEACON AND BEACON'S EMPLOYEES.

118.       On April 11, 2016, Insight and Beacon entered into a Settlement Agreement (the "Settlement Agreement") to resolve various disputes between Insight, Beacon, and certain of Insight's former employees.

119.     Paragraph 13 of the Settlement Agreement provides: "For the period from April 1,

2016 through February 15, 2017 (the "No-Hire Restriction Period"), Beacon Hill shall

not Hire any individual Permanent Employee of Insight Global which employment would

result in a violation of the Permanent Employee's written non-compete covenant to which

they are bound with Insight Global". Ex. 18, at ¶ 13.

120.     There is no evidence that Beacon breached any provision of the Settlement

Agreement or otherwise failed to fully perform under the Settlement Agreement.

Specifically, Beacon did not breach Paragraph 13 of the Settlement Agreement. Beacon's

hiring of the Former Employees did not violate that provision because it did not hire any

of the Former Employees during the No-Hire Restriction Period. For example, Ms.

Sutmar was the first of the Former Employees that Beacon hired, and it did not hire her

until after she left Insight on March 6, 2017, almost a month after the end of the No-Hire

Restriction Period.

121.     The Settlement Agreement also provides:

> Insight Global, including its subsidiaries, parent companies, predecessors,
> successors, divisions, affiliates, officers, members, managers, directors,
> employees and attorneys (collectively, the "Insight Global Release Parties")
> hereby release and forever discharge the Former Insight Global Employees,
> Beacon Hill and their respective heirs and personal representatives,
> subsidiaries, predecessors, successors, parent companies, divisions,
> affiliates, officers, members, managers, directors, employees and attorneys
> (collectively the "Beacon Hill Release Parties"), from any and all manner
> of claims, disputes, liabilities, causes of action, suits, set-offs, contracts,
> agreements, counterclaims, demands or damages, whatsoever, based on any
> legal or equitable theory, right of action or otherwise (whether arising under
> federal, state or local law or regulation or common law), foreseen or
> unforeseen, known or unknown, matured or unmatured, accrued or not
> accrued, which one or more of the Insight Global Release Parties ever had,
> or now has or may have against one or more of the Beacon Hill Release
> Parties from the beginning of time, including, without limitation, any claim
> or damage arising from, relating to, or concerning (a) any employment
> agreement, employment or affiliation with Insight Global or Beacon Hill;

(b) the events and agreements which formed the basis for the allegations, defenses, or counterclaims in one or more of the Actions; and (c) the Actions.

*Id.* at ¶ 20 (emphasis added).

122.     The Settlement Agreement additionally provides that, in the event of litigation between Insight and Beacon "respecting this [Settlement] Agreement, the prevailing party shall be awarded its costs of litigation, including reasonable attorneys' fees, from the non-prevailing party." *Id.* at ¶ 16.

## VI.     INSIGHT HAS NOT SUFFERED ANY ACTUAL, NON-SPECULATIVE HARM FROM ANY ALLEGEDLY WRONGFUL CONDUCT BY DEFENDANTS.

123.     Insight claims that it has suffered irreparable harm from Defendants' allegedly wrongful actions, including their purportedly improper use or disclosure of its purportedly confidential information or trade secrets.

124.     However, the Court observes that at no time during either the Restricted Period or this action did Insight ever seek a temporary restraining order or a preliminary injunction to prevent this supposed irreparable harm, despite the fact that all of the Employment Agreements of the Former Employees contain a provision purportedly entitling Insight to such relief upon request and without the posting of a bond.

125.     Moreover, the Court takes judicial notice that there are very few reported decisions in cases involving attempts by Insight to enforce against other former employees the post-employment restrictive covenants that, according to Insight, are in their employment agreements in order to prevent the irreparable harm that would presumably result from their breach of such covenants.

126.     Insight was unable to provide any evidence of any actual damage caused by any alleged use or disclosure of its allegedly confidential or trade secret information by Defendants.

127.     Insight also claims that it has been damaged by the departure of the Former Employees in an amount equal to the cost to replace them as employees.

128.     However, there is no dispute that Insight's estimated employee replacement cost does not depend on whether or not a former employee complies with the restrictive covenants in her Employment Agreement.

129.     Insight additionally claims that it has lost profits due to the Former Employees' alleged breaches of their Employment Agreements.

130.     However, Insight presented no evidence that Defendants caused Insight to lose business from any client. Insight is not aware of any clients or candidates that Insight has lost as a result of any conduct by any of Defendants, any job placements that Insight would have filled but for any conduct of any of Defendants, or any money Insight lost because of anything done by any of Defendants. Moreover, between 2017 and 2018, the revenue of Insight's New York office grew by approximately █████████████, and that office was, on average, meeting its quarterly revenue growth targets.

## CONCLUSIONS OF LAW

**I.    COUNTS I THROUGH X**

1.  Defendants are entitled to judgment on Counts I through X of Insight's SAC because Insight has released them.

2.  Insight previously entered into the Settlement Agreement with Beacon.

3. Beacon has fully performed under the Settlement Agreement and has not breached its obligations under that agreement.

4. In the Settlement Agreement, Insight released Beacon and its employees from any future claims concerning any employment agreement with or employment by Insight or Beacon.

5. The plain terms of the Settlement Agreement clearly reflect Insight's intent to release unforeseen, unknown, unmatured, and unaccrued future claims. The release is, therefore, enforceable against future claims. *JEDA Capital-56, LLC v. Vill. of Potsdam, N.Y.*, 661 F. App'x 20, 24 (2d Cir. 2016); *Rotberg v. Dodwell & Co.*, 152 F.2d 100, 101 (2d Cir. 1945); *Gerszberg v. Iconix Brand Grp., Inc.*, No. 17-cv-8421 (KBF), 2018 WL 2108239, at *3–4 (S.D.N.Y. May 7, 2018); *Troy News Co., Inc. v. City of Troy*, 563 N.Y.S.2d 301, 303 (N.Y. App. Div. 1990); *Northrup Contracting, Inc. v. Vill. of Bergen*, 514 N.Y.S.2d 306, 308 (N.Y. App. Div. 1987). The plain terms of the Settlement Agreement also clearly apply to claims by Insight against Beacon and the Former Employees, as Beacon's employees. Additionally, the plain terms of the Settlement Agreement clearly apply to claims by Insight based on the Former Employees' Employment Agreements with Insight and their employment with Insight and Beacon.

6. All of Insight's claims in this lawsuit concern the Former Employees' Employment Agreements with Insight and/or their employment by Insight and/or Beacon.

7. Thus, Insight's release in the Settlement Agreement constitutes a complete bar to this action. *Gerszberg*, 2018 WL 2108239, at *3.

8. Defendants are also entitled to judgment on Counts I through X of Insight's SAC for the additional reasons set forth below.

**II.      COUNT III**

9.   The Former Employees are entitled to judgment on Count III of Insight's SAC because

their Employment Agreements are unenforceable.

**A.      Mr. Norman**

10.  Insight only claims that Mr. Norman breached the non-compete covenant in his

Employment Agreement.

11.  By its express terms, Mr. Norman's Employment Agreement is governed by Georgia law.

12.  Georgia law only enforces non-compete covenants against an employee who does not:

> (1) Customarily and regularly solicit for the employer customers or
> prospective customers; (2) Customarily and regularly engage in making
> sales or obtaining orders or contracts for products or services to be
> performed by others; (3) Perform the following duties: (A) Have a primary
> duty of managing the enterprise in which the employee is employed or of a
> customarily recognized department or subdivision thereof; (B) Customarily
> and regularly direct the work of two or more other employees; and (C) Have
> the authority to hire or fire other employees or have particular weight given
> to suggestions and recommendations as to the hiring, firing, advancement,
> promotion, or any other change of status or other employees; or (4) Perform
> the duties of a key employee or of a professional.

Ga. Code Ann. § 13-8-53(a).

13.  As a Recruiter and a Professional Recruiter at Insight, Mr. Norman rarely, if ever,

solicited clients or prospective clients on behalf of Insight. He made no sales or

placements, and he obtained no job requisitions, orders, or contracts for services to be

performed by others. His primary responsibility was not managing Insight or any of its

departments or subdivisions. He did not perform the duties of a key employee or a

professional. *Blair v. Pantera Enters., Inc.* --- S.E.2d ---, 2019 WL 1033594, at *3 (Ga.

Ct. App. 2019); Ga. Code Ann. § 13-8-51(8), (14). Mr. Norman's role in identifying

candidates that Insight's Account Managers placed with its clients is not enough quality

Mr. Norman as the type of employee against whom a non-compete covenant may be enforced under Georgia law. *CSM Bakery Sols., LLC v. Debus*, No. 1:16-cv-03732-TCB, 2017 WL 2903354, at *3-7 (N.D. Ga. Jan. 25, 2017).

14. The non-compete covenant in Mr. Norman's Employment Agreement is unenforceable.

15. Therefore, Mr. Norman did not breach the non-compete covenant in his Employment Agreement, and Count III fails as concerns Mr. Norman. *Winders v. State Farm Fire & Cas. Co.*, --- F.Supp.3d ---, 2018 WL 6380769, at *2 (N.D. Ga. 2018); *SAWS at Seven Hills, LLC v. Forestar Realty, Inc.*, 805 S.E.2d 270, 274 (Ga. Ct. App. 2017).

**B.    Ms. Sutmar**

16. Insight claims that Ms. Sutmar breached the non-disclosure, non-compete, and non-solicitation covenants in her Employment Agreement.

17. By its express terms, Ms. Sutmar's Employment Agreement is governed by Illinois law.

18. Under Illinois law, post-employment restrictive covenants "are disfavored and held to a high standard". *Am. Transp. Grp., LLC v. Power*, No. 17 C 7962, 2018 WL 1993204, at *4 (N.D. Ill. Apr. 27, 2018) (citing, *inter alia*, *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 522 (Ill. App. Ct. 2007)). The employer bears the heavy burden of establishing that every aspect of the covenant is necessary. *Id.*; *Cambridge Eng'g, Inc.*, 879 N.E.2d at 522. A covenant will only be enforced if it is "reasonable" in that it: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promissee", which interest "may be limited by type of activity, geographical area, and time"; "(2) does not impose undue hardship on the employee-promissor; and (3) is not injurious to the public". *Reliable Fire Equip. Co. v.*

*Arredondo*, 965 N.E.2d 393, 396-97 (Ill. 2011) (citing, *inter alia*, *BDO Seidman v.*

*Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999)).

19. Illinois recognizes that an employer may have a legitimate business interest in: "the near-

permanence of customer relationships, the employee's acquisition of confidential

information through his employment, and time and place restrictions." *Reliable Fire*

*Equip. Co.*, 965 N.E.2d at 403. Whether an employer actually has one of these potentially

legitimate business interests "is based on the totality of the facts and circumstances of the

individual case". *Id.*

20. Insight claims that it has a legitimate business interest in client relationships and

goodwill. Whether a business has such a legitimate interest "'turns in large degree on the

nature of the business involved, and certain businesses are just more [or less] amenable to

success under it'". *Instant Tech., LLC v. DeFazio*, 40 F.Supp.3d 989, 1012 (N.D. Ill.

2014) (quoting *Lawrence & Allen, Inc. v. Cambridge Human Res. Grp., Inc.*, 685 N.E.2d

434, 444 (Ill. App. Ct. 1997)). Protectable client relationship and goodwill "is generally

absent from businesses engaged in sales". *Lawrence & Allen, Inc.*, 685 N.E.2d at 444

(citing *Springfield Rare Coin Galleries, Inc. v. Mileham*, 620 N.E.2d 479, 488 (Ill. App.

Ct. 1993)). They are similarly missing "'where the nature of the plaintiff's business does

not engender customer loyalty by providing a unique product or personal service and

customers utilize many suppliers simultaneously to meet their needs'". *Instant Tech.,*

*LLC*, 40 F.Supp.3d at 1012 (quoting *Lawrence & Allen, Inc.*, 685 N.E.2d at 444). "By

nature and practice [the IT staffing market] is non-exclusive" and "a very commoditized

business". *Id.* at 1004, 12 (quotation omitted). Thus, Illinois courts have repeatedly found

that businesses in the staffing industry, and, specifically, in the IT staffing industry, have

no such interest. *Instant Tech. LLC v. DeFazio*, 793 F.3d 748, 750 (7th Cir. 2015); *ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 192 F.Supp.3d 943, 960-61 (N.D. Ill. 2016); *Instant Tech., LLC*, 40 F.Supp.3d at 1011-12; *Lawrence & Allen, Inc.*, 685 N.E.2d at 437, 45. Insight has not shown that, unlike other staffing agencies, it enjoys near-permanent client relationships; it has not established that: its industry is not competitive; its methods and services are unique from other IT staffing agencies; its MSAs provide for exclusive relationships with its clients; its clients do not use other staffing agencies at the same time and for the same placements; its clients are loyal to it; and its success in one placement will guarantee success in another placement. Insight does not have a legitimate interest in client relationships and goodwill under Illinois law.

21. Insight also claims that it has a legitimate business interest in its confidential information, including, specifically, the identity of its clients as well as information about their hiring managers, job openings, and hiring preferences. Under Illinois law, such client list information is not confidential, *Unisource Worldwide, Inc. v. Carrara*, 244 F.Supp.2d 977, 986 (C.D. Ill. 2003), unless "'the information has been developed by the plaintiff over a number of years at great expense and kept under tight security,'" *Lifetec, Inc. v. Edwards*, 880 N.E.2d 188, 196 (Ill. App. Ct. 2007) (quoting *A.J. Dralle, Inc.*, 627 N.E.2d 690, 697 (Ill. App. Ct. 1994)). Illinois courts have repeatedly found that businesses in the IT staffing industry have no such confidential information. *Instant Tech. LLC*, 793 F.3d at 750; *ATC Healthcare Servs., Inc.*, 192 F.Supp.3d at 961; *Instant Tech., LLC*, 40 F.Supp.3d at 1011-12. Insight has not shown that, unlike other staffing agencies, it possesses confidential information; it has not established that: its information is not well-known, publicly available or easily ascertainable with minimal effort from non-

confidential sources; its information is not shared by its clients with multiple staffing

agencies, candidates, and the public; its information does not quickly become outdated

and valueless; and it takes reasonable measures to protect its information.

22. Further, even if Insight had made such a showing, it nonetheless failed to establish the

necessary fact that Ms. Sutmar used such information for her own benefit. *Lawrence &*

*Allen, Inc.*, 685 N.E.2d at 445. Moreover, there is no risk of inevitable disclosure by Ms.

Sutmar because Insight has no confidential client information. *PepsiCo, Inc. v. Redmond*,

54 F.3d 1262, 1269 (7th Cir. 1995); *Stenstrom Petroleum Servs. Grp., Inc. v. Mesch*, 874

N.E.2d 959, 976-77 (Ill. App. Ct. 2007). Insight has no recognizable interest in the

confidentiality of any information that Ms. Sutmar obtained through Insight's general

sales training, *Springfield Rare Coin Galleries, Inc.*, 620 N.E.2d at 486; *ILG Indus., Inc.*

*v. Scott*, 273 N.E.2d 393, 396 (Ill. 1971), or through her memories of and experience at

Insight, *Stenstrom*, 874 N.E.2d at 1093-94. Insight does not have a legitimate business

interest in confidential information under Illinois law.

23. Insight additionally claims that it has a legitimate business interest in a stable workforce.

Illinois law recognizes a stable workforce as a potentially legitimate business interest, but

it "must also be real—not merely aspiration", and so it "'requires a work force that is

stable in the first instance or at least one whose stability will likely result from the

restrictive covenant'". *Insight Tech., LLC*, 40 F.Supp.3d at 1013-14 (quoting *Pampered*

*Chef v. Alexanian*, 804 F.Supp.2d 765, 787 (N.D. Ill. 2011)). "The reality is that [IT

staffing] business[es] rel[y] on a high volume of direct sales, which is a business model

traditionally characterized by 'massive' turnover", *id.* (quoting *Pampered Chef*, 804

F.Supp.2d at 788), and that thus lacks a stable workforce, *id.; Pampered Chef*, 804

F.Supp.2d at 787-88. Insight has not shown that, unlike its competitors, it has a stable workforce; it has not established that: it does not lose approximately 75% of the employees that it hires; it does not frequently transfer its employees between its offices; it does not frequently transfer its client accounts between its employees; or the enforcement of the covenants against the Former Employees would result in a more stable workforce. Insight does not have a legitimate business interest in a stable workforce under Illinois law.

24. Because Insight does not have a legitimate business interest in client relationships and goodwill, confidential information, or a stable workforce under Illinois law, the non-disclosure, non-compete, and non-solicitation covenants in Ms. Sutmar's Employment Agreement are unenforceable. *Reliable Fire Equip. Co.*, 965 N.E.2d at 396-97.

25. Therefore, Ms. Sutmar did not breach the non-disclosure, non-compete, and non-solicitation covenants in her Employment Agreement, and Count III fails as concerns Ms. Sutmar. *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015); *Am. Ctr. for Excellence in Surgical Assisting Inc. v. Cmty. Coll. Dist. 502*, 315 F.Supp.3d 1044, 1052 (N.D. Ill. 2018).

**C.     Mr. Wenzel**

26. Insight claims that Mr. Wenzel breached the non-disclosure, non-compete, non-recruit, and non-solicitation covenants in his Employment Agreement.

27. By its express terms, Mr. Wenzel's Employment Agreement is governed by Pennsylvania law. However, Pennsylvania's law on post-employment restrictive covenants violates the fundamental principles of justice embodied in New York's law on the same subject by placing the burden on employee to show that the covenants are unreasonable (rather than

on the employer to show that they are reasonable) and by not requiring consideration of whether they will result in undue hardship on him (as opposed to requiring such consideration). *Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F.Supp.3d 541, 568 (M.D. Pa. 2014); *Brown & Brown, Inc. v. Johnson*, 34 N.E.3d 357, 360-61 (N.Y. 2015). Therefore, New York law actually governs Mr. Wenzel's Employment Agreement, notwithstanding the contractual choice of law provision. *Brown & Brown, Inc.*, 34 N.E.3d at 360-61.

28. New York law disfavors and strictly construes post-employment restrictive covenants. *Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 386-87 (2d Cir. 1982); *Morris v. Schroder Cap. Mgmt. Int'l*, 859 N.E.2d 503, 506 (N.Y. 2006); *Am. Broadcasting Cos., Inc. v. Wolf*, 420 N.E.2d 363, 368 (N.Y. 1981). The employer bears the burden of establishing every element of enforceability of the covenant. *Brown & Brown, Inc.*, 34 N.E.3d at 361. A covenant will only be enforced if it is "reasonable in time and area" and "reasonable" in that it: "(1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public". *BDO Seidman*, 712 N.E.2d at 1223 (citing, *inter alia*, Restatement (Second) of Contracts § 188).

29. New York recognizes that it may be a legitimate interest of an employer: "(1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, . . . (3) in those cases where the employee's services to the employer are deemed special or unique", or (4) to "prevent[] former employees from exploiting or appropriating the goodwill of a client". *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F.Supp.2d 525, 535-36

(S.D.N.Y. 2004) (quotations omitted). Whether an employer actually has one of these potentially legitimate interests depends "on the particular facts and circumstances giving context to the agreement". *BDO Seidman*, 712 N.E.2d at 1224 (citations omitted).

30. As previously stated, Insight claims that it has a legitimate interest in client relationships and goodwill. The purpose of protecting such an interest is to protect "*information* or *relationships* which pertain peculiarly to the employer" and have been developed "over a long period of time". *BDO Seidman*, 712 N.E.2d at 1224 (quotation omitted). New York courts have found that businesses in the staffing industry have no such interest. *Robert Half Int'l, Inc. v. Dunn*, No. 5:13-cv-974, 2013 WL 10829925, at *5 (N.D.N.Y. Oct. 29, 2013). Insight has not shown that, unlike other staffing agencies, it enjoys an exclusive relationship with its clients, as explained above. Insight does not have a legitimate interest in client relationships and goodwill under New York law.

31. As previously stated, Insight also claims that it has a legitimate interest in its confidential information, including, specifically, the identity of its clients as well as information about their hiring managers, job openings, and hiring preferences. In New York, client list information is not confidential where such information is well-known or readily ascertainable. *Free Country Ltd. v. Drennen*, 235 F.Supp.3d 559, 566 (S.D.N.Y. 2016); *Iron Mountain Info. Mgmt., Inc. v. Taddeo*, 455 F.Supp.2d 124, 138, 40 (E.D.N.Y. 2006); *Marsh USA, Inc. v. Alliant Ins. Servs., Inc.*, 26 N.Y.S.3d 725 (N.Y. Sup. Ct. 2015). New York courts have repeatedly found that businesses in the staffing industry have no such confidential information. *Dunn*, 2013 WL 10829925, at *6; *Ability Search, Inc. v. Lawson*, 556 F.Supp. 9, 15-16 (S.D.N.Y. 1981). Insight has not shown that, unlike other staffing agencies, it possesses confidential information, as explained above.

32. Further, as also explained above, even if Insight had made such a showing, it nonetheless failed to establish the necessary fact that Mr. Wenzel used such information for his own benefit. *BDO Seidman*, 93 N.Y.2d at 391. Moreover, there is no risk of inevitable disclosure by Mr. Wenzel because Insight has no confidential client information. *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05 Civ. 9478(GEL), 2009 WL 399221, at *11-12 (S.D.N.Y. Feb. 18, 2009). Insight has no recognizable interest in the confidentiality of any information that Mr. Wenzel obtained through Insight's general sales training or through his memories of and experience at Insight. *Poller v. BioScrip, Inc.*, 974 F.Supp.2d 204, 218 (S.D.N.Y. 2013); *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F.Supp.2d 586, 606 (S.D.N.Y. 2001); *Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.E.2d 590, 594 (N.Y. 1976); *Paramount Pad Co. v. Baumrind*, 151 N.E.2d 609, 610 (N.Y. 1958); *Levine v. Bochner*, 517 N.Y.S.2d 270 (N.Y. App. Div. 1987); *Catalogue Serv. of Westchester, Inc. v. Henry*, 484 N.Y.S.2d 615 (N.Y. App. Div. 1985). Insight does not have a legitimate interest in confidential information under New York law.

33. Additionally, as also explained above, Insight claims that it has a legitimate interest in a stable workforce. Under New York law, maintaining a stable workforce is not, in and of itself, a legitimate interest, *Reed Elsevier Inc. v. Transunion Holding Co., Inc.*, No. 13 Civ. 8739(PCK), 2014 WL 97317, at *12-13 (S.D.N.Y. Jan. 9, 2014); rather, it must be a factor supporting another recognized legitimate business interest, *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F.Supp.3d 592, 600 (S.D.N.Y. 2016), such as protecting against the loss of client goodwill and relationships, confidential information, or the loss of "unique or extraordinary" employees, meaning those employees "whose services are practically irreplaceable based on their unique relationships with the customers with whom they

deal", *Oliver Wyman, Inc. v. Eielson*, 282 F.Supp.3d 684, 694 (S.D.N.Y. 2017). As explained above, Insight has no legitimate interest in client goodwill and relationships or confidential information under New York law. Insight failed to show that it has a legitimate interest in preventing the loss of unique or extraordinary employees; Insight has failed to establish that its countless Account Managers and Recruiters or that Mr. Norman, the only employee who Mr. Wenzel purportedly improperly recruited, are unique or extraordinary employees. Insight does not have a legitimate interest in a stable workforce under New York law.

34. Because Insight does not have a legitimate business interest in client relationships and goodwill, confidential information, or a stable workforce under New York law, the non-disclosure, non-compete, non-recruit, and non-solicitation covenants in Mr. Wenzel's Employment Agreement are unenforceable. *BDO Seidman*, 712 N.E.2d at 1223.

35. Therefore, Mr. Wenzel did not breach the non-disclosure, non-compete, non-recruit, and non-solicitation covenants in his Employment Agreement, and Count III fails as concerns Mr. Wenzel. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004); *Roberts v. Karimi*, 251 F.3d 404, 407 (2d Cir. 2001); *Can't Stop Prods., Inc. v. Sixuvus, Ltd.*, 295 F.Supp.3d 381, 400 (S.D.N.Y. 2018).

## III.   COUNT IV

36. Mr. Norman is entitled to judgment on Count IV of Insight's SAC because his Separation Agreement is unenforceable.

37. Insight claims that Mr. Norman breached his Separation Agreement by breaching the provision that re-affirms the non-compete covenant in his Employment Agreement.

38. By its express terms, Mr. Norman's Separation Agreement is also governed by Georgia law.

39. Because the non-compete covenant in Mr. Norman's Employment Agreement is unenforceable under Georgia law, the provision in his Separation Agreement re-affirming the non-compete covenant in his Employment Agreement is also unenforceable under Georgia law.

40. Therefore, Mr. Norman did not breach his Separation Agreement, and Count IV fails. *Winders*, 2018 WL 6380769, at *2; *SAWS at Seven Hills, LLC*, 805 S.E.2d at 274.

## IV.   COUNTS I AND II

41. Mr. Wenzel and Ms. Sutmar are entitled to judgment on Counts I and II of Insight's SAC because Insight has no trade secret information.

42. Insight claims that, under the Federal DTSA and New York common law, Mr. Wenzel and Ms. Sutmar misappropriated its trade secrets by communicating with the hiring managers at the NY Clients and by emailing the Call Sheet and the Designee Packet to a personal email address, respectively.

43. The Federal DTSA defines a trade secret, in pertinent part, as "information [that] derives independent economic value, actual or potential, from not being generally known to, and not be readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information". 18 U.S.C. § 1839(3)(A)-(B). Misappropriation in violation of the DTSA is, in pertinent part, "an unconsented disclosure or use of a trade secret . . .". *Syntel Sterling Best Shores Mauritius Ltd. v. The Trizetto Grp., Inc.*, No. 15-CV-211 (LGS) (RLE), 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (citing 18 U.S.C. § 1839(3)(A)-(B)).

44. New York common law defines a trade secret as "information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-cv-8190 (RJS), 2017 WL 4402540, at *3–4 (S.D.N.Y. Sept. 30, 2017) (quoting Restatement (First) of Torts § 757, cmt. b). A claim for misappropriation requires that a party show, *inter alia* "that it possessed a trade secret". *Id.* at *3; *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999).

45. When determining whether information constitutes a trade secret under either the DTSA or common law, New York courts consider the following factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 WL 557906, at *3-4 (S.D.N.Y. Jan. 23, 2018); *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009). "[T]he most important consideration [is] whether the information was secret", *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986), and "the primary consideration in determining secrecy is whether the information is easily ascertainable by the public", *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 499 (S.D.N.Y. 2002).

46. As explained above, courts do not generally recognize client information, including the identities of clients and their hiring managers such as those found on the Call Sheet, as trade secrets, *Free Country Ltd.*, 235 F.Supp.3d at 566; *TNS Media Research, LLC v. TRA Global Inc.*, 977 F.Supp.2d 281, 314 (S.D.N.Y. 2013); *Iron Mountain Info. Mgmt.*,

*Inc.*, 455 F.Supp.2d at 138, 40; *Marsh USA, Inc.*, 26 N.Y.S.3d 725, especially in the IT staffing industry. *Robert Half Int'l, Inc.*, 2013 WL 10829925, at *6, 8; *Instant Tech., LLC*, 40 F.Supp.3d at 1012, 16. Insight has not established that it alone, among all of its competitors in the IT staffing industry, somehow has propriety client information developed through proprietary means. Insight's client information, including the Call Sheet, is not a trade secret.

47. Insight offered no evidence that the Designee Packet contains any information other than general sales and marketing training information, and that such information is not already known or easily duplicated by others. Where, as here, the Designee Packet consists of basic sales advice that any staffing agency could develop, that provides no competitive advantage to Insight, and that could easily be independently developed or "reverse engineered" by any other company, it is not a trade secret. *Delta Filter Corp. v. Morin*, 485 N.Y.S.2d 143 (N.Y. App. Div. 1985). Moreover, this general sales training has been internalized by Ms. Sutmar, and she cannot be prevented from relying on her training in performing any subsequent jobs. *L.M. Rabinowitz & Co. v. Dasher*, 82 N.Y.S.2d 431, 439 (N.Y. Sup. Ct. 1948). Insight's Designee Packet is not a trade secret.

48. Because the information at issue is not Insight's trade secret, Mr. Wenzel and Ms. Sutmar did not misappropriate any of Insight's trade secrets under the Federal DTSA or New York common law. *Next Commc'ns, Inc.*, 2016 WL 1275659, at *3; *N. Atl. Instruments, Inc.*, 188 F.3d at 43–44; *Syntel Sterling Best Shores Mauritius Ltd.*, 2016 WL 5338550, at *6; 18 U.S.C. § 1839(3)(A)-(B).

49. Therefore, Counts I and II fail.

## V.   COUNT V

50. Mr. Norman is entitled to judgment on Count V of Insight's SAC because the provision in his Separation Agreement re-affirming the non-compete covenant in his Employment Agreement is unenforceable.

51. Insight claims that Mr. Norman fraudulently induced it into executing the Separation Agreement because he executed the Separation Agreement with the intent to violate the non-compete covenant in his Employment Agreement, which provision the Separation Agreement purports to re-affirm.

52. Fraudulent inducement requires: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wild Bunch, SA v. Vendian Entm't, LLC*, No. 17 Civ. 1383, 2018 WL 1365690, at *3 n.1 (S.D.N.Y. Feb. 26, 2018). The plaintiff must prove these elements by clear and convincing evidence. *CCM Rochester, Inc. v. Federated Inv'rs, Inc.*, 234 F.Supp.3d 501, 506 (S.D.N.Y. 2017).

53. As explained above, the provision in Mr. Norman's Separation Agreement re-affirming the non-compete covenant in his Employment Agreement is unenforceable because the non-compete covenant in his Employment Agreement is itself unenforceable. Because that provision is unenforceable, even if Mr. Norman had made any misrepresentation concerning that provision, which Insight did not prove, such a misrepresentation would not have been material, as required to sustain this claim. *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012).

54. Therefore, Mr. Norman did not fraudulently induce Insight to enter into the Separation Agreement, and Count V fails. *Winders*, 2018 WL 6380769, at *2; *SAWS at Seven Hills, LLC*, 805 S.E.2d at 274.

## VI.    COUNT VI

55. Mr. Wenzel and Ms. Sutmar are entitled to judgment on Count VI of Insight's SAC because it is based on Insight's non-viable trade secret misappropriation claims.

56. Insight claims that Mr. Wenzel and Ms. Sutmar breached their duty of loyalty to Insight by misappropriating its trade secrets.

57. A breach of the duty of loyalty must occur during an employee's employment with an employer. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 300 (2d Cir. 2006); *Delville v. Firmenich Inc.*, 920 F.Supp.2d 446, 469 (S.D.N.Y. 2013); *Cerciello v. Admiral Ins. Brokerage Corp.*, 936 N.Y.S.2d 224 (N.Y. App. Div. 2011). "'A breach of . . . loyalty[] occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity.'" *Dewitt Stern Grp., Inc. v. Eisenberg*, 257 F.Supp.3d 542, 585 (S.D.N.Y. 2017) (quoting *Poller*, 974 F.Supp.2d at 227). To state a claim for breach of the duty of loyalty, "a plaintiff must show the existence of a fiduciary duty, a knowing breach of that duty, and damages resulting from the breach." *Id.* (citing *Johnson v. Nextel Commc'ns*, 660 F.3d 131, 138 (2d Cir. 2011)).

58. As explained above, Insight's trade secret misappropriation claims against Mr. Wenzel and Ms. Sutmar fail because none of the information at issue in this action is trade secret

or confidential information. Insight has failed to show that Mr. Wenzel or Ms. Sutmar engaged in any other unfair, fraudulent, or wrongful act, as it did not establish that, while they were working for insight, they: were working for Beacon; were talking to Insight's clients about the fact that they were going to work for Beacon; or were asking Insight's clients to move their business to Beacon.

59. Therefore, Mr. Wenzel and Ms. Sutmar did not breach their duty of loyalty to Insight, and Count VI fails.

## VII.   COUNTS VII AND VIII

60. Beacon and Mr. Wenzel are entitled to judgment on Counts VII and VIII, respectively, of Insight's SAC because they did not interfere with any enforceable covenants in the Former Employees' Employment Agreements.

61. Insight claims that Beacon and Mr. Wenzel tortiously interfered with the post-employment restrictive covenants in its Employment Agreements with the Former Employees.

62. Under New York law, a plaintiff must prove the following elements to support a claim for tortious interference with a contract: "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom'". *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (citing *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)). "[T]he degree of protection available to a plaintiff for a competitor's tortious interference with contract is

defined by the nature of the plaintiff's enforceable legal rights." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 495-96 (N.Y. 1996) (citation omitted).

63. As explained above, the post-employment restrictive covenants in the Former Employees' Employment Agreements are unenforceable.

64. Thus, there were no enforceable covenants between Insight and its Former Employees with which Beacon and Mr. Wenzel could interfere, and Counts VII and III fail. *NBT Bancorp Inc.*, 664 N.E.2d at 495-96.

## VIII.   COUNTS IX AND X

65. Mr. Wenzel and Beacon are entitled to judgment on Counts IX and X, respectively, of Insight's SAC because Insight has not produced any evidence to support any element of these claims.

66. Insight alleges that Mr. Wenzel and Beacon tortiously interfered with its business relations with the NY Clients.

67. Under New York law, the elements of a claim for tortious interference with business relations are that: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose and or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship". *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quotation omitted). The "general rule" for the third element is that the "defendant's conduct must amount to a crime or an independent tort", though there is an exception to this general rule where "a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiff'". *Carvel Corp. v. Noonan,* 818 N.E.2d 1100, 1103 (N.Y. 2004) (quotations omitted).

68. First, as explained above, Insight produced no evidence that, as an IT staffing agency, it has exclusive or long-term relations with the NY Clients. Thus, Insight cannot establish the first element of its claim that "it had a business relationship with a third party". *Jackie's Enters., Inc. v. Belleville*, 87 N.Y.S.3d 124, 129-30 (N.Y. App. Div. 2018) (citations omitted).

69. Second, Insight produced no evidence that Mr. Wenzel or Beacon interfered with its purported business relations with the NY Clients. Insight has no evidence that Mr. Wenzel or Beacon disparaged Insight to the NY Clients, or that Mr. Wenzel did anything to cause Insight's alleged lack of opportunity to submit candidates to NBC's Division. Insight is, for this reason, unable to establish the second element of its claim.

70. Third, there is no evidence that Mr. Wenzel or Beacon acted for a wrongful purpose or used improper means. There is no evidence that they committed a crime or an independent tort. As to Mr. Wenzel's alleged breach of the non-compete and non-solicitation covenants in his Employment Agreement, such a breach of contract does not suffice as underlying tortious conduct "unless a legal duty independent of the contract itself has been violated," and Mr. Wenzel violated no such independent legal duty here because Insight had no trade secrets for Mr. Wenzel to appropriate and no confidential information for him to use or disclose, as explained above. *Plasticware, LLC v. Flint Hills Res., LP*, 852 F.Supp.2d 398, 403 (S.D.N.Y. 2012) (quotation). There is likewise no evidence that they acted solely to harm Insight; rather, Insight claims that they are its competitors, competition "provides an obvious motive for . . . interference other than a desire to injure the plaintiff", *Carvel Corp.*, 818 N.E.2d at 1104, and "[a]ctions intended to solicit business, which are motivated by economic self-interest, cannot be

characterized as malicious", *Tri-Star Lighting Corp. v. Goldstein*, 58 N.Y.S.3d 448 (N.Y.

App. Div. 2017). Therefore, Insight cannot establish the third element of its claim.

71. Fourth, there is no evidence that Mr. Wenzel or Insight caused any injury to Insight's

alleged business relations with the NY Clients. *RFP LLC v. SCVNGR, Inc.,* 788

F.Supp.2d 191, 198 (S.D.N.Y. 2011). As explained above, Insight produced no evidence

that, as an IT staffing agency, it has any guarantee of receiving future business from the

NY Clients. In any event, Insight has, in fact, continued to obtain business from NBC.

Insight has done no analysis of whether there has been any actual decrease in revenue or

profit earned from its relationship with NBC, and it does not know why it has not

obtained recent business from the Department. For these reasons, Insight cannot establish

the fourth element of its claims.

72. Therefore, Counts IX and X fail.

## **CONCLUSION**

1. For the reasons set forth herein, the Court holds that Defendants are entitled to judgment

in their favor on every count in Insight's SAC.

2. In accordance with Paragraph 16 of the Settlement Agreement, Beacon, as the prevailing

party in this litigation, is awarded its reasonable attorneys' fees and costs from Insight.

ECKERT SEAMANS CHERIN & MELLOTT, LLC

*/s/ Charlotte L. Bednar*
Geraldine A. Cheverko (gcheverko@eckertseamans.com)
Charlotte L. Bednar (cbednar@eckertseamans.com)
Anthony M. Moccia (amoccia@eckertseamans.com)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
10 Bank St., Suite 700
White Plains, NY 10606
Phone: (914) 949-2909
Facsimile: (914) 949-5424


***Attorneys for Defendants Daniel Wenzel, Luke Norman, Lauren Sutmar and Beacon Hill Staffing Group, LLC***

Dated:  March 15, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served upon all counsel of via Federal Express on this 15th day of March 2019, upon the following counsel:

Edward Filusch
Jessica Rosenberg
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
***VIA EMAIL:*** efilusch@kasowitz.com
jrosenberg@kasowitz.com

Ariel D. Zion
Insight Global, LLC
4170 Ashford Dunwoody Road, NE
Suite 250
Atlanta, Georgia 30319
***VIA EMAIL:*** Ariel.Zion@insightglobal.com

*/s/ Charlotte L. Bednar*