DEF. 83

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| INSIGHT GLOBAL, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 1:17-CV-08323 |
| v. | ) | |
| | ) | |
| DANIEL WENZEL, LUKE NORMAN, | ) | |
| LAUREN SUTMAR, and BEACON HILL | ) | |
| STAFFING GROUP, LLC, | ) | |
| Defendants. | ) | |

Rebuttal Expert Report of Jon P. Klerowski

July 6, 2018

HIGHLY CONFIDENTIAL

## Table of Contents

I.    Introduction and Scope of the Engagement ........................................................................ 1

II.   Expert Qualifications ........................................................................................................ 3

III.  Summary of Opinions ...................................................................................................... 4

IV.   Background ...................................................................................................................... 5

V.    Professional Guidance Related to Preparing a Damage Calculation ................................ 8

  A.  Background on Economic Damages ................................................................................ 8

  B.  Damages Calculation Approaches ................................................................................ 10

VI.   Analysis of the Ratner Report ........................................................................................ 11

  A.  Overview of Methodology Used by the Ratner Report .................................................. 11

  B.  Analysis of the Replacement Cost Damages Methodology Applied in the Ratner Report ..... 12

  C.  Analysis of the Cost to Develop Trade Secrets Methodology Applied in the Ratner Report ..... 23

HIGHLY CONFIDENTIAL

# Exhibits

**Exhibits:**

**Exhibit A** – Information Considered

**Exhibit B** – Professional Biography – Jon P. Klerowski

**Exhibit C** – Example Experienced Hire Job Opportunities (Comparable Companies)

HIGHLY CONFIDENTIAL

## I.      Introduction and Scope of the Engagement

I have been engaged by Eckert Seamans Cherin & Mellott, LLC ("Counsel") as an accounting and finance expert in connection with the lawsuit (the "Litigation") before the United States District Court for the Southern District of New York (the "Court") entitled *Insight Global, LLC* ("Plaintiff") *vs. Daniel Wenzel, Luke Norman, Lauren Sutmar, and Beacon Hill Staffing Group, LLC* ("Defendants"). The Litigation is described in more detail in Insight Global's First Amended Complaint filed January 11, 2018 (the "Complaint"). I understand that this report is intended to be used in that Litigation. Counsel has asked me to review information related to this Litigation to enable me to evaluate and opine on the analyses and opinions contained in the June 20, 2018 Report of Ian Ratner (the "Ratner Report"), with regard to the Plaintiffs' alleged damages related to the Litigation.[1] To the extent that my report does not address or rebut specific statements or opinions in the Ratner Report, this does not mean that I have no opinion on or agree with the specific statements or opinions contained therein, nor does the Defendant concede or admit any such statements or opinions.

I have not been requested to express, and I do not have or express, any opinions related to the Plaintiff's liability allegations against the Defendants.

My opinions, analyses, and conclusions are based on my education, training, and experience, and on the work performed by me and those under my supervision through the date of this report. I have consulted with, and obtained input from, other Partners with extensive expert witness experience within my firm regarding the subject matter of this report. In order to develop my opinions in this matter, various procedures were performed, including analysis and review of:

- Various court documents;
- The Ratner Report;
- Certain deposition transcripts;
- Certain documents produced in this Litigation;
- Relevant authoritative literature and guidance; and

---

[1] Capitalized terms used, but not defined herein shall have the meaning set forth in the Ratner Report.
HIGHLY CONFIDENTIAL

1

▪ Other relevant facts and data.

A list of the materials considered in forming my opinions is included in **Exhibit A**. I reserve the right to supplement or modify this report to respond to any additional expert opinions submitted by or on behalf of the Plaintiffs and/or should additional relevant information become available to me which bears on the analyses, opinions, or conclusions contained herein. This engagement was performed in accordance with the guidelines of the AICPA Code of Professional Conduct and the AICPA's Statements on Standards for Consulting Services.

HIGHLY CONFIDENTIAL

## II.    Expert Qualifications

I am a Partner at Floyd Advisory LLC, a business advisory and forensic accounting firm. In my career, I have been engaged as an expert and consultant to assist in business disputes, including arbitrations and litigation matters, often involving the analysis of economic damages and other finance and accounting matters. I also have experience in matters involving financial reporting, forensic accounting investigations, disputes involving complex financial and accounting related issues, valuation matters, and other similar assignments. The Partners of Floyd Advisory have significant expert witness testimony experience and have served as expert witnesses and testified on accounting and financial issues in the United States District Court and the United States Bankruptcy Court in several states and in the trial courts of various states.

I earned a Bachelor of Science in Finance from Bentley University and a Master in Business Administration, with a concentration in Accounting, from Suffolk University. I am a Certified Public Accountant ("CPA"), Certified Fraud Examiner ("CFE") and Accredited in Business Valuation ("ABV") by the American Institute of Certified Public Accountants ("AICPA"). A copy of my professional biography, which summarizes my experience and qualifications, is attached as Exhibit B, which includes all of the publications I authored within the previous ten years. I have not testified at trial or deposition within the past four years. My firm is being compensated at a rate of $600 per hour for my services and this compensation is not contingent upon my opinion or the outcome of this matter.

HIGHLY CONFIDENTIAL

### III.   Summary of Opinions

I have reviewed and evaluated the Ratner Report and have identified flaws in the opinions presented therein. In my opinion, based on my education, experience, and training, as well as the analyses and procedures I have performed, to a reasonable degree of certainty in the field of accounting, the Ratner Report:

- ◼ presents a hypothetical replacement cost damages model of supposed costs to replace the Former Employees and is not an analysis of actual costs incurred by the Plaintiff.

- ◼ asserts that the Plaintiff cannot hire experienced associates, but fails to establish a reasonable foundation for that assumption. The Ratner Report then utilizes a model based on the premise that Insight Global cannot hire experienced associates, and thus fails to address the Plaintiffs' obligation to mitigate damages by hiring experienced personnel.

- ◼ fails to consider the revenues associated with replacing the Former Employees in its replacement cost damages model.

- ◼ presents a replacement cost model that contains flaws and inconsistencies, as well as certain inputs and assumptions that lacked adequate explanation, evidence or support.

- ◼ presents cost to develop trade secret calculations that contains flaws, as well as certain inputs and assumptions that lacked adequate explanation, evidence or support.

In my opinion, the flaws I have identified in the analyses and opinions presented in the Ratner Report render such analyses and opinions unreliable.

HIGHLY CONFIDENTIAL

## IV.    Background

The following information with respect to the Litigation, to the extent it relies upon or summarizes the allegations of Plaintiff's Amended Complaint, is for background purposes only, and does mean that the Defendant concedes or admits any such allegations.

### Relevant Parties

Insight Global, LLC ("Insight Global" or the "Company") is a limited liability company with headquarters in DeKalb County, Georgia.[2] Insight Global provides staffing services with a "focus in information technology ("IT"), and Accounting, Finance, and Engineering ("AF&E") sectors" to clients throughout the country.[3] Insight Global provides short-and long-term staffing services for IT and AF&E positions, as well as "direct placement services for permanent positions."[4]

Daniel Wenzel ("Defendant Wenzel" or "Wenzel") is a former employee of Insight Global. Wenzel began his career with Insight Global on or about June 17, 2013 and ended his employment with the Company on or about July 10, 2017.[5] During his time with the Company, Wenzel held roles as a Recruiter in Training, a Recruiter, an Account Manager, and a Sales Manager, and then his role changed back to Account Manager prior to his departure.[6] Wenzel operated out of the New York and Philadelphia offices at different points during his employment with Insight Global.[7]

Luke Norman ("Defendant Norman" or "Norman") is also a former employee of Insight Global. Norman began his career with Insight Global on or about January 5, 2015 and ended his employment with the Company on or about September 18, 2017.[8] During his time with the Company, Norman held roles as a Recruiter in Training, a Recruiter, and a Professional Recruiter.[9] Norman operated out of the New York office throughout his employment with Insight Global.[10]

---

[2] Complaint, paragraph 9.
[3] Complaint, paragraph 18.
[4] Complaint, paragraph 18.
[5] Complaint, paragraph 31.
[6] Complaint, paragraphs 32-36.
[7] Complaint, paragraph 31.
[8] Complaint, paragraph 38.
[9] Complaint, paragraphs 39-41.
[10] Complaint, paragraph 38.

HIGHLY CONFIDENTIAL

Lauren Sutmar ("Defendant Sutmar" or "Sutmar") is also a former employee of Insight Global. Sutmar began her career with Insight Global on or about February 3, 2014 and ended her employment with the Company on March 6, 2017.[11] During her time with the Company, Sutmar held roles as a Recruiter in Training, a Recruiter, and an Account Manager.[12] Sutmar operated out of the Chicago and New York offices at different points during her employment with Insight Global.[13]

Beacon Hill Staffing Group, LLC ("Beacon Hill") is a national staffing services company.[14] Beacon Hill is headquartered in Boston, Massachusetts and maintains additional offices, including in New York.[15]

### Summary of the Dispute

On January 11, 2018, Insight Global filed the Complaint against the Defendants demanding, among other things, judgment against Wenzel, Norman, Sutmar, and Beacon Hill related to alleged misappropriation of trade secrets, breach of contract, and other alleged civil claims.[16]

Insight Global claims that employees have access to valuable trade secrets that belong to the Company, as well as other confidential and other proprietary business information about Insight Global's business.[17] During their time employed at Insight Global, Wenzel, Norman, and Sutmar signed employment agreements that contained "several restrictions on their use and/or disclosure of Insight Global's trade secret information, as well as their conduct during and after employment with the Company."[18] Shortly after Wenzel, Norman, and Sutmar each ended their employment with Insight Global, they became employed at Beacon Hill's New York office in positions which Insight Global claims are "in the same or similar position as those that they held at Insight Global."[19] Insight Global alleges that the Former Employees directly violated their employment

---

[11] Complaint, paragraph 43.
[12] Complaint, paragraphs 44-46.
[13] Complaint, paragraph 43.
[14] Complaint, paragraph 1.
[15] Complaint, paragraph 13.
[16] Complaint, paragraphs 106-187.
[17] Complaint, paragraph 48.
[18] Complaint, paragraph 4.
[19] Complaint, paragraph 5.

HIGHLY CONFIDENTIAL

agreements in accepting roles at Beacon Hill.[20] The employment agreements were "At-Will" agreements, which I understand to mean that there was no set term for the employment and the employment could be terminated by either party at any time with or without cause.[21]

Insight Global also alleges that the Former Employees "deliberately and knowingly misappropriated a number of documents and other information containing Insight Global trade secrets and are now using them to compete with the Company."[22] According to the Complaint, this was a violation of the Former Employees' employment agreements and of federal and state trade secret statutes.[23]

Additional information regarding the claims in this Litigation is included in the Complaint and various Court documents.

---

[20] Complaint, paragraph 5.
[21] For example, see the First Amended Complaint Exhibit A.
[22] Complaint, paragraph 6.
[23] Complaint, paragraph 6.

HIGHLY CONFIDENTIAL

## V. Professional Guidance Related to Preparing a Damage Calculation

### A. Background on Economic Damages

The AICPA, the national professional organization of CPAs in the United States, provides guidance relating to consulting services and the preparation of economic damages calculations. Business damages may arise from either a contract dispute or a civil wrongdoing (e.g. property damage, unfair competition, unlawful misappropriation, negligence, or fraud), or both.[24] In order to prove damages, the plaintiff must prove that both the "wrongful act of the defendant caused a loss" and the "amount of the loss can be estimated with reasonable certainty."[25] Once causation is proved, damage analyses are conducted to estimate the damage suffered by the plaintiff as a result of the defendant's wrongful act.[26] Importantly, damage analyses should consider lost "net" profits, meaning gross revenue that would have been earned but for the wrongful act less avoided costs.[27,28]

The AICPA also outlines the need for reasonable certainty when calculating economic damages and that damage calculations need not have outright certainty, but should "be anchored in facts, make use of sound methodologies, and yield reasonable results."[29] The overall objective being "that plaintiffs are not awarded speculative, overly optimistic or unrealistic damages."[30] The AICPA further provides guidance regarding the information that should be obtained and considered by the damages expert, as follows:[31]

> A practitioner attempts to obtain relevant data that is sufficient to provide a reasonable basis for conclusions or recommendations for any professional services performed. In litigation, data are usually obtained through discovery, including depositions, interrogatories, and document production motions. In addition, the data-gathering process

---

[24] AICPA Forensic & Valuation Services Practice Aid, *Calculating Lost Profits*, American Institute of Certified Public Accountants (2018) at pgs. 20-21.

[25] *Ibid.,* at pg. 8.

[26] *Ibid.,* at pg. 8.

[27] *Ibid.,* at pg. 8.

[28] *Avoided costs* are those costs that would have been incurred in connection with the generation of the lost revenues but were not incurred. *Ibid.,* at pg. 30.

[29] AICPA Forensic & Valuation Services Practice Aid, *Attaining Reasonable Certainty in Economic Damages Calculations*, American Institute of Certified Public Accountants (2015) at pg. 8.

[30] *Ibid.,* at pg. 10.

[31] AICPA Litigation Services and Applicable Professional Standards, *Consulting Services Special Report 03-1*, American Institute of Certified Public Accountants (2003) at pg. 4.

HIGHLY CONFIDENTIAL

may include a review of relevant documents, research and analysis, and interviews. The nature and extent of the data will vary with each engagement and may include the practitioner's computations and analysis and other information-supporting conclusions.

This guidance is consistent with the standard in the AICPA Code of Professional Conduct that requires a member to "[o]btain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any *professional services* performed."[32] Additionally, if an expert witness is relying on assumptions provided by the client or counsel, the AICPA provides that the practitioner should (i) "consider analyzing key assumptions to determine whether they are reasonable,"[33] and (ii) "[c]onsider the underlying data and assumptions that go into management-provided information, and consider further corroborating evidence."[34]

The AICPA highlights other key factors that should be taken into consideration when performing a damages calculation. First, the plaintiff has an obligation to mitigate its damages.[35] This requires that the plaintiff makes a reasonable effort to remediate damages caused by the defendant and a failure to do so may be a defense that can be utilized by the defendant.[36] Additionally, the practitioner should separately consider the impact of any events subsequent to the alleged act, as they may not be caused by the defendant.[37]

In summary, the AICPA professional guidance emphasizes the need for the expert CPA's opinion to attain the "reasonably certain" standard and be properly supported by sufficient relevant data to avoid presenting speculative damage calculations.

---

[32] AICPA Code of Professional Conduct at 1.300.001.

[33] AICPA Litigation Services and Applicable Professional Standards, *Consulting Services Special Report 03-1*, American Institute of Certified Public Accountants (2003) at pg. 5.

[34] AICPA Forensic & Valuation Services Practice Aid, *Attaining Reasonable Certainty in Economic Damages Calculations*, American Institute of Certified Public Accountants (2015) at pg. 31.

[35] AICPA Forensic & Valuation Services Practice Aid, *Calculating Lost Profits*, American Institute of Certified Public Accountants (2018) at pg. 47.

[36] *Ibid.*

[37] *Ibid.*, at pgs. 49-50.

HIGHLY CONFIDENTIAL

## B. Damages Calculation Approaches

Generally, a calculation of damages is performed to assess the harm caused by the defendant's alleged act (with the objective of making the plaintiff whole).[38] Oftentimes, lost profits of the plaintiff are used as a measure of business damages. Typical methods of calculating lost revenues and profits, include:[39]

- The "Before and After" method; and
- The "Yardstick" (or "Benchmark") method.

The "Before and After" method uses the underlying theory that "but for" the defendant's action, the plaintiff would have experienced the same level of profits after the event or action as the plaintiff did before that event or action.

The "Yardstick" method utilizes a "yardstick" that is used to estimate what the revenues and profits of the plaintiff would have been. Some examples of this method include the plaintiff's actual experience versus past budgeted results, the actual experience of a similar business unaffected by the defendant's actions, and industry averages.

---

[38] Weil, R.L., Frank, P.B., Hughes, C.W., Wagner, M. J. *Litigation Services Handbook 4th Edition*, John Wiley & Sons Inc.: New Jersey (2007) Ch.13 at pg. 3.

[39] AICPA Forensic & Valuation Services Practice Aid, *Calculating Lost Profits*, American Institute of Certified Public Accountants (2018) at pg. 26.

HIGHLY CONFIDENTIAL

## VI.   Analysis of the Ratner Report

Counsel has asked me to prepare this report regarding my analyses and opinions related to the opinions contained in the Ratner Report. The Ratner Report presents opinions related to quantifying alleged damages, if any, suffered by Insight Global in connection with conduct of Defendants alleged in this Litigation. I have reviewed and evaluated the Ratner Report and have identified flaws in the methodologies adopted and opinions presented therein that, in my opinion, render such analyses and opinions unreliable. An overview of the methodology used in the Ratner Report as well as the flaws I have identified therein are described below.

### A.  Overview of Methodology Used by the Ratner Report

The Ratner Report presents opinions on damages allegedly suffered by the Plaintiffs, using certain damages methodologies. Based on applicable laws and the Litigation's facts and circumstances, the Ratner Report determined that there were three applicable damages methodologies related to Insight Global's allegations:[40]

- Lost profits of Plaintiff Insight Global or the unjust enrichment of Defendant Beacon Hill;
- The replacement cost of the Former Employees; and
- The cost to develop Insight Global's trade secrets.

### Lost Profits or Unjust Enrichment

The Ratner Report states that it does not have sufficient information to calculate damages using these methodologies.[41] Notably, although the Ratner Report states that "unjust enrichment of the Defendant Beacon Hill" is an applicable damages methodology related to Insight Global's claims, there is no cause of action in the Complaint that claims that Beacon Hill was unjustly enriched.[42] The only claim in the Complaint that refers to unjust enrichment relates to the Former Employees.[43]

---

[40] Ratner Report, pg. 16.
[41] Ratner Report, pgs. 17-18. In paragraph 54, the Ratner Report describes a hypothetical example where a "customer may have recently doubled their staffing needs." Notably, information with respect to a customer's staffing levels and needs would not be available or maintained by other staffing agencies such as Beacon Hill. This type of information could only be obtained from the customer itself, if it was willing to share such information.
[42] Ratner Report, pgs. 16 and 18.
[43] Complaint, paragraph 114.

HIGHLY CONFIDENTIAL

*The Replacement Cost of Former Employees*

The Ratner Report defines Replacement Cost as "the additional costs incurred by Insight Global in order to replace each Former Employee with a similar employee of the same tenure based on the average time it would take the Company to do so" and states that Replacement Cost is "an appropriate measure of damages for some of Insight Global's claims."[44]

*The Cost to Develop Insight Global's Trade Secrets*

The Ratner Report states that the following methods may be utilized to measure damages related to the alleged misappropriation of Insight Global's trade secrets:[45]

- Insight Global's lost profits or the disgorgement of Beacon Hill's unjust enrichment;
- Reasonable royalty; or
- Cost to develop the trade secrets.

With respect to lost profits and unjust enrichment, the Ratner Report reiterated its claim that it does not have sufficient information to calculate damages using these methodologies. Regarding the reasonable royalty approach, the Ratner Report deemed the approach inappropriate given the Litigation's facts and circumstances.[46]

The Ratner Report concluded that the appropriate measure of damages is the amount it would have cost the Defendant to develop the misappropriated trade secrets and used "the cost incurred by Insight Global to develop the trade secrets" as a reasonable proxy.[47]

## B. Analysis of the Replacement Cost Damages Methodology Applied in the Ratner Report

As discussed above, the Ratner Report utilizes a Replacement Cost methodology as a measure of damages. The Replacement Cost methodology consists of a model developed by Ratner in coordination with Insight Global (the "Replacement Cost Analysis") and is described as follows:

---

[44] Ratner Report, pg. 19.
[45] Ratner Report, pg. 24.
[46] Ratner Report, pgs. 24-25.
[47] Ratner Report, pg. 25.

HIGHLY CONFIDENTIAL

"based upon information the Company routinely maintains, we developed a model which calculates the Replacement Cost and period of time required to replace an Account Manager or Professional Recruiter with a similar employee of the same tenure."[48] The Ratner Report then describes the model in four steps.[49]

I have reviewed and evaluated the use of the Replacement Cost damages methodology in the Ratner Report and have identified flaws in the methodologies adopted and opinions presented therein that, in my opinion, render such analyses and opinions unreliable, as demonstrated below:

### No Analysis or Evidence of Lost Profits is Presented

Damage analyses are conducted to estimate the damage suffered by the plaintiff as a result of the defendant's wrongful acts.[50] The Ratner Report puts forth a Replacement Cost Analysis as a measure of damages, yet there is no evidence of analysis of Insight Global's books and records to assess whether it lost revenues, profits, or specific customers, or was otherwise negatively impacted, due to the actions of the Defendants. The Replacement Cost Analysis employed in the Ratner Report is a hypothetical model of supposed costs to replace the Former Employees;[51] it is not an analysis of the Plaintiff's lost revenue or profits, or actual costs incurred by the Plaintiff, caused by the actions of the Defendants, or related to the Insight Global customers listed in the Complaint, since the departure of the Former Employees.

### Replacement Cost Methodology Fails to Address the Impact of Mitigation

A plaintiff has an obligation to mitigate damages and is not generally permitted to recover damages that were foreseeable and could have been avoided by reasonable efforts of the plaintiff.[52] Mitigation is a significant consideration in any damages analysis, which would typically examine what the plaintiff could or should do to minimize the impact of damages. Guidance issued by the AICPA states that "it is important that the practitioner understand what steps, if any, were taken

---

[48] Ratner Report, pg. 19.

[49] Ratner Report, pgs. 20-23.

[50] AICPA Forensic & Valuation Services Practice Aid, *Calculating Lost Profits*, American Institute of Certified Public Accountants (2018) at pg. 8.

[51] Notably, the Replacement Cost Analysis is speculative in nature as there is no reasonably reliable time for which the "At-Will" employees were expected to have remained employed at Insight Global.

[52] AICPA Forensic & Valuation Services Practice Aid, *Calculating Lost Profits*, American Institute of Certified Public Accountants (2018) at pg. 47.

HIGHLY CONFIDENTIAL

by the plaintiff to mitigate its losses so the financial impact of such mitigation can be measured and a determination can be made by the practitioner as to what steps could or should have been taken by the plaintiff."[53] However, the Ratner Report fails to appropriately address the impact of mitigation.

Through conversations with Counsel, I understand that Insight Global's hiring model is somewhat unique to the staffing industry, as several of its competitors hire experienced recruiters and account managers. The Ratner Report describes Insight Global's general practice of typically only hiring entry-level employees/recruiters[54] and then providing significant time and resources to train and prepare them for advancement.[55] The Ratner Report states that Insight Global's "hiring practices and promoting from within are demonstrated in their internally generated growth that has consistently exceeded the industry and their consistent profitability despite the costs associated with recruiting and training additional associates to fuel growth."[56] Additionally, the Ratner Report states that Insight Global is achieving higher than average profitability margins, but lagging behind certain comparable U.S. public companies, such as Robert Half International, Inc. and On Assignment Inc.[57]

Regarding Insight Global's hiring methods, the Ratner Report states that "Insight Global **cannot**, and does not, replace the loss of experienced associates by hiring from another firm" (emphasis added).[58] However, even though the Ratner Report describes Insight Global's general hiring philosophy as "promote from within," the Ratner Report does not provide any evidence or justification for why Insight Global simply *cannot* hire experienced associates.

I conducted searches for some of the most profitable comparable U.S. public companies listed in Table 3 of the Ratner Report, and noted that several had recruiter positions available which required relevant work experience, suggesting other successful companies in the industry do not

---

[53] *Ibid.,* at pg. 48.
[54] This excludes operations personnel and support functions such as accounting, human resources, and legal, for example. Ratner Report, pg. 15.
[55] Ratner Report, pg. 12.
[56] Ratner Report, pg. 15.
[57] Ratner Report, pg. 11.
[58] Ratner Report, pg. 15.

HIGHLY CONFIDENTIAL

share Insight Global's hiring model.[59] Importantly, I noted that Robert Half International, Inc., the most profitable company in 2016 and 2017 according to Table 3 of the Ratner Report, had a current IT recruiter position available with at least 2 years of experience in IT recruiting preferred. See **Exhibit C**, which contains additional examples of experienced hire recruiter job postings for certain comparable companies listed in Table 3 of the Ratner Report. This suggests that Insight Global's unique "promote from within" culture is not a barrier to hiring experienced associates, nor essential to being profitable in the staffing industry.

Based on the preceding discussion, the Ratner Report asserts that the Plaintiff cannot hire experienced associates, but fails to establish a reasonable foundation for that assumption. The Ratner Report then utilizes the Replacement Cost Analysis, which is based on the premise that Insight Global cannot hire experienced associates, and thus fails to address the Plaintiffs' obligation to mitigate damages by hiring experienced personnel.

### *Replacement Cost Methodology Fails to Consider Revenue Associated with Replacement Costs*

As discussed above, damage analyses should consider net profits, meaning consideration of both revenues that would have been earned but for the wrongful act, and the avoided costs.[60, 61] The Ratner Report's Replacement Cost damages methodology results in a model (the Replacement Cost Analysis) that only considers the costs associated with hiring hypothetical additional employees, and fails to consider the additional revenue offset that would be generated by such additional employees. Notably, the Ratner Report highlights the fact that "essentially all revenue generating activities are performed by Recruiters and Account Managers that have gone through the [Insight Global recruitment and training] process."[62] In other words, although in the model Insight Global would incur additional costs associated with hiring new employees to replace the

---

[59] See Exhibit C for job postings from Robert Half International, Inc., KForce, Inc., and Resources Global Professionals, the operating subsidiary of Resources Connection, Inc. These three companies were included in Table 3 of the Ratner Report. These comparable companies have job postings on their respective websites for roles similar to Insight Global Recruiter and Account Manager roles that require or prefer previous industry experience.

[60] AICPA Forensic & Valuation Services Practice Aid, *Calculating Lost Profits*, American Institute of Certified Public Accountants (2018) at pg. 8.

[61] *Avoided costs* are those costs that would have been incurred in connection with the generation of the lost revenues but were not incurred. *Ibid.,* at pg. 30.

[62] Ratner Report, pg. 15.

HIGHLY CONFIDENTIAL

Former Employees, they would also receive the benefit of the additional revenue generated by the new employees.

The Replacement Cost damages methodology presented in the Ratner Report erroneously fails to consider the revenues associated with the Replacement Costs. This material omission renders the Replacement Cost Analysis unreliable.

*Replacement Cost Analysis is Flawed*

Notwithstanding the discussion above, I reviewed the Replacement Cost Analysis under the assumption that it would be an appropriate methodology to assess damages in this Litigation. Based on my review, I identified several flaws and inconsistencies, as well as certain inputs and assumptions that lacked adequate explanation, evidence or support. Each of these items are discussed below:

### a. *Replacement Cost Analysis Inappropriately Applies a Hypothetical But For Scenario*

As discussed above, the "before and after" method is premised on the underlying theory that "but for" the defendant's action, the plaintiff would have experienced the same level of profits, implying the use of the same or similar cost structure in the analysis.[63]

The Replacement Cost Analysis calculates the replacement cost of a Former Employee as the assumed cost Insight Global would incur related to the replacement employees less "the expenses that would have been incurred if the Former Employee had remained."[64] With respect to the latter component of the calculation (i.e. the costs that would have been incurred "but for" the Former Employee departure), the Replacement Cost Analysis erroneously uses the average annual salary of the Former Employee's position (i.e. average Account Manager or Professional Recruiter salary), as opposed to the Former Employee's actual salary at the time of departure. For example, for Defendant Wenzel, the Replacement Cost Analysis uses the average annual Account Manager salary of $52,000 within the "but for" scenario,[65] instead of using Wenzel's actual annual salary

---

[63] AICPA Forensic & Valuation Services Practice Aid, *Calculating Lost Profits*, American Institute of Certified Public Accountants (2018) at pg. 26.
[64] Ratner Report, pg. 22.
[65] Ratner Report, Wenzel Schedule 5.

at the time of departure of $119,500.[66] The same methodology was applied to Defendant Sutmar and Defendant Norman's calculations. If the Replacement Cost Analysis appropriately utilized the Former Employee's actual salary for the "but for" scenario, the Replacement Cost would be less than the                presented in Table 5 of the Ratner Report.

To be consistent with the AICPA literature and generally accepted damage analyses concepts, the calculation of the replacement cost of the Former Employees should be based on the expected salary of each of the Former Employees in the "but for" scenario, and not an average salary of all employees at that position. Because the Former Employees' salaries at the time of departure were higher than the average for each of their positions, the Replacement Cost Analysis overstates the replacement cost of the Former Employees.

*b. Replacement Cost Analysis Inappropriately Includes Other Expenses to Support Account Managers*

The Replacement Cost Analysis includes three general categories of Replacement Costs, one of which is "Other Expenses to Support Account Managers."[67] The Ratner Report describes this category as "the incremental salaries and benefits paid to additional Sales Managers and Professional Recruiters in order to maintain these targeted ratios given the fact that on average the company would have had more Account Managers throughout the time period than if the Former Employee had remained."[68] As discussed above, the Replacement Cost Analysis is a theoretical model which is not based on actual or incremental costs incurred related to employees actually hired to replace the Former Employees.[69] In addition, although the Company claims to maintain "targeted ratios," the ratios are a preference of the Company and not connected to any alleged impact caused by the departure of the Former Employees.

---

[66] IG_00002145.

[67] Ratner Report, Table 5 (pg. 20).

[68] Ratner Report, pg. 23.

[69] The model also fails to consider existing employee promotions, even though such promotions would be consistent with its "promote from within" culture.

HIGHLY CONFIDENTIAL

The "Other Expenses to Support Account Managers" category includes three types of expenses: Professional Recruiter Salaries and Benefits, Professional Recruiter Training Expense, and Sales Manager Salaries and Benefits.[70]

### Professional Recruiter Expenses (Salaries, Benefits and Training Expense)

Related to the former Account Managers (Wenzel and Sutmar), the Replacement Cost Analysis inappropriately includes as damages certain hypothetical costs associated with additional Professional Recruiters in order to maintain targeted staffing ratios, as discussed below.

The Replacement Cost Analysis calculates these additional Professional Recruiter costs as "Pro Recruiter Cost Required to Replace Departed Account Manager" less "Pro Recruiter Cost 'But For' Account Manager Departure."[71] The "Pro Recruiter Cost Required to Replace Departed Account Manager" is based on the targeted ratio of 0.5 Professional Recruiters per Account Manager. The "Pro Recruiter Cost Required to Replace Departed Account Manager" is based on the average number of Account Managers required during the replacement period (1.37 for Wenzel) and the targeted 0.5 ratio. Using these inputs, the Replacement Cost Analysis calculates that 0.69 Professional Recruiters would be required under the replacement scenario versus the "but for" scenario, a difference of 0.19 Professional Recruiters. Importantly, both of these inputs are based on "targeted" staffing ratios and not actual staffing levels and costs incurred associated with a Professional Recruiter. And, specific to the "Pro Recruiter Cost 'But For' Account Manager Departure," the Replacement Cost Analysis does not provide any evidence or verifiable data with respect to how many Professional Recruiters actually supported the former Account Managers (Wenzel and Sutmar) at the time of their departure, nor the actual costs associated with such Professional Recruiters at the time. In addition, the difference of 0.19 Professional Recruiters in the two scenarios would be unlikely to materially impact the overall targeted staffing ratios and thus cause the Company to increase its Professional Recruiters staffing level in the hypothetical replacement period.

---

[70] Ratner Report, Table 5 (pg. 20).
[71] Ratner Report, Wenzel Schedule 7 and Sutmar Schedule 7.

HIGHLY CONFIDENTIAL

Sales Manager Salaries and Benefits

Related to the former Account Managers (Wenzel and Sutmar), the Replacement Cost Analysis inappropriately includes as damages certain hypothetical costs associated with additional Sales Managers in order to maintain targeted staffing ratios, as discussed below.

The Replacement Cost Analysis calculates these additional Sales Manager costs as "Sales Manager Cost Required to Replace Departed Account Manager" less "Sales Manager Cost 'But For' Account Manager Departure."[72] The "Sales Manager Cost Required to Replace Departed Account Manager" is based on the targeted ratio of 8.20 Account Managers per Sales Manager.[73] The "Sales Manager Cost Required to Replace Departed Account Manager" is based on the average number of Account Managers required during the replacement period (1.37 for Wenzel) and the targeted 8.20 ratio. Using these inputs, the Replacement Cost Analysis calculates that 0.17 Sales Managers would be required under the replacement scenario versus the "but for" scenario, a difference of 0.05 Sales Manager. Importantly, both of these inputs are based on "targeted" staffing ratios and not actual staffing levels and costs incurred associated with Sales Managers. And, specific to the "Sales Manager Cost 'But For' Account Manager Departure," the Replacement Cost Analysis does not provide any evidence or verifiable data with respect to how many Sales Managers actually supervised the former Account Managers (Wenzel and Sutmar) at the time of their departure, nor the actual costs associated with such Sales Managers at the time. In addition, the Ratner Report notes that each Sales Manager currently manages approximately eight Account Managers,[74] and the difference of 0.05 Sales Managers between the two scenarios would be unlikely to materially impact the overall targeted staffing ratios and thus cause the Company to increase its Sales Manager staffing level in the hypothetical replacement period.

---

[72] Ratner Report, Wenzel Schedule 9 and Sutmar Schedule 9.
[73] Ratner Report, Wenzel Schedule 1 and Sutmar Schedule 1.
[74] Ratner Report, pg. 14.

HIGHLY CONFIDENTIAL

Due to the foregoing analysis, the Replacement Cost Analysis inappropriately includes hypothetical incremental costs related to additional Professional Recruiters and Sales Managers that would be required to maintain targeted staffing levels.

    *c.  Replacement Cost Analysis Relies on Several Unsubstantiated Inputs and Assumptions Without Obtaining Further Corroborating Evidence*

The Replacement Cost Analysis uses several unsupported inputs and assumptions provided by the Company without obtaining further corroborating evidence in the form of supporting schedules, supporting data or historical records. Certain examples are discussed further below.

#### Salaries and Benefits

The Replacement Cost Analysis relies on several inputs and assumptions related to average salaries and benefits for each employee position. For example, certain average salary and benefit cost assumptions are listed in a schedule[75] produced by the Company, however there is no evidence or supporting schedules providing any level of detail beyond the assumption itself. Additional unsupported cost assumptions included in the Replacement Cost Analysis include: Average Annual Sales Manager Bonus of        and an automobile allowance of     for Account Managers and Sales Managers.[76]

#### Sales and Training Meeting Assumptions

The Replacement Cost Analysis relies on several inputs and assumptions related to sales and training meeting costs, including the number of meetings typically attended per year by employee position, hotel costs, flight costs and other incidental travel costs. The inputs and assumptions are listed in a schedule[77] produced by the Company, however there is no evidence or supporting schedules providing any level of detail beyond the assumption itself.

---

[75] IG_00002150, "Comp & Training" tab.
[76] Ratner Report, Wenzel Schedule 9 and Sutmar Schedule 9.
[77] IG_00002150, "Comp & Training" tab.

HIGHLY CONFIDENTIAL

20

Corporate Recruiter Commission Costs

The Replacement Cost Analysis relies on a key assumption that Insight Global's Corporate Recruiters hire 40 Recruiters per year and earn a commission of        for each Recruiter that is hired. These inputs and assumptions used in the Replacement Cost Analysis are listed in a schedule[78] produced by the Company, however there is no evidence or supporting schedules providing any level of detail beyond the assumption itself.[79] Additionally, this calculation relies on the assumption that there is a Corporate Recruiter commission paid for each and every Recruiter hired, but does not provide any support or evidence for the assumption.

Importantly, during the normal course of business, the Company should maintain historical records, data, information and schedules related to all of these unsupported inputs and assumptions.

### d. *Replacement Cost Analysis Utilizes Unexplained or Inconsistent Methodologies*

The Replacement Cost Analysis utilizes unexplained or inconsistent methodologies and inputs. Certain examples are discussed further below.

Assumed Payroll Tax Rate of 9%

The Replacement Cost Analysis utilizes a payroll tax rate of 9% for all salary-related calculations, presumably based on a schedule produced by Insight Global (the "Payroll Tax Schedule").[80] The Payroll Tax Schedule calculates the effective payroll tax rate across salary levels. Because certain payroll taxes are capped (i.e. Social Security taxes), the effective payroll tax rate decreases as salaries increase. For example, as shown in the Payroll Tax Schedule, the effective payroll tax rate associated with a salary of $41,000 is 9.77%, and the effective tax rate associated with a salary of $162,681 is 7.28%. The Replacement Cost Analysis uses a payroll tax rate of 9% for all salary-related

---

[78] IG_00002150, "Comp & Training" tab.
[79] IG_00002150, "Comp & Training" tab.
[80] IG_00002150, "Payroll Tax" tab.

HIGHLY CONFIDENTIAL

calculations,[81] when a more precise tax rate can be calculated and used for varying salary levels. The Ratner Report does not provide an explanation as to how the 9% figure was derived or why it was selected and utilized throughout the calculations.

Methodology for Timeframes Utilized

The Replacement Cost Analysis utilizes inconsistent timeframes for certain inputs and calculations, including:

- The Attrition Rate, which is the percentage of employee turnover at Insight Global:
  - ○ Recruiter 1 Attrition Rates are based on data for the 2015 and 2016 cohorts.[82]
  - ○ In some instances, Account Manager Attrition Rates are based on data for the 2013 through 2016 cohorts, and in other instances data for the 2011 through 2013 cohorts was used.[83] The same is true for Professional Recruiter Attrition Rates.[84]
- The Conversion Ratio (the percentage of Recruiters that get promoted to Account Manager) is based on data for the 2014 through 2016 cohorts.[85]

Importantly, these ratios are significant assumptions in determining the replacement period and thus the Replacement Cost, yet the Ratner Report provides no explanation for the inconsistent methodologies.

Methodology Related to Insight Global Sectors

The Replacement Cost Analysis appears to utilize inputs and assumptions based on information for both the IT sector and the AF&E sector. Notably, each of the Former Employees focused on the IT sector, yet the Replacement Cost Analysis does not provide

---

[81] Ratner Report, Wenzel Schedule 1.
[82] IG_00002150, "Rec Term Piv" tab.
[83] IG_00002150, "AM Term" tab.
[84] IG_00002150, "Pro Term Piv" tab.
[85] IG_00001438.

HIGHLY CONFIDENTIAL